**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.T., | |
| Plaintiff, | Civil Action No. 19-989 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**MEMORANDUM OPINION**

Plaintiff, J.T., brings this action against the District of Columbia under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, the latest iteration in a long-running series of administrative hearings and lawsuits aimed at securing a special education for her son V.T.  She now challenges three separate administrative determinations—two for the 2018–2019 school year and one for the 2019–2020 school year—dismissing her claims that the District of Columbia Public Schools ("DCPS") denied V.T. a free appropriate public education ("FAPE"). She contends that, for the 2018–2019 school year, DCPS twice unilaterally determined which school V.T. would attend without ensuring her participation as required by IDEA regulations and, further, that the schools selected were substantively inappropriate because they were unable to satisfy the requirements of V.T.'s Individualized Education Program ("IEP"), resulting in denial of a FAPE for that school year.  She further contends that DCPS failed to place V.T. in any school for the 2019–2020 school year and in so doing, again, denied her son a FAPE.

Pending before the Court are the plaintiff's motion for summary judgment, *see* Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 33; *see also* Pl.'s Opp'n to Def.'s Cross-Mot. Summ. J. & Reply in Supp. Pl.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 38, and the defendant's cross-

1

motion for summary judgment, *see* Def.'s Opp'n Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J. ("Def.'s Opp'n"), ECF No. 37; *see also* Def.'s Reply Pl.'s Opp'n Def.'s Cross-Mot. Summ. J. ("Def.'s Reply"), ECF No. 40.[1]  For the reasons explained below, plaintiff's motion is granted in part and denied in part, and defendant's cross-motion for summary judgment is granted in part and denied in part.[2]

## I.     BACKGROUND

V.T. is a student-resident of the District of Columbia eligible for special education under the IDEA disability classification Autism Spectrum Disorder. *See* Admin. Record 1 ("AR1") at 219–49, ECF No. 9-3.[3]  His disorder makes it difficult for him to remain attentive, communicate with his classmates and teachers, and make progress in a general education curriculum.  *Id.* at 224.  V.T. attended Kingsbury Day School ("Kingsbury") for multiple years, but Kingsbury did not have an intensive autism program available, which eventually necessitated V.T.'s departure from the school.  *Id.* at 677.

### A.     Prior Challenges

In 2015, after realizing that Kingsbury could no longer provide the environment necessary for V.T.'s education, plaintiff, his mother, requested an IEP from DCPS.  V.T. received the requested IEP, but only after plaintiff filed an administrative due process complaint against the DCPS for its failure to issue one.  *See id.* at 790.  Following a due process hearing on the issue, on October 5, 2015, a hearing officer ordered DCPS to perform evaluations of V.T.,

---

[1]      The memoranda filed in support of some of these motions are docketed twice.  *See, e.g.*, Pl's Opp'n, ECF Nos. 38 and 39; Def.'s Opp'n, ECF Nos. 36 and 37. To simplify citation, only one of the duplicate memoranda will be referenced.

[2]      Plaintiff requested oral argument, *see* Pl.'s Opp'n at 1, but given the thorough briefing, a hearing is unnecessary.  *See* LCvR 7(f) (authorizing oral hearings at "the discretion of the Court").

[3]      The Administrative Record includes, *inter alia*, plaintiff's due process complaints, administrative hearing filings and transcripts, final determinations by hearing officers, and discussion between parties regarding V.T.'s Individualized Education Programs and access to a free appropriate public education, and is docketed in two parts, cited as AR1, ECF Nos. 9–12, and AR2, ECF Nos. 28–30.

develop an IEP for him, find an appropriate school placement, and reimburse his parents for the cost of his private education up to the time of the order and until V.T. was placed in an appropriate school. *Id.* at 789–806. This was to be the first of several administrative challenges brought by plaintiff against DCPS.

DCPS and V.T.'s parents convened and finalized his first IEP in February 2016. Plaintiff was dissatisfied with the process, however, and filed another due process complaint on April 20, 2016, alleging that DCPS had denied her meaningful participation by refusing to discuss specific school placements and "by refusing to discuss issues relating to the 'manner' of the specialized instruction such as environment, student teacher ratio, and amount of 1:1 instruction." *See id.* at 813. *See generally id.* at 811–30. On July 22, 2016, the hearing officer issued a decision favorable to plaintiff, ordering the creation of a new IEP with increased parental participation as well as both retrospective and prospective compensation for V.T.'s private education. *Id.* at 830.

In August 2016, the parties convened to create a new IEP at another meeting that was evidently adversarial. *See id.* at 839 ("Parent was brusque, if not rude, at points during… the meeting") ("DCPS staff approached the… meeting as though they were there only to answer questions and provide information"). Following this meeting, on August 31, 2016, a new IEP was finalized along the same lines as the previous iteration. *See id.* at 836–37.

V.T.'s parents filed another due process complaint challenging the August 2016 IEP. On April 3, 2017, another hearing officer found that DCPS had again denied V.T. FAPE by failing to develop an appropriate IEP that fully accounted for V.T.'s special education needs. *Id.* at 448–55. The hearing officer ordered yet another IEP meeting as well as reimbursement for V.T.'s private education for the rest of the school year. *Id.* at 858.

Another IEP meeting was convened in April 2017 and resulted in a new IEP in May 2017.  *See J.T. v. Dist. of Columbia*, No. 17-cv-1319 (BAH), 2019 WL 3501667, at *2 (D.D.C. Aug. 1, 2019), *appeal docketed*, No. 19-7136 (D.C. Cir.).  V.T.'s parents again objected to its appropriateness, however, and filed an administrative challenge.  *See id.* at *2–3.  "While that administrative complaint was pending, DCPS agreed to fund V.T.'s education at Kingsbury Day School for the 2017–18 school year."  *Id.* at *3.  The hearing officer eventually ruled against V.T.'s parents, deciding that the May 2017 IEP was appropriate.  *See id.*  Plaintiff appealed that determination to this Court, which dismissed the case as moot on the grounds that the parties had agreed to yet another IEP in 2018, and plaintiff "ha[d] not sought retrospective relief for the year that V.T. was educated pursuant to the 2017 IEP."  *Id.* at *4–6.[4]

### B.     The Challenges at Issue

In July 2018, following a collaborative meeting, the parents and DCPS created an IEP acceptable to all parties.  *See* AR1 at 219–49. The IEP, dated July 10, 2018, provided for a wide range of specialized instruction and accommodations, including twenty-four hours per week of specialized instruction, twelve hours per week of speech-language pathology, eight hours per month of occupational therapy, four hours per month of behavioral support services, 120 minutes per month of consultation divided among related services, a maximum classroom size of six students, and several methods for avoiding audio overload.  *Id.* at 678. DCPS's Monitoring Specialist, who is responsible for ensuring that students' placements satisfy the requirements of their IEPs, informed plaintiff on August 1, 2018, via email, that she would be referring the final IEP to three listed private schools, including Frost.  *Id.* at 8.  In the same email, the Monitoring

---

[4]        This decision is currently on appeal to the D.C. Circuit.  *See J.T. v. Dist. of Columbia*, No. 19-7319 (D.C. Cir.).

