THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.T.<br>　　　　Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA<br>　　　　Defendant. | Civil Action No. 19-989<br>(BAH) |

## VERIFIED STATEMENT OF DOUGLAS TYRKA

1. I am over 18 years of age and competent to testify regarding the matters described herein.

2. I am the sole owner of Tyrka & Associates, LLC, counsel for the Plaintiff in this case.

3. The times and expenses itemized in the itemizations attached to the Plaintiff's Motion for Attorneys' Fees and Costs accurately represent the times spent and expenses incurred by Tyrka & Associates in litigating this case, as those items were contemporaneously recorded.

4. All of the work identified as mine was performed by me personally. I personally entered and edited all the itemizations.

5. In recording times, Tyrka & Associates does not record times for tasks taking less than several minutes each and does not record times for various administrative tasks, even when those tasks are case-specific.

6. Tyrka & Associates does not record travel time when the staff member in question can accomplish multiple tasks with the same trip, as is often the case. When Tyrka & Associates does record travel time, it is billed at one-half the staff member's ordinary rate.

7. The items in the itemizations marked "NC" are items which I, in my conservative judgment, believed should not reasonably be charged to either party. In reviewing and adjusting an itemization, in addition to striking items by marking them with "NC" as shown, I also wholly

delete entries from the original, contemporaneous time records when I deem it unreasonable to identify them as reasonable charges attached to this litigation.

8.     From its inception in 2005 Tyrka & Associates has always exclusively charged at hourly rates matching those in what is commonly known as "the LSI *Laffey* Matrix," the *Laffey* Matrix adjusted for changes in the legal services component of the Consumer Price Index as described in *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 61 (D.C. Cir. 2015) and other cases. The LSI *Laffey* Matrix is available from multiple sources, and is reproduced as an exhibit to the Plaintiff's Motion, Exhibit 6. The current LSI *Laffey* Matrix rate for my experience is $919+/hour.

9.     Though Tyrka & Associates has historically primarily represented clients who cannot afford representation, the firm has had several clients pay the firm at the LSI *Laffey* Matrix rates directly, regardless of whether reimbursement is ever obtained.

10.    In 2021, the District of Columbia settled Tyrka & Associates' bill for an IDEA case based on hourly rates equal to 100% of the rates in the LSI *Laffey* Matrix.

11.    In 2020, the District of Columbia settled Tyrka & Associates' bill for three IDEA cases based on hourly rates equal to 100% of the rates in the United States Attorney's Office's attorney's fees matrix (USAO Matrix), for 95% of the total bill.

12.    In 2019, the District of Columbia settled Tyrka & Associates' bill for an IDEA administrative case based on hourly rates equal to 100% of the rates in the United States Attorney's Office's attorney's fees matrix (USAO Matrix), rounded from $102,000 to $100,000.

13.    In 2018, the District of Columbia paid, in settlement, Tyrka & Associates' bills for six IDEA administrative cases in full, based on hourly rates equal to 100% of the rates in the United States Attorney's Office's attorney's fees matrix (USAO Matrix).

14.     The expenses in the itemization presented in this case are the charges customarily paid in this field in this jurisdiction.

15.     I received my juris doctorate from the University of Texas School of Law at Austin in June of 1998. Since my graduation from law school, I have worked exclusively in litigation. Since the middle of 2003, at least 90% of my practice has been in the field of special education law, representing parents in the District of Columbia. In my conservative and educated estimate, I have litigated over 1000 IDEA administrative cases and over 50 IDEA federal cases. I have won private school placement – the most substantial relief obtainable in IDEA cases – for more than 100 children, in my conservative estimate.

16.     Tyrka & Associates and I in particular are known as experts in special education law in the District of Columbia. I am active in the community of "parent attorneys" in the District of Columbia. Aside from my contributions to semi-public discussions among members of the bar, I often advise other parent attorneys, including very experienced ones. Approximately once per week I answer a telephone call or email from a parent attorney seeking advice on a case. Other IDEA attorneys regularly ask me to take IDEA cases from them to the federal courts.

17.     During contentious fees litigation during the last 15 years, the District of Columbia has never questioned my experience, reputation, and expertise in this field. The District has acknowledged my expertise in the field in court.

18.     In addition to my work as a special education lawyer, I have also worked on "Title VII" employment discrimination cases in federal court, "Section 1983" civil rights cases in federal court, and one complex wrongful death case involving medical technology and possible medical malpractice. I have found legal work under the IDEA to be far more complex than Title VII work

3

and civil rights work and somewhat more complex than the wrongful death work. This complexity results from several factors.