Specialist asked if plaintiff was interested in other schools as well, but plaintiff did not respond

to propose any other schools.  *Id.*

### i.      January 2019 (First) HOD on V.T.'s Placement at Frost

One of the schools to which V.T.'s July 2018 IEP was initially referred was Frost School-

Oakmont Primary Program ("Frost").  *Id.*  Following review of DCPS's referral, Frost sought to

observe V.T. to determine if the school could fulfill the terms of his IEP.  *Id.*  V.T. was no longer

enrolled at Kingsbury, however, and thus Frost was unable to observe him without him visiting

Frost.  *Id.* at 8–9.  Due to time constraints, Frost was unable to observe V.T. until he visited the

school over two meetings on September 6 and 12, 2018.  *Id* at 9.  During these observations,

V.T. attended art and math classes to determine whether the school fit his needs as set out in the

2018 IEP.  *Id.*

On September 12, 2018, following the visit, plaintiff emailed DCPS's Monitoring

Specialist informing her that V.T. had been observed at Frost, thanking her for the referral, and

expressing no misgivings about Frost.  *Id.*  The Monitoring Specialist responded the next day

that she was pleased the visit went well, informing plaintiff that Frost had accepted V.T., and

offering bus transportation to Frost.  *Id.*  DCPS never received a response to its offer of

transportation.  *Id.*

Following plaintiff's silence, on September 17, 2018, DCPS called plaintiff prior to

sending a Location of Services ("LOS") letter. *Id.* [5]   In this telephone call, plaintiff informed

DCPS that she was dissatisfied with Frost and told the Monitoring Specialist to contact her

attorney, refusing to discuss any specifics.  *Id.*   Following this call, DCPS forwarded both

---

[5]      A LOS letter contains information about the school, either public or private, that DCPS determines can
properly meet the needs of a child's IEP.  *See* SPECIAL EDUCATION PROGRAMS & RESOURCES GUIDE FOR FAMILIES,
D.C. PUB. SCH. 19 (2020).

Frost's acceptance letter and the LOS letter to plaintiff.  *Id.; see id.* at 250 (DCPS LOS letter identifying Frost as V.T.'s location of service, based on a review of "evaluations, IEP, IEP progress reports and educational records . . . [and] programming offered at the school," informing plaintiff of determination that the school "is able to implement [V.T.'s] Individualized Education Program and provide him with the special education he needs," and inviting plaintiff to contact Frost with questions).

The following day, plaintiff's counsel emailed the Monitoring Specialist, asserting that Frost failed to meet the terms of V.T.'s IEP and that DCPS's assignment was "procedurally illegal in at least one highly relevant way," *id.* at 1266, without detailing the statutory or regulatory basis for the alleged illegality.  Plaintiff's counsel and DCPS exchanged several emails regarding plaintiff's concerns with Frost, including its class size, students who were prone to loud outbursts, and the school's distance from V.T.'s home.  *Id*. at 10.  On September 28, 2018, the Monitoring Specialist responded that DCPS had reached out to Frost, which in turn had confirmed the school's ability to fulfill the terms of V.T.'s IEP.  *Id.*  Despite this assurance, V.T. never enrolled at Frost.  *Id.*

On October 12, 2018, plaintiff filed another due process complaint, alleging that V.T. had been denied a FAPE because Frost did not satisfy the requirements of V.T.'s IEP and because the school-selection process lacked parental input.  *Id.* at 3.  Plaintiff sought a variety of relief measures, including: (i) a finding that V.T. was denied FAPE; (ii) an order requesting DCPS to fund V.T.'s home instruction until DCPS provided an appropriate school; (iii) an order for DCPS to provide compensatory education or, in the alternative, fund an independent compensatory

evaluation to determine appropriate compensatory education;[6] and (iv) any other just and appropriate relief.  *Id.* at 4–5.

Following a hearing, the hearing officer issued, on January 11, 2019, a hearing officer determination ("First HOD"), concluding that DCPS had met its burden of persuasion on the issue of whether Frost was an appropriate educational placement, citing testimony of Frost and DCPS personnel that Frost was capable of satisfying the requirements of V.T.'s IEP and "favorably not[ing] the[ir] expertise and exercise of judgment . . . in determining that [Frost] would be suitable for [V.T.]."  *Id.* at 17.  The hearing officer found that DCPS had not prevented or disregarded parental input but rather had actively encouraged it, citing DCPS's invitation for input at the 2018 IEP meetings.  *Id.* at 18.  Accordingly, the hearing officer dismissed all plaintiff's claims for relief with prejudice.  *Id.* at 19.

### ii.    March 2019 (Second) HOD on V.T.'s Placement at the Community School of Maryland

While the dispute over Frost was ongoing, DCPS sent plaintiff a letter informing her that the Community School of Maryland ("CSM") had been chosen as V.T.'s new LOS.  *Id.* at 904.  CSM contacted plaintiff on September 6, 2018 to schedule an interview, which plaintiff agreed to and arranged.  *Id.* at 679.  Plaintiff and V.T. visited CSM and, according to the CSM director, had a positive reaction to the school.  *See id.*  ("Director of Education believed that Parent had a positive reaction to her visit at [CSM], with the only concern being whether [CSM] offered diplomas or only certificates").  DCPS sent a LOS letter to plaintiff, stating that CMS had been selected for V.T.'s placement.  *Id.*[7]  Plaintiff was notified, on October 30, 2018, that she would

---

[6]      Compensatory education is an equitable form of reimbursement appropriate when a school district does not provide a FAPE, which "aims to put a student . . . in the position he would be in absent the FAPE denial" by "'provid[ing] the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'"  *B.D. v. Dist. of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016) (quoting *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005)).

[7]      The substance of the CSM LOS letter was identical to that of the Frost CSM letter, *see supra* Part I.B.i.

need to contact the Office of the State Superintendent of Education ("OSSE") to arrange transportation, if necessary. *Id.* at 680. Plaintiff never contacted OSSE, however, and no transportation was arranged. *Id.* V.T. never enrolled to attend CMS.

On December 20, 2018, plaintiff filed another due process complaint, again alleging that V.T. had been denied FAPE because the placement at CMS was substantively inappropriate and because the process of school selection had been devoid of parental input. *Id.* at 675. Plaintiff's request for relief was the same as in the Frost hearing, namely: (i) a finding that V.T. was denied FAPE; (ii) an order requiring DCPS to fund V.T.'s home instruction and services until DCPS provides an appropriate placement; (iii) an order requiring DCPS to provide Plaintiff all of V.T.'s educational records; an order for DCPS to provide appropriate compensatory education for any denial of FAPE or, in the alternative, fund a compensatory education evaluation in order to determine appropriate compensatory education; and (iv) any other just and appropriate relief. *Id.* at 677.

At the hearing, CSM's Director of Education testified before the hearing officer that after reviewing V.T.'s IEP, he had no concerns about CSM's ability to provide V.T. an appropriate special education. He testified that he viewed V.T. "as a good candidate for the program" at CSM and "within the type of children that [CSM] deals with," and that CSM "could meet [V.T.]'s needs both behaviorally and academically." *Id.* at 679–80. DCPS's Monitoring Specialist likewise testified that she believed that CSM could service the IEP. *Id.* at 680. On March 21, 2019, the hearing officer issued his decision ("Second HOD") concluding that DCPS had met its burden of persuasion on educational placement, based on the testimony he heard that CSM could fully implement V.T.'s IEP. *See id.* at 688. The hearing officer also found ample opportunity for parental input, including the 2018 IEP meetings, the visit to CMS, and the

opportunity to email DCPS upon receiving the CMS LOS.  *Id.* at 689.  For those reasons, plaintiff's claims were dismissed with prejudice.  *Id.* at 690.

### iii.    November 2019 (Third) HOD Regarding V.T.'s 2019–2020 FAPE

Following the due process hearings and determinations regarding V.T.'s Frost and CSM placements, DCPS failed to assign V.T. to any school for the 2019–2020 school year, despite efforts to locate alternative appropriate schools.  *See* AR2 at 8, ECF No. 28-1.  On September 6, 2019, V.T.'s parents filed a due process complaint regarding DCPS's failure to provide a school placement.  *Id.* at 20.  Plaintiff requested, among other relief, funding for home instruction until DCPS provided an appropriate school.  *Id.* at 21.

While this due process complaint was pending, DCPS issued a new IEP for V.T. that allowed up to nine students in his classroom, three more than in his two preceding IEPs.  *Id.* at 823.  V.T.'s parents filed another due process complaint, this time regarding the change to V.T.'s IEP, which triggered IDEA "stay-put" rights maintaining the applicability of the 2018 IEP.  *See id.* at 11; 20 U.S.C. § 1415(j).