19. Every IDEA case requires specialized non-legal knowledge regarding special education. Every case requires knowledge of education policies, procedures, techniques, best practices, records, and administration. Almost every case requires knowledge of specialized disciplines, including psychology, speech and language pathology, occupational therapy, physical therapy, and medicine, and others. A competent IDEA litigator must know enough of those disciplines to understand and critique evaluations, cross-examine experts, and work with one's own experts. Moreover, because school districts use their regular staff as experts but parents' expert witness fees are not reimbursable, IDEA litigators must often rely on their own knowledge instead of that of experts.

20. The reason that the particular wrongful death case I noted was closer in complexity to IDEA cases than the other work I mentioned is that the wrongful death case required me to educate myself in non-legal areas regarding medical technology and medicine in general. I still consider that work to be less complex than IDEA work, because IDEA work has required me to acquire knowledge in many more non-legal areas, and for the reasons listed in the next paragraph.

21. There is very limited discovery and pretrial exchange between the parties in IDEA cases, but that usually makes the preparation and litigation of IDEA cases more complicated, especially because hearing officers typically allow respondents to spontaneously adjust defenses. Before the start of an IDEA hearing, and often well into a hearing, I have little idea what positions the respondent will take beyond "Respondent did not deny FAPE." For that same time, I often have little idea upon what documents the respondent will rely and for what purpose, because even

though those the documents must be disclosed, there is no advance knowledge of what portions of what documents the respondent will emphasize, from a file possibly hundreds or thousands of pages thick. Similarly, though the respondent may disclose five to twenty potential witnesses, because hearing officers almost never require any warning of witnesses' testimony, I have no idea until the close of the parent's case which witnesses will appear or what each witness – including expert witnesses – will say. For these reasons, in a typical case and usually even in a simple case, I must prepare for very many potential defense cases presented by the respondent.

22.     I have worked on both administrative and federal court IDEA cases. In my experience the administrative work is generally at least as complex as the federal work. The work in both venues involves the same legal questions. The federal work requires much more writing, and often more research as a result. But because at the administrative level the legal issues are rarely well defined until closing argument, at the administrative level one usually needs much more legal preparation and a much better general IDEA familiarity than is required at the federal level. Similarly, because there is no discovery at the administrative level, one often does not know what the key evidence, including testimony, is until well into the hearing, so one must be very familiar with every existing document and must prepare for a broad range of surprise testimony, including possible testimony from a diverse range of experts.

23.     I have entered into hourly rate retainers with many clients, in various areas of law. I and the firms for which I have worked have always set my hourly rate at the outset of the relationship. I have varied my hourly rates over time, but I have never changed my hourly rate based on the expected complexity of a case. I have not done that because the total cost of more complex litigation is already captured by the greater number of hours spent on more complex cases and because it is often difficult to judge the complexity of a case at the outset.

24.     In the past, for several years my firm litigated hundreds of IDEA cases each year for non-paying clients, that is, with no expectation of payment other than from court awards pursuant to the IDEA's fee-shifting provision. In the last several years, it has become very difficult to earn a reasonable income from that work, and in my experienced opinion, impossible to maintain a law firm that relies upon that work for the majority of its work.

25.     Below I review the history of my efforts to obtain fees for my IDEA work outside of litigation and explain why IDEA work for non-paying clients has become very financially difficult.

26.     Before 2009, DCPS paid for my work voluntarily, without litigation, in several hundred cases. I was paid for my IDEA work in at least 95% of cases at 100% of what I had billed, and was often paid from a few months to one year after performing the work. The small number of cases for which I was not fully paid were cases in which the bills had exceeded the attorneys' "fee cap" then in effect in the District of Columbia.

27.     On multiple occasions, the DCPS attorney responsible for reviewing IDEA attorney fee bills, told me that Tyrka & Associates' bills were "clean" and reliable.

28.     Beginning in 2009, DCPS discontinued voluntary payments to my firm before litigation. In January 2009, the DCPS attorney responsible for reviewing and approving IDEA attorney invoices, informed me that DCPS would no longer negotiate settlements of IDEA attorneys' fees. In September 2009, in a deposition under oath, she stated that DCPS had stopped negotiating IDEA attorney fee settlements on October 1, 2008 at the latest.

29.     My clients filed their first fees cases in 2009. Approximately 142 of the fees cases begun by me in 2009 remain in litigation, without final resolution of the amounts due, despite my prosecution of those claims, including a motion for contempt.