On November 20, 2019, the hearing officer issued his decision ("Third HOD") on DCPS's failure to assign V.T. to a school for the 2019-2020 school year.  *Id.* at 3–13.  The hearing officer found that, although DCPS had made consistent efforts to assign V.T. to an appropriate school, it did not finalize V.T.'s IEP prior to the 2019–2020 school year and did not offer him an appropriate educational placement, which amounted to denying him a FAPE.  *Id.* at 11. The hearing officer determined, however, that "[i]n light of the fact that DCPS has now developed an updated IEP for [V.T.] and is currently making referrals to non-public special education separate schools for [V.T.] to attend in SY 2019-20," an award prospective relief was

inappropriate.  *Id.* at 12.  The hearing officer did award compensatory education for V.T.'s
missed school up to the time of the hearing decision.  *Id.*

Shortly following this determination, plaintiff moved this Court for a preliminary
injunction, seeking an order requiring the District to fund independent instruction and services
until DCPS had placed V.T. in an appropriate school.  *See* Pl.'s Mot. for Prelim. Inj. at 2, ECF
No. 16.  That motion was denied on the grounds that the hearing officer acted within his broad
discretion in declining to award the prospective relief that plaintiff sought through her request for
a preliminary injunction.

Plaintiff now seeks review, via a motion for summary judgment, of the January 11, 2019
First HOD, the March 21, 2019 Second HOD, and the November 20, 2019 Third HOD.  She
seeks (1) a declaratory judgment that V.T. was denied FAPE for the 2018–19 school year, (2)
market-rate funding for V.T.'s instruction and services to be provided at home, until DCPS
provides V.T. an appropriate school placement; (3) an order compelling DCPS to fund an
independent compensatory education evaluation for the 2019–2020 school year; (4) reasonable
attorney's fees and costs; and (5) any other relief the Court deems appropriate.  Amend. Compl.
¶ 1, ECF No. 15.  The briefing on the parties' cross motions for summary judgment was
completed on June 26, 2020, and this matter is now ripe for resolution.

## II.    LEGAL STANDARD

The IDEA guarantees "that all children with disabilities have available to them a free
appropriate public education [("FAPE")] that emphasizes special education and related services
designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  Among the "various
procedural safeguards" provided in the IDEA to "guarantee parents both an opportunity for
meaningful input into all decisions affecting their child's education and the right to seek review

of any decisions they think inappropriate," *Dist. of Columbia v. Doe,* 611 F.3d 888, 890 (D.C. Cir. 2010) (quoting *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)), is the right to a due process hearing held before a hearing officer, *see* 20 U.S.C. § 1415(c).  Any party aggrieved by a decision of a hearing officer under the IDEA may appeal the findings and decision to any state court or a United States district court.  20 U.S.C. § 1415(i)(2).

The party challenging an administrative decision has the burden of proving deficiencies in the administrative decision by a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C)(iii).  When evaluating an appeal of an administrative decision, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The court must resolve factual disputes based upon its own *de novo* review of the record and evaluation of the preponderance of the evidence, giving "due weight" to the findings of the IDEA hearing officer, depending upon the thoroughness and reasonableness of the administrative proceedings.  *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *Doe,* 611 F.3d at 897.

## III.   DISCUSSION

Plaintiff argues that V.T. has been denied a FAPE, in violation of the IDEA, for the 2018–2019 school year, for two separate reasons: first, because plaintiff was excluded from the school-selection process in violation of the Act's procedural protections; and second, because the two schools DCPS selected for V.T. did not comply with the requirements of his IEP.  The District, for its part, contends that plaintiff has been afforded as much participation in V.T.'s education as the IDEA requires and, further, that the two schools selected for V.T. were capable

of implementing his IEP.  Plaintiff separately argues that V.T. is entitled to compensatory education for the first five weeks of the 2018–2019 school year and the entirety of the 2019–2020 school year, during which periods DCPS provided no proposed placement.  These contentions are discussed in turn.

### A. DCPS's Alleged Failure to Include Plaintiff in the Decisionmaking Process Regarding V.T.'s Placements for the 2018–2019 School Year Did Not Deny V.T. a FAPE

Plaintiff first contends that she was improperly excluded from DCPS's decision to place V.T. at Frost and CSM.  The IDEA requires that "[e]ach local educational agency [("LEA")] . . . shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement on their child."  20 U.S.C. § 1414(e).  More specifically, implementing regulations developed by the Department of Education require that "[b]efore a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency must initiate and conduct a meeting to develop an IEP for the child."  34 C.F.R. § 300.325(a)(1).  "The agency must ensure that a representative of the private school or facility attends the meeting."  *Id.* § 300.325(a)(2).  "If the representative cannot attend, the agency must use other methods to ensure participation by the private school or facility, including individual or conference telephone calls."  *Id.*  Thus, before placing V.T. at either of the private schools, Frost or CSM, DCPS was required by hold a meeting about V.T.'s IEP that included the parents and a representative of the school or "use other methods" to ensure participation of these interested parties.

DCPS did not convene such a meeting attended by both plaintiff and representatives of the Frost or CSM.  *See* AR1 at 1382 (testimony of DCPS Monitoring Specialist acknowledging that no IEP meeting was held with attendance by both parents and Frost representative to discuss

the Frost placement); *id.* at 1522 (testimony of DCPS Monitoring Specialist acknowledging that no IEP meeting was held with attendance by both parents and CSM representative to discuss the CSM placement). Nor were school placements seriously discussed with plaintiff, irrespective of whether a school representative was present. Although DCPS alluded in passing to Frost during the July 2018 IEP meeting, no Frost representative was present. CSM was never brought up at any meeting and likewise no CSM representative was present at any meeting.

The efforts undertaken by DCPS to find an appropriate placement for V.T. were far from trivial given the requirements of his IEP. Nonetheless, these efforts were not in full compliance with regulatory requirements. *See Dist. of Columbia v. Kirksey-Harrington*, No. 14-cv-180 (BAH/AK), 2015 WL 13651264, at *8–9 (D.D.C. Jan. 14, 2015), *report and recommendation adopted*, 2015 WL 495013 (D.D.C. Feb. 4, 2015) (finding student's placement at private school without discussing that school as a possible placement with parent, without a representative from the school present at the IEP meeting, and without explanation to the student's parent of the way in which the school would implement the IEP was an IDEA violation and a denial of FAPE); *Eley v. District of Columbia* ("*Eley I*"), No. 11-cv-309 (BAH/JMF), 2012 WL 3656471, at *9 (D.D.C. Aug. 24, 2012) (concluding that an LEA's unilateral assignment of a student to a school without convening a meeting including the parents and school representative "violated an important procedural safeguard and seriously impaired the right of the parent to participate in the process" and thereby denied the student a FAPE); *see also Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 657–58 (S.D.N.Y. 2005) (ruling that the absence of a school representative from the IEP meeting violated the procedural protections of the IDEA and denied the student a FAPE, because the student's "mother could not ask questions or raise concerns about that proposed placement with a knowledgeable individual").

13

The District neither contests nor seeks to excuse its failure to comply with 34 C.F.R. § 300.325(a), but instead responds with two arguments.[8]  First, it contends that the IDEA and its implementing regulations ensure that "[p]arents have the right to participate in the development of their child's educational program, including the design of the IEP and the determination of the type of placement; but they do not have the right to determine 'school site selection.'"  Def.'s Mem. at 22 (quoting *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 79 (2d Cir. 2014)).  The District primarily relies for this proposition on *Lunceford v. District of Columbia*, in which the D.C. Circuit adopted the interpretation of "[t]he leading [Second Circuit] precedent on what type of change constitutes a change in educational placement."  745 F.2d 1577, 1582 (D.C. Cir. 1984).  According to that Second Circuit case, "a change in educational placement occurs only when there is a change in the 'general educational program in which a child . . . is enrolled, rather than mere variations in the program itself."  *Id.* (omission in original) (quoting *Concerned Parents v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 754 (2d Cir. 1980)).  As such, the District contends, DCPS's decisions to place V.T. at Frost and then CSM were not placements within the meaning of the IDEA, and so the statute did not mandate parental participation in the decisions to have V.T. attend those schools.