30.     In 14 cases, I have had to file for contempt or threaten to do so after months of failure by the District to comply with fee orders won in litigation.

31.     In fewer than 10 instances in the last 12 years, DCPS has sent me an offer to settle all issues in an administrative IDEA case, including attorneys' fees. In those offers DCPS has never offered more than $5,000 in fees, and has repeatedly offered $0 in fees.

32.     From my long experience reviewed above and my regular communication with many other parent attorneys, I have concluded that 1) it is a waste of time to seek fee reimbursement from the District before filing suit; and 2) parents and lawyers should expect to wait for reimbursement a minimum of 18 months and often several years from the date substantive work begins.

33.     Through 2005-2008, my firm maintained a client list of approximately 300, and filed more than 200 administrative complaints on behalf of indigent clients each year.

34.     In 2005, the DCPS attorney then responsible for reviewing and approving IDEA attorney fee invoices told me that my partner and I represented the students in approximately 10% of all administrative IDEA cases in the District.

35.     During the years 2005-2009, I was very familiar with the identities of lawyers specializing in parent-side IDEA work in the District of Columbia. During those years, Brown & Associates was the largest such firm by a wide margin, and my firm was the second or third largest.

36.     Through 2005-2008, because negotiated fees with DCPS were fairly reliable and because my firm had a substantial staff as a result, my firm operated much like a public interest organization. The firm assisted our clients in all ways related to special education, without regard for eventual compensability of individual activities.

37. In 2009, having received no payments from DCPS in more than a year, I laid off my firm's entire staff and closed the firm's offices. Since that time, I have functioned primarily as a solo practitioner, with no full-time associates and no full-time paralegal or clerical help.

38. In the years since March 2009, I have necessarily prioritized all my work according to expected income. This has meant that I give potential IDEA administrative cases from non-paying clients the lowest priority, though I often would prefer to do more of that work because the students of indigent parents tend to have much greater need of help. When working for a richer client, the difference between winning and losing is usually the difference between the parents paying for services or getting them for free; when working for a poorer client, the difference between winning and losing is always the difference between the student getting necessary services and not getting them.

39. In the years since March 2009, my firm has filed fewer than 10 IDEA administrative complaints per year for clients without the means to pay the firm, after filing hundreds per year in the preceding several years. In that time, I have turned away many potential clients, all of them non-paying clients with IDEA cases; I have not turned away any paying clients in that time.

40. In estimating the likely return for possible work, I put the lowest estimate on work for non-playing clients with IDEA cases for many reasons, including the following: the District's refusal to negotiate fees in good faith and at a reasonable rate; the necessity of litigation for fees; some judges regularly awarding hourly rates of 75% of the rates in the USAO fees matrix; the chance of losing the cases and obtaining no fee; the inability to recover fees for unsuccessful claims and theories; the inability to recover fees for many hours of necessary work, including work in attending necessary meetings; the possibility of judges cutting time entries for various reasons; the inability to recover expert witness costs; the very long wait for fees through

8

litigation; the unpleasant nature of fee litigation work; and the general inconsistency and insecurity of income earned in that way.

41.     On several occasions I have been asked to give advice to lawyers beginning a practice focusing on IDEA work for non-paying clients. I consistently tell them that to account for likelihood of success, cuts to work performed, the inefficiencies of working for oneself, and the range of hourly rates awarded, they should expect their effective hourly rate for every hour worked to be approximately 25% of their USAO fees matrix rate, such that a hard-working lawyer in their third year out of school working (not billing) 2000 hours in a year should expect to earn approximately $150,000 at current rates. I also tell them that recovery of any money will require litigation, that at a minimum there will be no recovery until 18 months from the start of the work, and that recovery may take several years. In sum, I tell them that if they work hard they should expect to earn nothing for 2 years, then an inconsistent and insecure income according to the calculations above, with likely periods of several months or more with no income, with no health insurance, no paid leave, and double payroll taxes.

42.     I have known many IDEA parent lawyers for many years, including some who work primarily for non-paying clients. I closely watch IDEA fee litigation in this jurisdiction. From my experience running a small firm, from my conversations with other lawyers, and from my close watch of fee litigation I believe that with the sometime application of "75% USAO rates," it is impossible to maintain a practice in which a large portion of the work is IDEA work for non-paying clients. By "maintain," I mean "consistently cover expenses and earn a profit to support a reasonable professional income in this area."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _March 15, 2020_                             _Douglas Tyrka_