This argument of the District's is unavailing.  First, the District's interpretation of *Lunceford* as meaning that "educational placement" cannot refer to the physical location at which a student receives educational services has previously been rejected by this Court. *Lunceford* involved a student who lived in a private hospital where he was also provided educational services.  *Lunceford*, 745 F.2d at 1579.  The hospital informed the student that he

---

[8]     In fact, the District barely mentions with 34 C.F.R. § 300.325(a) either in opposing plaintiff's motion for summary judgment or in support of its own cross-motion for summary judgment. *See generally* Def.'s Opp'n; Def.'s Reply.

was being discharged and recommended that he continue receiving the same educational services

on an outpatient basis. *Id.* As such, "[t]he only change at issue in *Lunceford* was the student's

residential setting, not his IEP or any other aspect of his educational setting." *Eley v. Dist. of*

*Columbia* ("*Eley II*"), 47 F. Supp. 3d 1, 11 (D.D.C. 2014). Accordingly, this Court in *Eley II*

reasoned that the D.C. Circuit's "focus on the ultimate 'change' under consideration in

*Lunceford*—namely, the student's residence—counsels against reading the case as supporting the

contention that the phrase 'educational placement' may never include a location component," *id.*

at 11–12, and noted that "many of the D.C. Circuit cases interpreting the IDEA since *Lunceford*

have used the term 'placement' interchangeably with the term 'location,'" *id.* at 15; *see also,*

*e.g.*, *McKenzie v. Smith*, 771 F.2d 1527, 1533 (D.C. Cir. 1985) (using "placement" to refer to the

student's "day program in a private special education facility"). This Court then held, "[a]bsent

binding precedent from the D.C. Circuit," that "the term 'educational placement' in the IDEA . . .

can include both the physical location of educational services and the services required by the

student's IEP." *Id.* at 16–17.

   *Lunceford* thus does not compel the conclusion that "educational placement" never refers

to the physical location of educational services. Here, the plain language of the regulation at

issue, 34 C.F.R. § 300.325, makes clear that "placement" does refer to such a physical location.

The regulation mandates that "before it "*places* a child with a disability in . . . a private school or

facility," an LEA must "initiate and conduct" an IEP meeting, and that the LEA "must ensure

that a representative of the private school or facility attends the meeting." 34 C.F.R.

§ 300.325(a)(1) (emphasis added). The requirement that a representative of the school at which

a student will be placed attend the IEP meeting would be incoherent if "place[]" as used in the

regulation did not refer to placement at a specific physical school. Other provisions of the IDEA

and its implementing regulations similarly use "place" in a manner that signifies placement at a physical site, repeatedly referring to "plac[ing]" and "placement" of children in private schools. For example, a "child's placement" must be "as close as possible to the child's home," 34 C.F.R. § 300.116(b)(3), which is unintelligible unless "placement" refers to the location at which the student receives educational services. *See also, e.g.*, 20 U.S.C. § 1415(d)(2)(H)(i); 34 C.F.R. § 300.148(a); Pl.'s Mem. at 17 n.6.

Furthermore, this interpretation comports with this Court's interpretation of the term "educational placement" in a closely related IDEA provision. In *Eley II*, this Court considered whether DCPS's decision to move a student to a different school qualified as a change in the student's "then-current educational placement" triggering the student's stay-put rights under 20 U.S.C. § 1415(j). *See* 47 F. Supp. 3d at 8–9. The parties proposed differing interpretations of "educational placement," with plaintiff contending that it "includes an actual, physical school" and the school district contending that it referred only to the student's IEP. *Id.* (quoting Pl.'s Reply Re: "Stay-Put" Prelm. Inj. at 9). This Court explained that the "plain language of the term 'educational placement' certainly does not exclude reference to a physical location," and further reasoned that "elsewhere in § 1415, the context of the word 'placement' would lead to an absurd result if it were not meant to refer to a particular location." *Id.* at 9–10. The same is true here; as explained above, "place" as used in the regulation at issue clearly refers to placement at a specific physical school. Accordingly, the decision to have V.T. attend Frost, and then CSM, were educational placements to which the procedural protections of the IDEA, including 34 C.F.R. § 300.325(a), apply.

DCPS's second response is that even if the determination of the specific school V.T. would attend is a "placement" within the meaning of the IDEA, no procedural violation occurred

because plaintiff participated in the selection process to the extent required by law.  Def.'s Mem. at 24–28.  Echoing the first two HODs, DCPS contends that because plaintiff participated "in a collaborative manner" in the July 2018 IEP meeting, she was entitled to no further participation. *Id.* at 25.  The District further notes that plaintiff was "provided information about both schools" and "invited to visit and did visit each school, and spent time in each classroom with the opportunity to ask questions" of school employees.  *Id.* at 25, 27.  What plaintiff really seeks, in the District's view, is not parental participation but rather "a veto power over any proposal or determination advanced by the [school district] regarding a change in placement."  *Id.* at 24 (alteration in original) (quoting *Doe ex rel. Gonzales v. Maher*, 793 F.2d 1470, 1489 (9th Cir. 1986)); *see also id.* at 25–27. [9]

       Whether plaintiff was denied a procedural protection of the IDEA—and she was—is a separate issue from whether that denial in turn constituted a denial of a FAPE to V.T.  A procedural violation of the IDEA is not a *per se* harm leading inexorably to a finding of denial of a FAPE, as plaintiff would have it.  Rather, "an IDEA claim is viable only if those procedural violations affected the student's *substantive* rights."  *Lesesne ex rel. B.F. v. Dist. of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006) (emphasis in original).  Thus, "[i]n matters alleging a procedural violation," a student has been denied a FAPE "only if the procedural inadequacies impeded the child's right to a free appropriate public education; significantly impeded the parent's opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parent's child; or caused a deprivation of educational

---

[9]     Although the District correctly urges that V.T. has not been denied a FAPE because plaintiff has been afforded ample opportunity for participation, its characterization that plaintiff demands a "veto power" over any proposed placement for V.T, Def.'s Mem. at 26, is incorrect. The IDEA and its implementing regulations do not require, and plaintiff does not contend, that plaintiff is entitled to unilaterally determine which school V.T. will attend or unilaterally reject a proposed placement that satisfies the conditions of V.T.'s IEP.  Plaintiff's contention is only that she has been denied a procedural protection that the Act guarantees her, and that the denial amounts to a serious deprivation of her participation rights.

benefit." 20 U.S.C. § 1415(f)(3)(E)(ii) ; *see also* 34 C.F.R. § 300.513(a)(2) (same); *Lesesne*, 447 F.3d at 834 ("[O]nly those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable." (alteration in original) (quoting *C.M. v. Bd. of Educ.*, 128 Fed. Appx. 876, 881 (3d Cir. 2005) (per curiam))). For DCPS to have denied V.T. a FAPE, therefore, plaintiff must establish by a preponderance of the evidence that the procedural violations resulted in a loss of educational opportunity or "seriously deprive[d]" plaintiff of her IDEA participation rights, *id.*  Here, although the procedural violation had some impact on plaintiff's ability to participate in the formulation of V.T.'s education, by abridging her ability to understand how Frost and CSM would specifically be able to implement V.T.'s IEP, this was not a serious deprivation, in light of the many opportunities plaintiff had for participation.

First, plaintiff had substantial opportunity to participate—and did participate—in the July 2018 IEP meeting.  *See Paolella ex rel. Paolella v. Dist. of Columbia*, 210 Fed. Appx. 1, 3 (D.C. Cir. 2006) (determining that parental involvement in the IEP-development process indicated meaningful participation such that there was no denial of a FAPE); *see also, e.g.*, *Cooper v. Dist. of Columbia*, 77 F. Supp. 3d 32, 38 (D.D.C. 2014) (finding that a procedural violation of the IDEA did not amount to denial of a FAPE because plaintiff had otherwise had "substantial input" at all stages of her child's IEP development and school placement). The notes of the July 2018 IEP meeting reflect that plaintiff participated meaningfully in the development of the IEP, with DCPS representatives asking her questions about V.T.'s ability to perform various school tasks and plaintiff explaining the specific types of educational and therapeutic activities and support she wanted V.T. to receive.  *See* AR1 at 355–65.  For instance, the notes thoroughly document the participants' discussions on such various topics as reading, writing, social and

emotional skills, speech services, occupational therapy, and classroom accommodations. *Id.* at 358–62. Furthermore, schools capable of implementing V.T.'s IEP were briefly discussed at the IEP meeting, and the meeting notes include no indication that plaintiff objected to any of the four proposed schools. *See* Def.'s Mem. at 38. To be sure, the notes indicate that schools capable of implementing the IEP under development were apparently discussed, if only briefly, and reveal that the focus of the meeting was primarily discussion of V.T.'s educational and therapeutic abilities and needs and the development of an appropriate IEP. *See* AR1 at 355–65. The fact that plaintiff was meaningfully involved in the formulation of V.T.'s IEP does not, of course, necessarily mean that she was also meaningfully involved in the determination of V.T.'s placement. That the topic of placement was broached during the meeting, however, indicates that plaintiff's participation on school selection was both solicited and welcome.

Second, plaintiff enjoyed significant participation in the form of her visits to Frost and CSM. The school visits were obviously helpful in giving plaintiff firsthand exposure to the educational environments in which DCPS proposed to place V.T. and ask questions about the schools, which opportunity she took advantage of, *see, e.g.*, *id.* at 679 (noting that plaintiff asked the CSM Director of Education whether CSM offered diplomas during her school visit). Observing the particular classrooms into which V.T. would be placed gave plaintiff information that formed the basis for her later concerns about whether Frost and CSM would be able to adequately implement V.T.'s IEP. *See, e.g.*, AR1 at 1391 (testimony of V.T., based on her visit to Frost, that the Frost classroom was too noisy for V.T.); *see also infra* Part III.B (describing plaintiff's testimony regarding her concerns about whether Frost and CSM complied with the requirements of V.T.'s IEP).

This is not to say that the regulatory violation that occurred here had no effect on plaintiff's ability to participate.  Although she was substantially involved in the 2018 IEP meeting, and school selection was briefly discussed, including mention of Frost, there appears not to have been serious discussion on the matter and CSM was never even mentioned.  Further, although plaintiff visited both Frost and CSM, and the hearing officer later heard testimony that each school would have been able to implement V.T.'s IEP, plaintiff received no explicit explanation of how either school would be able to implement the specific requirements of the IEP.  The meeting mandated by 34 C.F.R. § 300.325(a) would have presented such an opportunity for plaintiff to receive such an explanation and to voice her substantive concerns about each school before DCPS formally placed V.T. there.  Although the lack of such a meeting affected plaintiff's ability to participate, given her close, ongoing involvement in the process of developing the IEP and identifying a specific school placement, DCPS's failure to convene the meeting required by 34 C.F.R. § 300.325(a) was not a sufficiently serious deprivation of plaintiff's participation rights under the IDEA, *see Lesesne*, 447 F.3d at 834, to constitute denial of a FAPE to V.T.

Further supporting this conclusion is the language of 34 C.F.R. § 300.325(a), which provides that if the school representative is unable to attend the required meeting, the LEA "must use other methods to ensure participation by the private school or facility, including individual or telephone conference calls."  34 C.F.R. § 300.325(a)(2).  This provision indicates that the LEA has some amount of flexibility in how, precisely, the school representative participates in the IEP meeting to explain to a parent how the requirements of the IEP will be met.  This allowance that the regulation may be satisfied in a range of ways, and the space it creates for the LEA to exercise some discretion, suggests that a violation of this regulation is not so serious as to

necessarily constitute a serious deprivation of a parent's IDEA participation rights and thus a denial of a FAPE to the student.

Other courts have likewise hesitated to rule that a violation of 34 C.F.R. § 300.325(a), standing alone, is a procedural violation serious enough to support a determination that a student has been denied a FAPE. For instance, in *E.M. v. Poway Unified School District*, the district court ruled that the LEA had violated the procedural protections of the IDEA by failing to adequately explain a proposed placement, including by failing to convene the meeting required by 34 C.F.R. § 300.325(a). No. 19-cv-689, 2020 WL 229991, at *14–15 (S.D. Cal. Jan. 15, 2020). In ruling that the student had been denied a FAPE, the court noted the procedural violation but relied more heavily on the fact that the LEA had provided plaintiff with no "information regarding the classroom [E.M.] would be placed in or the curriculum that would be used." *Id.* at *14 (alteration in original) (quoting Doc. No. 27 at 29). Plaintiff here, having visited both Frost and CSM, does not find herself in the same position; the court in *E.M.* specifically observed, in fact, that the LEA had failed to arrange for the parents to visit the proposed school. *Id.*; *see also Werner*, 363 F. Supp. 2d at 659 (ruling that student was denied a FAPE when LEA not only failed to hold meeting with school representative but also failed to ensure that a school representative "contacted [student's] parents either before or after the meeting").

Similarly, in *A.V. ex rel. Vaz Antunes v. Lemon Grove School District*, the district court acknowledged that 34 C.F.R. § 300.325 had been violated but held this did not amount to a serious infringement of parental participation, and thus no denial of a FAPE occurred, because of "substantial evidence in the record of an interactive and dynamic process between the parents and the various IEP team members," including a visit by the parents to the school. No. 3:16-cv-

803-CAB-(BLM), 2017 WL 733424, at *13 (S.D. Cal. Feb. 24, 2017) (quoting *R.A. v. West Contra Costa Unified Sch. Dist.*, 2015 WL 4914795, at *19 (N.D. Cal. Aug. 17, 2015)). Likewise, in *R.A. v. West Contra Costa Unified School District*, the district court appears to have found a 34 C.F.R. § 300.325(a) violation but declined to find a denial of a FAPE because the violation did not seriously infringe on the parents' participation, citing the fact that the district organized for the parents to visit the school and meet with school representatives—just as plaintiff did here—and that the parents "had the opportunity to meaningfully participate in the IEP process."  2015 WL 4914795, at *19.

Plaintiff's reliance on cases in which a procedural defect was found to amount to a denial of a FAPE is misplaced.  Those cases involved parents largely excluded from the IEP-development and school-placement processes, making the repercussions from the procedural violation far more serious than the technical violation that occurred here.  *See Eley I*, 2012 WL 3656471, at *9 (finding denial of a FAPE when the parent was completely excluded from the IEP meeting); *Kirksey-Harrington*, 2015 WL 13651264, at *8–9 (finding denial of a FAPE when DCPS placed student at a private school without coordinating a visit and without attempting to address concerns about the placement explicitly raised by parent); *Werner*, 353 F. Supp. 2d at 659 (finding denial of a FAPE when parent was provided no information about a proposed placement and LEA never arranged a school visit).

In sum, a violation of 34 C.F.R. § 300.325(a) has been found to contribute to denial of a FAPE only when accompanied by other significant shortcomings in ensuring parental involvement in development of the student's IEP and selection of his or her specific school placement.  Here, although DCPS failed to comply with the letter of the regulation, DCPS otherwise afforded plaintiff ample opportunity to participate; thus, notwithstanding the

regulatory violation, the hearing officer correctly determined that the procedural violation did not rise to the level of a serious deprivation of plaintiff's IDEA participation rights. *See* AR1 at 17–19, 688–90.

DCPS, on the whole, acted diligently and conscientiously in attempting to place V.T. for the 2018–2019 school year at a school that was satisfactory to plaintiff and capable of servicing V.T.'s IEP, and actively involved plaintiff in that process.  The significant opportunities that plaintiff has had to shape V.T.'s education mean that DCPS's failure to hold the meeting required by 34 C.F.R. § 300.325(a), though it did have some effect on plaintiff's ability to participate in shaping her son's education, did not deny V.T. a FAPE.

At the same time, some caution to DCPS is warranted. Meticulous compliance with all the procedural requirements of the IDEA fosters parental participation by encouraging timely objections to a student's proposed IEP or school placement and prompt resolution of those objections.  Indeed, had the required meeting been convened here, the parties may well have been able to address productively the substantive objections plaintiff had to the Frost and CSM placements, potentially obviating this litigation.  The record indicates that DCPS's policy and standard operating procedure is not to convene IEP team meetings including a school representative prior to placing a student in a private school, as 34 C.F.R. § 300.325(a) clearly requires.  DCPS should undertake careful review of that policy to determine if it regularly infringes on parents' participation rights under the IDEA.  Though it did not do so here, in other contexts a violation of 34 C.F.R. § 300.325(a) may well amount to a denial of a FAPE.

### B.   Plaintiff Has Failed to Show That Frost and CSM Could Not Implement V.T.'s IEP for the 2018–2019 School Year

Plaintiff next contends that DCPS denied V.T. a FAPE because the Frost and CSM placements did not comply with the requirements of his IEP, and that the hearing officer erred in

ruling that DCPS had proven that each placement was appropriate for V.T.  Pl.'s Mem. at 21.

"The IDEA requires school districts to offer placement in a school and in programming that can

fulfill the requirements set forth in the student's IEP."  *Middleton v. Dist. of Columbia*, 312 F.

Supp. 3d 113, 143 (D.D.C. 2018).  Importantly, in reviewing a HOD, the courts are not "to

substitute their own notions of sound educational policy for those of the school authorities which

they review."  *Rowley*, 458 U.S. at 206.  "[D]eference [to the adequacy of an IEP] is based on the

application of expertise and the exercise of judgment by school authorities."  *Endrew F. ex rel.*

*Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1001 (2017).  As such, "[c]ourts sitting on

an [IDEA] appeal do not have unfettered review but 'must . . . give 'due weight' to the

administrative proceedings and afford some deference to the expertise of the hearing officer and

school officials responsible for the child's education."  *Gill v. Dist. of Columbia*, 751 F. Supp. 2d

104, 108–09 (D.D.C. 2010) (quoting *Lyons v. Smith*, 829 F. Supp. 414, 418 (D.D.C. 1993)).

Furthermore, the hearing officer is best positioned to make credibility judgments as to testifying

witnesses and resolve factual disputes that amount to inconsistent testimony.  *Cf., e.g.*, *United*

*States v. Vega*, 826 F.3d 514, 543 (D.C. Cir. 2016) ("[T]he 'district court's credibility

determinations are entitled to the greatest deference from this court on appeal.'" (quoting *Carter*

*v. Bennett*, 840 F.2d 63, 67 (D.C. Cir. 1988))).

Plaintiff identifies three ways in which both Frost and CSM were inadequate placements

pursuant to the V.T.'s IEP, asserting that: transporting V.T. to those schools was not feasible, the

school's classrooms had too many students, and, relatedly, the classrooms were too noisy.  Pl.'s

Mem. at 21–22.  These three aspects of the Frost and CSM placements are examined separately.

i.      Transportation

At the hearings underlying the First and Second HODs, plaintiff testified that V.T. would

be unable to attend either Frost or CSM because each was too far from her home and because he

could not tolerate the long bus ride to and from school.  AR1 at 16, 681–82.  She explained that

for V.T. to commute to both Frost and CSM requires a one-hour car trip each way, including the

breaks that he must take en route because of the distress V.T. suffers as a result of being in the

car for an extended time period. *See id.* at 686; *id.* at 1386 (testimony of V.T.'s mother that

commuting to Frost takes between 30 minutes and one hour in the morning and between 45

minutes and one hour in the afternoon, and that "[l]ong trips for [V.T.] are very difficult. . . .

[H]e cannot stay in place for a long time, so I have to stop . . . ."); *id.* at 1584 (testimony of

V.T.'s mother that commuting to CSM takes between one hour and five minutes and one hour

and fifteen minutes each way).  As plaintiff explained, the difficulty of the morning commute, in

particular, renders V.T. too upset to participate in school once he arrives.  *Id.* at 1586–87.

These objections to the Frost and CSM placements are concerning but distance traveled

to school was not discussed at the IEP meeting, nor included or referenced in the IEP.  Rather,

the IEP allows for "special education transportation on a DOT vehicle," without requirements

related to the school's distance from plaintiff's home.  *Id.* at 678.  Since the IEP does not require

that V.T.'s placement be within a certain distance of his home, DCPS has not denied him a

FAPE by failing to place him at a close-in school.  *See, e.g., Petties v. Dist. of Columbia*, 238 F.

Supp. 2d 114, 116 (D.D.C. 2002) ("Once the IEP is developed, the school system must provide

an appropriate placement that meets those needs . . . .").  Rather, the appropriate course of action

would be to update V.T.'s IEP to include these transportation requirements, as the second HOD

explained.  AR1 at 686.  Plaintiff objects that the hearing officer erred by concluding in the

second HOD that the CSM placement was appropriate based on "[t]he possibility that special transportation needs 'could' theoretically be added to V.T.'s IEP," Pl.'s Mem. at 25, but DCPS is not to be faulted for failing to satisfy conditions that are not memorialized in the IEP.

Furthermore, as explained in the First HOD, plaintiff's testimony during the Frost hearing indicated that another solution to the transportation problem was for plaintiff to drive V.T. to school and to delay his start time each morning, so as to allow him time to arrive at school, recover from the commute, and be prepared to participate in educational services. *See* AR1 at 16. Plaintiff testified that she would be open to this plan, as long as she otherwise was satisfied with the school. *Id.* at 1413–15.[10] This "ready solution to a serious problem," *id.* at 16, further supports the hearing officer's determinations that both Frost and CSM could implement V.T.'s IEP notwithstanding plaintiff's transportation-based objections.

### ii.    Classroom noise

Plaintiff's second concern with the Frost and CSM placements was classroom noise. V.T.'s IEP provides "steps to assist in decreasing noise: (a) minimal risk for instruction and independent work, (b) use of a rug to decrease noise from tapping/walking, (c) adults speaking in low, calm tone to V.T., and (d) noise cancelling headphones for use while V.T. works on independent tasks." AR1. at 678.

At the hearing on the Frost placement, plaintiff testified that V.T. had been overwhelmed during his visit to Frost because other children in the classroom were non-verbal and therefore

---

[10]    Plaintiff objects that this testimony should be "dismiss[ed] from consideration" because it arose from an exchange initiated by the hearing officer "ask[ing] [plaintiff] what she was 'willing' to do." Pl.'s Mem. at 24. The hearing officer asked plaintiff if she would be amenable to this arrangement, over her counsel's objection that "the question posed was not a fact question but a demand that plaintiff take a position . . . without the benefit of consulting counsel." *Id.* Plaintiff argues this point only cursorily, has provided no argument on whether the hearing officer committed an error of law or abused his discretion in denying plaintiff's counsel's objection, and offers no analysis other than the bald assertion that "the Hearing Officer blatantly denied plaintiff her IDEA right to counsel." *Id.*

communicated by noise, including screaming.  *Id.* at 1391–92 (testifying that "[t]he noise was quite overwhelming for [V.T.]" and that it bothered him "very much").  She further testified that there were no "quiet areas" and that the classroom did not have "minimal noise and distraction" as required by V.T.'s IEP.  *Id.* at 1394.  A Frost teacher offered V.T. noise-cancelling headphones, however, which are included in his IEP as an appropriate means of ensuring a quiet classroom for V.T.  *Id.* at 1391–92.  The hearing officer, after noting that school transitions are difficult for any student, ruled that "a visit to a new classroom in which [V.T.] encountered challenges does not mean the school was automatically inappropriate," especially in light of the opinion of Frost and DCPS representatives that the school was capable of servicing V.T.'s IEP and the fact that he would not have been accepted there had the school not believed it was so capable. *Id.* at 16–17.

At the CSM hearing, plaintiff testified that most students in the classroom were nonverbal and could communicate only by making noise.  *Id.* at 681.  The Director of Education, in contrast, testified "credibly" in the hearing officer's view that "most of the children in the class for [V.T.] were very verbal."  *Id.*  The DCPS Monitoring Specialist confirmed that CSM could satisfy the noise requirements of V.T.'s IEP, *id.* at 1659, 1663, and, on the basis of this testimony, the hearing officer determined that CSM was capable of implementing V.T.'s IEP as to noise requirements.  *Id.* at 681.

Both of these determinations by the hearing officer, and the testimony of DCPS and school representatives underlying them, are entitled to considerable deference.  *See Endrew F.*, 137 S. Ct. at 1001; *Rowley*, 458 U.S. at 206.  As to the First HOD, plaintiff quibbles that the availability of noise-cancelling headphones at Frost "is distinct from the requirement of quiet generally."  Pl.'s Mem. at 27.  This is too thin a reed, however, to second-guess the expertise-

informed views of the hearing officer, the school representatives, and the DCPS representatives that Frost and CSM would be capable of servicing V.T.'s IEP.  As to the Second HOD, plaintiff speculates that the hearing officer impermissibly based his opinion about noise at CMS on statements made by a DCPS employee whom plaintiff never had the opportunity to cross-examine.  *See id.* at 27–28.  The essence of this objection appears to be that the Monitoring Specialist who testified that CMS could implement V.T.'s IEP also testified that she had never been to CSM; so, plaintiff infers, her testimony must have been based on information provided her by another DCPS employee whom plaintiff did not cross-examine, in violation of the IDEA, *see* 20 U.S.C. § 1415(h)(2).  This objection too is unpersuasive.  The Monitoring Specialist has expertise as to the private schools into which DCPS places students, and the courts have been specifically directed to, and do, rely on and defer to such expertise.  *See Rowley*, 458 U.S. at 206; *Gill*, 751 F. Supp. 2d at 109.  That deference would be disserved if an LEA in an IDEA administrative hearing were required to put into the record *every* basis for its representatives' knowledge and expertise.

### iii.    Classroom size

Plaintiff's final substantive objection to the Frost and CSM placements is that neither could satisfy the requirement of V.T.'s IEP that his classroom should have no more than six children, including himself.  Pl.'s Mem. at 28; *see* AR1 at 678.  At the due process hearing on Frost, plaintiff testified that seven students had been in the classroom during her visit, not including V.T.  *Id.* at 1389–90.  DCPS's monitoring specialist, who had been employed at Frost a year prior, testified that V.T. would have been the sixth student in a classroom of six, in accordance with his IEP.  *Id.* at 1486.  The hearing officer found that the DCPS "Monitoring Specialist credibly testified that [Frost] had a limit of six children in the classroom intended for

28

[V.T.]," *id.* at 11, and concluded that the likely explanation was that plaintiff had miscounted the number of students in the classroom. *Id.* at 16.

The testimony was similar at the CSM hearing.  Plaintiff testified that seven students were in the class when she visited, and that each child had a dedicated aide, further increasing the number of people in the classroom. *Id.* at 680–81.  The Director of Education, in contrast, testified that, at the time of plaintiff's visit, only four students were in the class into which V.T. would be placed. *Id.* at 680, 686–87.  The hearing officer found that the CSM Director of Education's testimony was credible and credited that the number of students in the classroom satisfied the requirement of V.T.'s IEP. *Id.* at 686–87.

This dispute over how many students were in the Frost and CSM classrooms boils down to conflicting testimony, the hearing officer's resolution of which should be deferred to so long as that determination is reasonable on the record.  The hearing officer heard the witnesses' testimony and was best positioned to make a judgment as to their credibility.  He reasonably determined that the school and DCPS representatives, familiar as they were with the classrooms in question, stated the correct number of students in each classroom.  No evidence in the record indicates that that credibility determination was unreasonable.

\* \* \*

In sum, then, the expert judgment of DCPS and representatives of Frost and CSM was that both of those schools could provide V.T. a special education pursuant to the parameters of his IEP.  The hearing officer heard testimony from those parties and from plaintiff and determined that both schools were in fact capable of complying with the terms of the IEP.  Those determinations are reasonably supported by the administrative record.  In light of that record support and in light of the deference owed to the hearing officer and the education specialists

29

responsible for V.T.'s education, plaintiff has therefore failed to show by the preponderance of the evidence that the hearing officer erred in deciding that Frost and CSM were capable of implementing V.T.'s IEP.

### C.   V.T. Is Not Entitled to Compensatory Education for the First Five Weeks of the 2018–2019 School Year

Plaintiff contends that even if the Frost was a substantively appropriate placement for V.T., he was denied a FAPE for the first five weeks of the 2018–2019 school year.  Pl.'s Mem. at 22.  The school year began on August 20, 2018, whereas the Frost placement that DCPS proposed would not begin until September 24, 2020, five weeks later.  AR1 at 1380.  V.T. was thus left without a placement for that five-week window.  DCPS does not contest the discrepancy between the beginning of the school year and V.T.'s start date at Frost but responds that plaintiff bears responsibility for the missing weeks because communication with her has proven difficult and she sometimes does not timely respond to emails.  *See* Def.'s Mem. at 35–37.[11]  Even crediting some communication issues with plaintiff, she does not appear to be wholly at fault for the delay, which is at least partially attributable to logistical difficulties, for example, with scheduling school visits.  *See id.* at 35–36.

As already noted, DCPS acted diligently in attempting to locate a placement for V.T. for the 2018–19 school year, and continued to circulate referrals to local private schools once plaintiff had filed due process challenges to the Frost and CSM placements, *see* AR2 at 6.  As plaintiff notes, neither the First HOD nor the Second HOD explicitly addressed this five-week gap during which V.T. was left without a placement.  In any event, though, the hearing officer's implicit determination that V.T. was not denied a FAPE by a five-week delay in his start date

---

[11]      English is not plaintiff's native language, and she has often preferred to communicate with DCPS through her lawyer, both of which may have contributed to communication difficulties with DCPS.  *See* Pl.'s Mem. at 6, 23 n.11.

was reasonable, particularly when DCPS had identified a placement for V.T. that would, it was determined, be capable of servicing his IEP.  LEAs must have some administrative flexibility in locating a school that can satisfy a student's IEP, *cf. Lunceford*, 745 F.2d at 1582 & n.5, and enforcing rigid adherence to strict deadlines would be more likely to frustrate than facilitate the goal of finding a suitable school.

Furthermore, in the context of fashioning relief when a student has been denied a FAPE, courts have countenanced hearing officers' orders to an LEA to identify an appropriate placement, or convene an IEP meeting, within some reasonable time limit (for instance, a month). *See, e.g.*, *Pinto v. District of Columbia*, 938 F. Supp. 2d 25, 28 (D.D.C. 2013) (observing that the hearing officer "ordered DCPS to conduct appropriate evaluations of [the student] and convene a meeting to revise his IEP as appropriate within 30 days of a written request by plaintiffs").  Obviously, an LEA may not be able instantaneously to place a student in an appropriate school.  Clearly, then, some limited amount of time without a placement does not necessarily amount to a denial of a FAPE.  Given the flexibility afforded to LEAs in securing a placement, the fact that this was a short, discreet gap rather than an open-ended, indefinite period of no placement, and the fact that Frost could have implemented V.T.'s IEP, plaintiff has not shown by a preponderance of the evidence that V.T. is entitled to compensatory education for that five-week lacuna.

### D.    V.T. Is Entitled to Compensatory Education for the 2019–2020 School Year

The third and final HOD at issue concerns the 2019–2020 school year.  As noted, the hearing officer determined that DCPS denied V.T. FAPE by "not offer[ing V.T.] an educational placement at the start of SY 2019-2020," AR2 at 11, and, accordingly, ordered DCPS to provide V.T. approximately three months of appropriate compensatory education, *id.* at 12.  DCPS did

31

not appeal that decision.  At the same time, however, the hearing officer declined to grant

plaintiff her requested prospective relief of "fund[ing], at market rates, [V.T.'s] instruction and

services, including access to all standard and necessary materials and resources, at home until

DCPS provides [V.T.] an appropriate school placement."  *Id.* at 4.  Plaintiff appeals that

decision, arguing that "[b]y leaving V.T. without an education indefinitely after finding an

ongoing denial of FAPE, the Hearing Officer ruled against the equities, against the IDEA's clear

purpose, and against the public interest."  Pl.'s Mem. at 32.  Plaintiff asks that the "[t]his

Court . . . overturn that ruling and order prospective and compensatory relief for DCPS's

ongoing failure to place V.T. in an appropriate school."  *Id.*

   This is not the first time that the dispute over V.T.'s 2019-2020 educational placement—

or lack thereof—has come before this Court.  As noted, shortly after the Third HOD was issued,

plaintiff moved, in December 2019, for a preliminary injunction.  She sought the relief denied by

the hearing officer—namely, an order that "the District . . . fund independent instruction and

services, and related materials and resources, at home through independent providers until it is

determined that DCPS is providing V.T. an appropriate school placement."  Pl.'s Mot. for

Prelim. Inj. at 2, ECF No. 16.

   Plaintiff's request was denied at a hearing on December 23, 2020, despite presenting "a

very troubling situation."  Dec. 23, 2019 Hr'g Tr. ("Hr'g Tr.") at 57:13, ECF No. 34.  Yet, "[a]

hearing officer has broad discretion to fashion a remedy," *id.* at 57:20; *see Lopez-Young v.

District of Columbia*, 211 F. Supp. 3d 42, 57 (D.D.C. 2016) ("A Hearing Officer has broad

discretion to fashion a remedy where he finds that a school district has denied a child FAPE.");

*see also Adams v. District of Columbia*, 285 F. Supp. 3d 381, 393 (D.D.C. 2018) ("Because [the

hearing officer] made 'reasoned and specific findings' regarding [the student's] disabilities and

past IEPs, this Court gives 'due weight' to his conclusions and 'exercise of discretion' in determining appropriate relief for the FAPE violations identified in the HOD." (quoting *Turner v. District of Columbia*, 952 F. Supp. 2d 31, 35–36 (D.D.C. 2013)), and in issuing the Third HOD, the hearing officer had acted within that discretion.  Specifically, he determined that "the prospective order" plaintiff sought "was unnecessary because DCPS [was] currently making referrals to non-public special education separate schools for VT to attend."  Hr'g Tr. 58:12–14.  That conclusion was reasonable, given that "IDEA cases often result in an order to a school district to revise an IEP and/or propose a new placement within a short period of time rather than an order granting the placement requested by the Plaintiff."  *Id.* at 58:19–22; *see, e.g.*, *Adams*, 285 F. Supp. 3d at 393 (upholding hearing officer's decision ordering "an IEP review and revision, rather than prospective placement at [plaintiff's chosen school]" and explaining that "such relief is not unusual in IDEA cases, including those in which the plaintiff requests private-school placement"); *G.G. ex rel. Gersten v. District of Columbia*, 924 F. Supp. 2d 273, 282 (D.D.C. 2013) (upholding hearing officer's directive "to convene [a multi-disciplinary] or IEP meeting" in lieu of ordering plaintiff's requested placement); *Pinto*, 938 F. Supp. 2d at 28 (observing that the hearing officer "declined . . . to grant plaintiffs' request for publicly funded placement at [plaintiffs' chosen school]" and "instead ordered DCPS to conduct appropriate evaluations of [the student] and convene a meeting to revise his IEP as appropriate within 30 days of a written request by plaintiffs").  Plaintiff's motion was thus denied, but with the opportunity to refile later if the "potential schools and referrals that have been made by DCPS all fall apart."  *See id.* at 60:4–5.  Plaintiff did not appeal the denial of her motion for a preliminary injunction, nor did she renew the motion when DCPS failed to make a prompt placement.

Although plaintiff's motion for a preliminary injunction was denied, her motion for summary judgment arises in different circumstances.  The 2019–2020 school year is over, yet still V.T. has not been placed.  *See* Pl.'s Mem. at 29–30; Def.'s Mem. at 37, 40–41. Accordingly, the question is no longer whether the hearing officer was required to grant plaintiff's request for publicly funded home instruction before DCPS could attempt to find V.T. a new placement.  Now, the question is whether the hearing officer erred by permitting DCPS not to place V.T. indefinitely—through the rest of the school year and beyond.

The answers to these two questions are different.  True, "[a] Hearing Officer has broad discretion to fashion a remedy where he finds that a school district has denied a child a FAPE," *Lopez-Young*, 211 F. Supp. 3d at 57, and that remedy can include allowing DCPS a reasonable period of time to identify a new placement, *see Adams*, 285 F. Supp. 3d at 393; *Pinto*, 938 F. Supp. 2d at 28; *G.G.*, 924 F. Supp. 2d at 282; *see also Struble v. Fallbrook Union High Sch. Dist.*, No. 07cv2328-LAB (CAB), 2011 WL 291217, at *7–8 (S.D. Cal. Jan. 27, 2011) (upholding hearing officer decision to "order[] the parties to meet again and develop a new IEP . . . rather than ordering a placement for [the student]").  Plainly, however, DCPS's time for proposing a new placement must be limited.  To hold otherwise would be to sanction the very conduct that required the hearing officer to issue a decision in the first place: failure to provide *any* instruction or services to V.T.  Thus, to the extent the third HOD has allowed DCPS to deny V.T. a FAPE throughout the rest of the 2019-2020 and now into the following school year, that decision was in error.

DCPS counters that a placement for V.T. for the 2019-2020 school year was in fact proposed, explaining that "since the November 20, 2019 HOD was issued, DCPS offered Plaintiff the option of having V.T. attend Garrison Elementary School [("Garrison")],

Communication and Education Support (CE) classroom, as an interim/temporary arrangement until a nonpublic school can be secured." Def.'s Mem. at 41. DCPS, however, has previously admitted that Garrison does "not fully" comply with V.T.'s current IEP, because "it's not a separate day school which is what's required by the July 2018 IEP," and because at Garrison "VT would be the eighth student in the classroom." Dec. 23, 2019 Hr'g Tr. at 42:14–15, 24. Accordingly, DCPS did not cure its failure to provide V.T. a FAPE in 2019-2020 by offering to place V.T. at Garrison.

In sum, the Third HOD erroneously permitted DCPS to deny V.T. a FAPE indefinitely, and V.T. is therefore entitled to compensatory education for the entire 2019–2020 school year, as well as an independent education evaluation to ascertain what, if any, progress V.T. would have made during the 2019–2020 school year, and by extension determine the compensatory education that V.T. needs. *See Walker v. District of Columbia*, 157 F. Supp. 2d 11, 20 (D.D.C. 2001) ("Where a school system fails to provide special education or related services, a student is entitled to compensatory education."); *see also* AR2 at 12 (ordering DCPS to grant plaintiff "authorization for an independent education evaluation" because plaintiff "did not present any evidence as to compensatory education and there [was] no evidence in the record from which the Hearing Officer [could] fashion an award"). DCPS must likewise promptly identify, in collaboration with plaintiff, a new placement that complies with V.T.'s current IEP.

## IV.    CONCLUSION

For the foregoing reasons, DCPS did not deny V.T. a FAPE for the 2018–2019 school year, either by denying plaintiff procedural rights under the IDEA or because its proposed placements failed to comport with V.T.'s IEP. V.T. is entitled, however, to compensatory education for DCPS's failure to identify an appropriate placement for him for the 2019–2020

school year.  Finally, DCPS must identify a new placement that complies with V.T.'s current IEP within one month of the date of this decision, or else provide V.T. compensatory education for time that he is not placed after that date.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: October 1, 2020

_____
BERYL A. HOWELL
Chief Judge