# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHANG CHOI, *et al.*,                    )
                                         )
    PLAINTIFFS,               )
                                         )    Civil Action 17-0003 (JEB/RMM)
vs.                                      )
                                         )
THE DISTRICT OF COLUMBIA,                )
                                         )
    DEFENDANT                 )

## DECLARATION OF CAROLYN HOUCK, ESQ.

I declare, under penalty of perjury, that the following statements are true.

1. I am over the age of eighteen (18), under no legal or mental disabilities. I have knowledge of the facts stated herein.

2. I am the sole attorney and owner of the Law Office of Carolyn Houck.

3. The hourly rates I charge my clients in are I line with the rates set forth in United States Attorneys Office (USAO) attorney's fees matrix.

4. I received a B.A. in Liberal Arts from Southwestern University in Georgetown, Texas, after having completed courses both at Southwestern University and the University of Texas, Austin. I received a Masters of Counseling Psychology from the College of Notre Dame in Belmont, California and a J.D. from Golden Gate University Law School in San Francisco, California.

5. I am a member of the bar of the District of Columbia (1998) and Maryland (1997) and am admitted to practice in the United States District Court for the District of Columbia.

6. Since 1997, the entirety of my law practice has been in the field of special education law, representing parents in the District of Columbia.

7. I have successfully represented hundreds of clients in more than 1600 cases leading to due process hearings or settlement agreements to enforce their rights under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §1400, *et seq* (IDEA).

ALL-STATE LEGAL®
PLAINTIFF'S
EXHIBIT

1

Case 1:15-cv-00338-JKB-JMC Document 159 Filed 11/13/18 Page 2 of 2

8. I am active in the community of parents' attorneys in the District of Columbia, participating in monthly meetings and frequent discussions of special education law matters among group members.

9. The community of attorneys with paying special education clients in the District of Columbia predominantly charge their clients at or near the current attorney's fees matrix rates published by the USAO.

10. When representing special education clients on a contingency basis, attorneys in the District of Columbia accept that representation for the prospect of recovering fees based on the reasonable fee-shifting guidelines found in the USAO's attorneys fees matrix.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 9, 2018.

Respectfully Submitted,

/s/Carolyn Houck,
Attorney at Law
P.O. Box 252
St. Michaels, MD  21663
Phone: 301-951-4278
Fax:    866-297-4248
Email: cwhouck1@gmail.com

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VICTORIA DOBBINS, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) Civil Action No. 16-01789 (DAR) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| DEFENDANT. | ) |

## DECLARATION OF ELIZABETH T. JESTER, ESQ.

I, Elizabeth T. Jester, Esq., being of legal age, hereby declare and state the following:

1. I am a partner at the law firm of Jester and Williams and I submit this declaration in support of reimbursement of attorney's fees and expenses incurred on behalf of Plaintiff.

2. I received a Bachelor of Arts Degree in Economics from Boston College, *magna cum laude*, in 1976. I am a 1980 graduate of Catholic University School of Law where I was a member of the Catholic University Law Review and a National Moot Court Team. I am a member of the Bar of the District of Columbia and have been a member of this Bar since March 1985. I formerly was a member of the Bar of the Commonwealth of Pennsylvania and was admitted to that Bar in December 1980. I am admitted to practice in the United States District Court for the District of Columbia, United States Circuit Court of Appeals for the District of Columbia, and the United States Circuit Court of Appeals for the Fourth Circuit. For the last approximately 20+ years my legal practice has been and is currently confined solely to the District of Columbia.

3. Prior to joining Jester and Williams, I served for approximately four years as staff

PLAINTIFF'S
EXHIBIT
**3**

ALL-STATE LEGAL®

Mot. for Fees Ex. 5, p. 3

attorney in the Office of the Chairman, National Labor Relations Board; approximately one year

as Senior Counsel to the Honorable John Fanning, Chairman of the National Labor Relations

Board; and approximately one year as Senior Counsel to the Honorable Donald Dotson,

Chairman of the National Labor Relations Board.

4.  Since entering private practice in 1987, my focus has been primarily on children's

rights issues.  To this end I have represented numerous children and their families concerning

housing and lead paint poisoning issues, including the disabilities inflicted on a child who is lead

poisoned.  I have been the featured speaker at several national lead poisoning conferences;

spoken at the D.C. Bar Annual Convention on the issue of lead poisoning; and worked with

several community groups in this area.

5.  I am also on the D.C. Superior Court Family Division panel of attorneys approved to

accept Special Education Attorney appointments and have been on this panel since its inception.

I have been an instructor at CLE courses sponsored by D.C. Superior Court and the  Public

Defender Service for the District of Columbia concerning special education issues.  I was a

presenter at a seminar concerning both attorney fees in special education cases and federal court

litigation in  IDEA cases at the 2010 BADC 21st Annual Neglect and Delinquency Practice

Institute which was held at The University of the District of Columbia during March 2010.  I was

a presenter at the 2011 BADC 22nd Annual Neglect and Delinquency Practice Institute which was

held at The University of District of Columbia in March 2011 on the topic of how to conduct due

process hearings pursuant to IDEA.  I also presented at the BADC Annual Neglect and

Delinquency Practice Institute in March 2014 and March 2015 on special education issues.  I

participated as an instructor for the annual training program  conducted by the D.C. Public

2

Defender Service in March 2010, June 2011, May 2012, May 2013, November 2013 and January 2015 for new special education attorneys who have recently been added to the D.C. Superior Court CCAN panel.  At these trainings conducted by the Public Defender Service I  presented on two topics: ethical considerations for special education attorneys and attorney's fees in special education litigation pursuant to IDEA.

      6.  Specifically, concerning special education, I have represented hundreds of  District of Columbia families in ascertaining the educational needs of their children with disabilities and procuring appropriate placements.  My special education practice is limited to matters arising in the District of Columbia.   I have participated in hundreds of administrative due process hearings pursuant to IDEA and procured countless settlement agreements in IDEA cases in the District of Columbia. I have not litigated special education cases in any other jurisdictions.  I  have been appointed by numerous judges in D. C. Superior Court in neglect and juvenile cases to represent parents/foster parents/surrogate parents/guardians concerning the educational needs of the children in their care who are wards of the District of Columbia.  I also receive referrals of clients from Childrens Law Center, D.C. Public Defender Service and private attorneys in the community.  Additionally, my extensive practice in the area of lead paint poisoning involved working with numerous professionals to ascertain the extent of neurological damage inflicted by lead and how this damage could be addressed through special education services.

      7.  With respect to my federal court litigation experience, I have successfully litigated approximately 25 Motions for Preliminary Injunction in the *Blackman/Jones* class action lawsuit in this Court before Judge Paul Friedman.  I have successfully litigated in this Court a preliminary injunction case concerning the "stay-put" provision of IDEA which resulted in DCPS

3

agreeing to maintain the placement of a child in the placement ordered by the hearing officer. *Stewart v. D.C.*, Judge Emmit Sullivan (file in storage–cite unavailable).   I was lead counsel in *Davis, et al. v. D.C.*, Case No. 03CV00639 (EGS), a case which involved the need for timely transcripts and functioning recording equipment at the DCPS Student Hearing Office.  As a result of the court approved settlement in that case, DCPS agreed to, *inter alia*,  provide new recording equipment to record the hearings conducted at  The Student Hearing Office pursuant to IDEA and agreed to hire an in-house stenographer to transcribe the hearings as required by IDEA.  I have also successfully litigated in this Court the appeal of several administrative hearing officer determinations, including: *Boddy v. D.C.,* Case No. 03CV1886 (GK), *Argueta v. D.C.*, 04CV00260(RCL), *George v. D.C.*, 04CV01669 (RWR), and *Green v. D.C.*, 05CV00550 (CKK).

8.  I have been co-counsel in a case before the Court of Appeals for the D.C. Circuit and assisted in drafting the appellate brief. *Blackman, et al. v. D.C.*, Case No. 04-7139 (D.C. Cir.) (re: attorneys fees pursuant to IDEA after prevailing on motions for preliminary injunctions in the Blackman/Jones class action for Plaintiffs Harris, Timmons and Blackwell).   In another case, before the Court of Appeals for the D.C. Circuit, *Boddy v. D.C.*, Case No. 05-7183,  I was lead counsel and argued the case before the D.C. Circuit Court.  As set forth in the points and authorities attached to the instant motion, I have initiated dozens of lawsuits in this honorable court concerning attorney fees for prevailing parties in administrative actions pursuant to IDEA.

9.   I have served as co-counsel in numerous lead paint litigation cases in D.C. Superior Court, including *Williams v. Vel Rey*, Civil Action No. 92-432 (Judge Mitchell-Rankin), a case in which the jury awarded over $2,300,000 in damages to the two minor plaintiffs for injuries

4

sustained from being lead poisoned.

10. I am familiar with the prevailing market rates for legal services in the Washington D.C. Area. The rates charged by me as set forth on Ex. 1 were the current market rates, or below current market rates, that existed at the time my services were rendered.   These rates are well within the range of prevailing rates in the District of Columbia market for legal services in special education cases and related matters.

11. My  billing rate as set forth in Ex. 1 is at the hourly rate of $ 581 per hour for work performed from June 1, 2016 through May 31, 2017.  My billing rate as set forth in Ex. 1 is at the hourly rate of $602 per hour for work from June 1, 2017 to the present.

12. My hourly rates of  $ 581 and $ 602  per hour is based on the market rates in the D.C. metropolitan area and based on the hourly rates set forth in the USAO Attorney's Fees Matrix. (Ex. 2)   Over the years, my rates and billing practices have been found to be reasonable and attorney fees at my requested rates were awarded to me by Judge Friedman, Judge Lamberth, Judge Bryant, Judge Sullivan, Judge Walton, Magistrate Judge Robinson and Judge Kessler in other cases brought pursuant to IDEA.

13. Recently the honorable Judge Kessler of this Court issued an Order that affirmed my billing practices and billing rates for April 2009 through August 2009 and found my rate of $400 per hour for that time period to be reasonable. *Cox v. District of Columbia*, (D.C.D.C. slip opinion issued December 9, 2010). Judge Walton of this Court issued an Order that affirmed my then billing rate of $450 per hour was reasonable.  *Garvin v. District of Columbia*, (D.C.D.C. slip opinion issued March 30, 2012).  Magistrate Judge Robinson found that my billing rate in line with the *Laffey* Matrix was appropriate. *Gaston v. District of Columbia*, D.C.D.C. slip

5

opinion issued August 26, 2015).

14.   The billing rate of $164 per hour for my paralegal Mery Williams is reasonable and comports with the rates for paralegals set forth in the USAO Attorney's Fees Matrix.  Ms. Williams has formal training as a paralegal and has worked with me in the past as a paralegal for approximately 19 years.  Ms. Williams no longer works for me full-time and did not work full-time for me during the pendency of the instant case.  Ms. Williams  now assists solely  with the preparation of attorney fee invoices, work that would have been done by me at a much higher hourly rate if her services were not available.  (Ex. 1)

15.   With the exception of the limited engagement of Mery Williams for the preparation of attorney fee petitions as set forth above, I have no support staff, secretary, or paralegal.  I have a law partner but his practice consists entirely of criminal and civil litigation.  He does not engage in any IDEA litigation and does not assist with my cases.  For all intents and purposes, I am the only one who performs work on  my cases and on behalf of my clients.

16.   I have maintained contemporaneous, accurate and complete records of all the time I have spent providing legal services in connection with this matter.  Those records, which contain a summary description of time and services rendered on a daily basis, were entered by a paralegal under my direction into a computerized billing program which generated the fee invoice which is attached as Ex. 1.   I have personally reviewed this billing memorandum and aver that it accurately describes the legal services and attendant time spent on specified tasks.   I further aver that the tasks for which compensation is being sought were necessary to the successful pursuit of Plaintiffs' claim.  In my judgment these are reasonable amounts that would be billed in similar circumstances.  I exercised billing judgment by not including on either of the invoices at issue

6

any time that I felt was excessive, not warranted or not directly connected with the matter at issue.

17. Ex. 1 contains a description of the expenses which were reasonably incurred by Plaintiff. This description reflects expenses normally charged by my firm.   The photocopy rate (.15 per page) is the rate awarded by this honorable Court for photocopying in the underlying case.   The cost of $ 400 is the actual fee charged by the U.S. District Court for the District of Columbia as the filing fee to file the underlying Complaint. The $ 50 charge to serve the Mayor and $50 to serve the D.C. Attorney General is the fee actually paid to the process server.  (Ex. 4) This description of costs was prepared under my supervision on the basis of the expense summaries prepared and maintained by me.   I have personally reviewed these summaries and Ex. 1 is an accurate description of the reasonable costs and expenses associated with this matter.

18. Throughout this proceeding, I have endeavored to represent Plaintiff's interest in the fullest and most efficient way possible.  I have endeavored to avoid any unnecessary duplication of work. The time for which I am claiming compensation is detailed in Ex. 1.  This time spent was reasonable and was necessarily expended on behalf of Plaintiffs' claims.

19. With very limited exceptions, my clients are indigent and unable to afford payment of attorney fees and costs on any level.  I "front" all costs of the litigation including on the occasions I am required to pay expert fees.   If the litigation is not successful, these costs are not recovered.  Up until July 2016, even if the litigation on behalf of my client was successful, expert fees were not reimbursable at all.  I simply had to absorb the cost of expert fees.  It is my normal practice to bill clients who are not indigent at rates equivalent to the rates set forth in the USAO Attorney's Fees Matrix.

20.  For approximately 19 years I employed a full-time paralegal, Mery Williams.  Due to the failure and refusal of D.C. Public Schools to reimburse my clients who were prevailing parties in their IDEA case for reasonable attorney fees and costs in a timely and fair manner I was no longer able to afford to employ Ms. Williams.   This resulted in a significant decrease in the number of clients that I was able to represent.  In addition, Ms. Williams is a naive Spanish speaker which allowed me to represent clients who spoke only Spanish.  Due to not being able to employ Ms. Williams any longer, I am no longer able to represent non-English speaking clients.  This has caused me to turn away many indigent Spanish speaking clients and therefore significantly limited the access to legal representation for these parents.

21.  For the last approximately 9 - 11 years I have been forced to severely limit the number of IDEA cases that I accept due to the fact that to be paid for successfully pursuing a client's claim, I must litigate for fees in federal court.  The fee litigation process is lengthy and results in payments for attorney fees being made years after I have provided my services.

22. D.C. Public Schools takes the position that IDEA litigation is not "complex" because there is no discovery such as interrogatories or depositions.  The absence of discovery, however, makes the ligation much more complex than if discovery was available.  For example, 5 business days prior to the hearing, the parties are required to produce all documents that will be offered as exhibits at the hearing.  In virtually every case, despite detailed records requests prior to and during the pendency of the due process complaint, as part of their "5 day disclosure" D.C. Public Schools produces documents, usually a very lengthy stack of documents, that counsel and the parent have never seen and were not aware even existed.  However, in a *very* short time frame (5 business days), counsel must review, digest, discuss with the parent, and incorporate these

8

documents into the issues presented at the hearing.  Another example of the complexity created

by the lack of discovery is as follows: at the prehearing conference held approximately one

month before the hearing, D.C. Public Schools indicates that they will be calling a specific

number of witnesses.   In their "5-day disclosure" materials D.C. Public Schools routinely lists

additional witnesses.   This means that I now have to prepare and integrate into the case the

additional witness.  Because there is no access to these witnesses (they are usually always D.C.

Public Schools employees who will not speak with a parent's attorney even if ethically permitted

to do so) I am left to guess at what their testimony would be.  The absence of discovery, standing

alone, makes IDEA litigation complex.  IDEA cases would be much easier and straight forward

to litigate if the parent had access to discovery.

    23.   Complexity of IDEA litigation is also reflected in the fact that I must be conversant

and knowledgeable in every discipline that touches the disabilities presented by the child at issue.

In some cases this involves understanding and being able to cross-examine the D.C. Public

Schools psychologist on the nuances of cognitive, academic, behavioral, and emotional testing.

It requires an understanding of the underlying medical and psychiatric issues and how these

issues affect the child. At the same time the child may also present with additional issues such as

language processing, sensory, visual/spatial impairments.  To prevail at the administrative

hearing, I must pull  all of the above together to show clearly and unequivocally how all of the

above interferes with the child's ability to access the general education curriculum.   This is *very*

complex and requires significant training, education and experience in order for me to

competently represent the parent.  Finally, D.C. Public Schools has a host of speech pathologists,

occupational therapists, psychologists, etc. who they bring in as witnesses, get qualified as expert

9

witnesses and present detailed testimony concerning the child.  On behalf of the parent, I am

limited to presenting the witnesses that I can talk into participating and who will be willing to

participate for  minimal or no compensation.  This is a significant factor in rendering IDEA

litigation complex.

In accordance with 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing
is true and correct.

Executed on November 3, 2017.

*/s/ Elizabeth T. Jester, Esq.*
Elizabeth T. Jester, Esq.

signed electronically

10

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Ms. Victoria Dobbins on behalf of A.D. | ) ) ) |
| **Plaintiff,** | ) ) |
| v. | ) Civil Action No. 1:16-cv-01789 (KJB-DAR) ) |
| **DISTRICT OF COLUMBIA,** **One Judiciary Square** **441 Fourth Street NW** **Washington, DC 20001,** | ) ) ) ) ) |
| **Defendant.** | ) ) ) |

## VERIFIED STATEMENT OF ATTORNEY ALANA HECHT

**ALANA HECHT & D.C. DISABILITY LAW GROUP**

1.     I am over 18 years of age and competent to testify regarding the matters described herein.

2.     I am the sole attorney and an owner of D.C. Disability Law Group, P.C., ("DCDLG") the law firm that has served as counsel for the Plaintiff in the administrative and federal court proceedings in this matter.

3.     The times and expenses itemized in the invoice which is attached to the *Plaintiff's Motion for Summary Judgment* accurately represent the times spent and expenses incurred by D.C. Disability Law Group, P.C. in preparing and building the case, later litigated by the law firm of Elizabeth Jester, on behalf of the parent of A.D. Those items were contemporaneously recorded.

4.     I personally reviewed and edited all the itemizations.

**PLAINTIFF'S EXHIBIT 5**
ALL-STATE LEGAL®

Verified Statement of Attorney Hecht
Page 1

5.      In recording times, D.C. Disability Law Group, P.C. does not record times for tasks taking less than several minutes each and does not record times for administrative tasks, even when those tasks are case-specific.

6.      D.C. Disability Law Group charges 15 cents per copy when it charges for copies that are made during the litigation process.  Often times, the firm does not record expenses for copies in order to maintain conservative billing practices.

7.      D.C. Disability Law Group sometimes charges for parking expenses when they are incurred by the attorney, her paralegal, or the client in connection with attending a due process hearing.  In the case of A.D., no such expenses were incurred or charged for.

8.      D.C. Disability Law Group uses the United States Post Office for mailing, and mails letters using regular stamps.  Up through January 26, 2014, those stamps were billed out at the rate of 46 cents.   Since January 27, 2014, stamps have raised in price to 49 cents a stamp, and have been billed out at that increased rate.   Charges for 46 or 49 cents on the invoice in this matter reflect charges for letters sent to the parent or DCPS on behalf of the student during the litigation of this case.

9.      DCDLG does not charge for travel time in order to maintain conservative billing practices.

10.      There are some items it in the itemizations that are marked "non-billable."  Those were entries which I determined, in my conservative judgment, should not be reasonably charged to the Defendant.

11.      In reviewing and adjusting the itemizations, in addition to striking items or marking them "non-billable" or "no charge," I also wholly deleted several entries from the

original, contemporaneous time records because I deemed it unreasonable to identify them as reasonable charges attached to this litigation.

12. D.C. Disability Law Group, P.C. currently matches its hourly rates to those in what is known as the USAO adjusted *Laffey* matrix and has had several paying clients that have paid these rates. Use of an updated *Laffey* Matrix was implicitly endorsed by the Court of Appeals in *Save our Cumberland Mountains v. Hodel*, 857 F. 2d 1516, 1525 (D.C. Cir. 1988)(en banc) and other cases such as *Blackman v. District of Columbia*, 59 F. Supp. 2d 37, 43 (D.D.C. 1999); *Jefferson v. Milvets System Technology, Inc.,* 986 F. Supp. 6, 11 (D.D.C. 1997); *Ralph Hoar & Associates v. Nat'l Highway Transportation Safety Admin.,* 985 F. Supp. 1, 9-10 n.3 (D.D.C. 1997); *Martini v. Fed. Nat'l Mtg Ass'n*, 977 F. Supp. 482, 485 n. 2 (D.D.C. 1997); *Park v. Howard University,* 881 F. Supp. 653, 642 (D.D.C. 1995). This *Laffey* matrix is available from multiple sources, and is reproduced in Exhibit 4 to the *Plaintiff's Motion for Summary Judgment.*

13. D.C. Disability Law Group mostly serves indigent clients that cannot afford to pay even nominal attorneys' fees. Those clients sign retainer agreements that do not require them to pay fees upfront but do advise them that the firm will be seeking full *Laffey* Matrix rates on the client's behalf and that the client is prohibited from agreeing to lower or unreasonable attorneys' fees rates if the client wishes the attorney to litigate a case under the IDEA on his or her behalf.

14. Ms. Dobbins was a non-paying client of D.C. Disability Law Group as is described in ¶ 13 above.

Verified Statement of Attorney Hecht
Page 3

15. My *Laffey* Matrix rate is also in line with the rates of others in the District of Columbia market that provide representation to parents under the Individuals with Disabilities Education Act.

16. D.C. Disability Law Group, P.C. has billed DCPS for IDEA attorney's fees in numerous cases since the firm's inception in August of 2012. Those bills always looked substantially like the itemizations attached to the *Plaintiff's Motion for Summary Judgment*, with hourly rates perfectly matching the adjusted *Laffey* matrix described above.

17. The expenses in the itemizations are the charges customarily paid in this field in this jurisdiction.

18. 100% of the practice of D.C. Disability Law Group, P.C. is in the field of special education law, representing parents in the District of Columbia. D.C. Disability Law Group currently has more than 100 clients.

19. Since the firm's inception in August of 2012, almost four years ago, D.C. Disability Law Group, P.C. has won private school placement – the most substantive relief obtainable in IDEA cases – in approximately 40 cases.

20. D.C. Disability Law Group is known to employ experts in the field of special education law in the District of Columbia. I, in particular, am recognized as an expert special education litigator in the D.C. area. I receive informal referrals from the Superior Court, private schools, DC Public School employees that believe their own students are not receiving appropriate services, and from clients who have had successful outcomes in their cases. I also receive referrals from agencies such as the Children's Law Center, the Juvenile Justice Clinic at the Georgetown Law Center, and Advocates for Justice in

Education, in addition to Probation Officers working with the D.C. Superior Court and other outside social service agencies.

21. I am active in the community of "parent's attorneys" in the District of Columbia. Aside from my contributions to semi-public discussions among members of the special education bar, I often advise other parent attorneys, including ones that have been practicing in the field for many years. I answer questions from fellow attorneys seeking advice regarding special education litigation at least once a week. In fact, as of mid-September, 2015, I am a co-chair of the Special Education Attorney Roundtable (SEAR).

22. In the past, I have been asked to train attorneys entering the field by the former director of the University of the District of Columbia's Special Education Law Clinic, Professor Joe Tullman. Additionally, although I am not on the panel for special education attorneys, I have been asked by several Judges in the Superior Court to take IDEA cases for children involved in delinquency and family court proceedings when those Judges are unable to appoint attorneys in those matters.

23. I am not a member of any panel within the District of Columbia Courts, any other state court, any District Court, or any other court in any jurisdiction. This includes the CCAN panel and the CJA panel. I have never attempted to join these court panels.

24. I was not appointed by any Court or entity to represent anyone in the underlying case litigated on behalf Plaintiff and the minor child A.D. I am not eligible to be appointed as a special education attorney in any case, as I am not a member of any panel, including any CCAN or CJA panel.

25. I attended Law School at the George Washington University School of Law, and received my *juris doctorate* in May of 2005. During my tenure at GW Law School, I interned at

Verified Statement of Attorney Hecht
Page 5

several public interest agencies including Bread for the City and the Legal Aid Society of Washington, D.C.

26.     I was first barred in the District of Columbia in December of 2005 after successfully passing the District of Columbia Bar.  The following year, I took and passed the Florida Bar, and was sworn into that bar in 2006.

27.     I am currently a 11th year attorney according to the *Laffey* Matrix and related case law. I graduated from law school in May of 2005, which means that I was a 7th year attorney in June 2012, first entered the "8 to 10" year bracket of experience in June of 2013, and entered my 9th year of practice in June 2014, and my 10th year of practice in June 2015, and moved into my 11th year of practice in June of 2016.

28.     I have been the sole attorney and an owner at the D.C. Disability Law Group since its inception in August of 2012.   In addition to myself, from August/ September of 2012 through the middle of February, 2015, I employed one full-time paralegal, Chithalina Khanchalern.  The firm also employs an educational advocate, Dr. Ida Jean Holman, who has been with the firm since its inception in August of 2012.

29.     The firm does not charge for the time expended working on cases by Dr. Ida Jean Holman, the educational advocate.  Even when Dr. Holman completes tasks that can be considered "paralegal" tasks, the firm does not charge for her time, even when it is directly related to litigation in a specific case.  To the extent that any time recorded by Dr. Holman on an invoice, this time is marked "non-billable."

30.     Prior to staring the D.C. Disability Law Group, I was employed for more than two years at Brown & Associates, the largest special education law firm in the District of Columbia

dedicating 100% of its practice to litigating cases under the Individuals with Disabilities Education Act in the District of Columbia.

31.    At Brown & Associates, I was litigated approximately 120 to 150 cases, with the parent being the "prevailing party" in at least 80% of those cases.  Of those cases in which the parent was the "prevailing party," I won tuition to private school placements in full-time special education schools in many of those cases.  In my conservative estimate, during my time at Brown & Associates, I won private school placement – the most substantive relief obtainable in IDEA cases – in more than 40 cases.

32.    Moreover, during my second year employed at Brown & Associates, I was responsible for training and supervising several new attorneys hired by the firm.

33.    The failure of DCPS to timely pay attorneys' fees affected Brown & Associates significantly, such that the law firm had to lay off two thirds of its staff.

34.    While I was not one of the attorneys laid off from Brown & Associates, I left the firm shortly after the firm's lay-offs, as the firm indicated at the time that it did not know if it would be able to continue paying its employees given DCPS's refusal to pay the firm.

35.    Upon leaving Brown & Associates I started D.C. Disability Law Group so that I could continue to provide special education litigation services to the indigent population in the District.

36.    If I cannot get *Laffey* rates in a timely manner for the legal work I perform, I may not be able to continue serving the indigent population on a contingency basis.  My firm has already been significantly affected by DCPS's delay in paying reasonable attorneys' fees in IDEA matters.

37.   As of mid-February 2015, the firm was no longer able to employ Chithalina Khanchalern full-time as a paralegal due to the practices of DCPS in refusing to pay reasonable attorneys' fees without protracted litigation in the District Court.  This required me to bill my attorney rates for work that could have been performed at a lower rate by a paralegal.  DCDLG advised DCPS of the danger of this happening in numerous fee cases before this Honorable Court, however, DCPS has continued to refuse to attempt fair and reasonable settlements of pending District Court matters, requiring the firm to pursue litigation in this forum and unnecessarily clog this Court's calendar.

38.   Even with the costs cut by no longer employing Ms. Khanchalern full-time, any delay in resolving fee cases pending before this Court may result in my firm being unable to continue representation of non-paying clients.

39.   Prior to being employed at Brown & Associates, I was employed at Swick & Shapiro, a civil rights firm that specializes in filing Title VII of the Civil Rights Act of 1964.

40.   During my time at Swick & Shapiro, I was admitted to practice in the United States District Court for the District of Columbia and the United States Court of Appeals for the D.C. Circuit, and my name appeared on several cases filed in those courts.  I appeared before District Court judges as a regular course of business at Swick & Shapiro.

41.   Previous to working at Swick & Shapiro, I litigated more than a hundred cases, over a two year period of time, in every branch of the D.C. Superior Court system as part of her job as an associate at Neighborhood Legal Services Program, a non-profit organization funded by the Legal Services Corporation representing indigent residents of the District of Columbia.  At NLSP, I was a general practitioner, representing clients in divorce

Verified Statement of Attorney Hecht
Page 8

proceedings, child custody proceedings, at Landlord-Tenant Court, in Small Claims Court, and in the general Civil Branch of the D.C. Superior Court.

42.  During my time at NSLP, I quickly gained a reputation as a competent attorney and an advocate for under-served individuals, and was asked to train new employees at the organization, appearing with them in court and reviewing their Complaints to ensure they were appropriate for filing.

43.  In addition to being barred in both the District of Columbia and the state of Florida, I have completed training at the National Institute for Trial Advocacy, which was a professional skills program at Georgetown University's School of Law.

44.  I have been awarded full *Laffey* Matrix rates for my work in litigating IDEA cases in the District of Columbia previously by this Court. In fact, in *Young v. District of Columbia*, Civil Action No. 11-1041 (ABJ), the Honorable Judge Amy Berman Jackson over-ruled The Honorable Magistrate Judge Facciola's Report & Recommendation. Magistrate Judge Facciola had recommended that the work I did in litigating a favorable case under the Individuals with Disabilities Education Act should be paid at a rate 25% less than the full *Laffey* Matrix Rate due to what he viewed as the lack of complexity of the administrative case. Judge Jackson disagreed with Magistrate Judge Facciola and awarded an attorney fee rate of 100% of the *Laffey* Matrix rate for my work in the administrative action on behalf of the student in that case. Recently, in a R&R issued by the Honorable Magistrate Judge Deborah A. Robinson, it was recommended that I be paid at the rate of 100% of *Laffey* for the work done in that case. *Duncan v. District of Columbia,* 1:13-cv-01062-RWR-DAR. That decision was adopted by Judge Richard Roberts on August 28, 2014. Additionally, the Honorable Judge Beryl Howell sustained

(in part) an objection made by Plaintiff in *Robinson v. District of Columbia*. Judge Howell ruled that despite Magistrate Judge Kay's ruling that Plaintiff should receive attorneys' fees at a level equivalent to 75% of the *Laffey* Matrix rate, Judge Kay's analysis regarding attorneys' fees was flawed, and in fact, Plaintiff was entitled to a rate of 100% of the *Laffey* Matrix Rate for both myself and former-Paralegal Khanchalern. *Robinson v. District of Columbia*, 1:13-cv-1006 (BAH). That decision was issued on July 28, 2014.

45. Due to the lack of discovery in IDEA administrative proceedings and due to the nature of IDEA work including putting on a full trial with witnesses that are in the total control and employ of the Respondent makes IDEA litigation more complex than any of the former work done by Ms. Hecht in her career, including litigation at the District Court level in Employment Discrimination/ Title VII matters, which relied solely on motions and other pleadings and which provided Plaintiff with fair and easy access to documents and witnesses through discovery.

46. IDEA litigation involves the presentation of entire bench trial, including the admission of exhibits, direct and cross examination of witnesses, opening and closing statements/ arguments, and a robust motions practice. Planning for such a trial without discovery and cross-examining witnesses that have daily interaction with the students at the heart of the lawsuits is extremely difficult, especially since the Respondent creates and maintains all school records and have more firsthand knowledge of what is going on in the school building.

47. Indeed, IDEA administrative litigation requires expertise that can only be gained by experience in the field and a wide knowledge and grasp of not only law, but many disciplines related to special education, including education, psychology, speech and

language pathology, assistive technology, occupational therapy, mental health diagnoses and treatments/ interventions, and a whole host of other related disciplines.

## FORMER PARALEGAL CHITHALINA KHANCHALERN

48.  Paralegal Chithalina Khanchalern graduated University of California at Berkeley with a Bachelor's Degree in Ethnic Studies in 2007.

49.  Following her graduation from undergraduate school, Ms. Khanchalern was hired as a case clerk at a large law firm in San Francisco, where she was the clerk for one of the senior partners of the firm. At that job, she performed duties similar to those of a paralegal, including but not limited to: drafting memorandum, organizing and managing records, handling phone calls, drafting and sending correspondence on the partner's behalf, managing the attorney's calendar, and other such duties as required.

50.  Ms. Khanchalern went on to get her Master's Degree in Special Education from the George Washington University School of Education in 2010. She then went on to teach two years as a special education teacher for D.C. Public Schools ("DCPS").

51.  Following her resignation as a teacher with DCPS, Ms. Khanchalern was hired at another law firm, this time one that specialized in special education litigation, James E. Brown & Associates. At Brown & Associates, Ms. Khanchalern pulled from her experience as a legal clerk to assist the attorney to which she was assigned with paralegal-type tasks including, but not limited to: drafting letters and memorandum, conducting factual research on case-related issues, assisting the attorney in devising case strategy, managing the attorney's calendar, and maintaining and organizing client records and court filings.

52. Paralegal Chithalina Khanchalern's previous work at two law firms, in addition to her degree in Special Education and her teaching experience with D.C. Public Schools gives her particularly relevant knowledge and expertise about the work being done by Attorney Hecht and the D.C. Disability Law Group, P.C. It was on that basis, and because this individual has sufficient training, education, and experience in the field that Ms. Khanchalern was hired as the sole paralegal for the D.C. Disability Law Group, P.C. in August of 2012.

53. During paralegal Chithalina Khanchalern's employment with the firm, her contract established that she was hired as a paralegal, and only a paralegal, at D.C. Disability Law Group. All of the job duties listed in Ms. Khanchalern's employment contract were those of a paralegal.

54. Paralegal Chithalina Khanchalern received a substantial amount of on-the-job training as a paralegal during her time at DCDLG and worked under the direct supervision of Attorney Hecht at all times. Each task completed by Paralegal Khanchalern was specifically requested by Attorney Hecht, who reviewed all correspondence and other legal documents completed by Paralegal Khanchalern.

55. The work that was done by Paralegal Khanchalern during all times relevant to the case litigated on behalf of the Plaintiff, was substantive legal work that, if not done by Ms. Khanchalern, would have had to be completed by Attorney Hecht at a higher billing rate.

56. At all times relevant to the current litigation, Ms. Khanchalern was employed full-time with D.C. Disability Law Group. At all times relevant to the current litigation, Ms.

Khanchalern's time was billed at the *Laffey* matrix rate set for paralegals, which was $145.00 per hour.

57. The sole position for which Ms. Khanchalern was hired at DCDLG was paralegal. Ms. Khanchalern did not provide educational consulting services to DCDLG, and cannot and did not provide expert testimony. All of the job duties completed by Ms. Khanchalern were substantive legal tasks supervised by Attorney Hecht.

58. In a recent case litigated in front of this court, after lengthy briefing and over the strong objections of the District, Magistrate Judge Kay ruled that Ms. Khanchalern should properly be considered a paralegal for the purposes of determining legal fees under IDEA cases. *Hines v. District of Columbia*, Civil Action No. 1:13-cv-00560-JEB-AK. Paralegal Khanchalern was also recognized as the firm's paralegal for billing purposes in a second case titled *Hines v. District of Columbia*, Civil Case No. 1:13-cv-00695-JDB-AK. In the recent R&R issued on June 17, 2014 by Deborah A. Robinson in *Duncan v. District of Columbia*, 1:13-cv-01062-RWR-DAR, Ms. Khanchalern was not only viewed as a paralegal, but was awarded full *Laffey* Matrix rates for paralegals, although some of her entries were cut. .

59. For example, in *Hines v. District of Columbia*, Magistrate Judge Kay determined that the work that Ms. Khanchalern does qualifies her as a paralegal for the purposes of legal fee calculations under IDEA, but reduced her rate to 75% of *Laffey* (along with a reduction of the attorney's rate to 75% of the *Laffey* Matrix rate) because of his determination that the case was not "complex" enough to warrant full *Laffey* Matrix rates for either the attorney or the paralegal. .

60. The Court made this same determination in a second *Hines v. District of Columbia* case, Case No. 1:13-cv-00695-JDB-AK, relying on the same analysis as in the previous *Hines* case.

61. Since that time, several other decisions have been issued and each time DCPS's arguments that Ms. Khanchalern should not be paid for her work at the *Laffey* Matrix rate or a percentage of that rate has been knocked down. In fact, in a very recent decision issued by The Honorable Magistrate Judge Deborah A. Robinson, this Court also concluded that the Chithalina Khanchalern should be paid at the *Laffey* Matrix rate, although she awarded her 100% of that Rate in a recent a R&R. *Duncan v. District of Columbia*, 1:13-cv-01062-RWR-DAR. That decision was adopted by Judge Richard Roberts on August 28, 2014.

62. Additionally, the Honorable Judge Beryl Howell ruled on her decision in *Robinson v. D.C.* that Plaintiff was entitled to a rate of 100% of the *Laffey* Matrix Rate for both Attorney Hecht and Paralegal Khanchalern. *Robinson v. District of Columbia*, 1:13-cv-1006 (BAH). That decision was issued on July 28, 2014.

## CASE FILED ON BEHALF OF THE PLAINTIFF

63. The student is a child with a disability pursuant to IDEA with a disability classification of Emotional Disturbance.

64. While the law firm of Elizabeth Jester litigated the case on behalf of A.D., the parent was first retained by D.C. Disability Law Group.

65. DCDLG represented the parent from November 2013 through June of 2014, during which time the firm built a case for litigation of a due process complaint.

66.     While DCDLG did not litigate the case at the Student Hearing Office or Office of Dispute

        Resolution, the work done by DCDLG were the initial building blocks upon which Ms.

        Jester built in order to successfully litigate the case and become the prevailing party.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on:   December 13, 2016        _____

                                        Alana M. Hecht, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | )
CHANG CHOI, *et al.*, | )
| )
PLAINTIFFS, | )
| )
vs. | ) Civil Action No. 17-00003 (JEB/RMM)
| )
DISTRICT OF COLUMBIA, | )
| )
DEFENDANT. | )
_____ )

## VERIFIED STATEMENT OF NICHOLAS OSTREM

1.  I am over 18 years of age and competent to testify regarding the matters described herein.

2.  I am the sole owner of The Ostrem Firm, LLC ("The Ostrem Firm"), a law firm specializing in litigation under the IDEA in the District of Columbia.

3.  The Ostrem Firm has always matched its hourly rates to those in what is commonly known as the "*Laffey* matrix," updated for changes in the legal services component of the Consumer Price Index, as described in *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 61 (D.C. Cir. 2015) and other cases.

4.  I received my juris doctorate from Barry University School of Law in Orlando, Florida, on or about May 2008. I have worked solely in the field of special education litigation in the District of Columbia for more than nine years. I have litigated or assisted in litigating over 100 special education cases in the District of Columbia, including administrative cases, and federal cases in the United States District Court for the District of Columbia, and the United States Court of Appeals for the District of Columbia Circuit. I have also represented more than 200 clients during this time, regarding more than 300 students.

1



More than 90% of these clients and students were represented while I was employed at firms with multiple attorneys and staff, as well as established practices and financial resources to sustain lengthy fee litigation.

5.   The Ostrem Firm is respected as specialists in special education law in the District of Columbia. Personally, I am a former Co-Chair of the District of Columbia Special Education Attorney Roundtable, and I am otherwise active in the community of "parent attorneys" in the District of Columbia. I have served as a hearing officer in mock proceedings for the Special Education Law Clinic at the University of the District of Columbia School of Law. I have also served as a panel member/presenter at community-wide forums at the Children's Law Center on certain special education issues in the District of Columbia, as well as a panel member/presenter at the mandatory training for new members of the D.C. Superior Court's Special Education Panel.

6.   I formed The Ostrem Firm in January 2013, with the expectation of working almost exclusively for indigent parents and students, and with the intent to rely on "fee-shifting" to fund the firm. I found it impossible to sustain such a practice, however, due to the factors listed in paragraph nine.

7.   From January 2013 to August 2015, I spent almost 100% of my time working on IDEA cases for indigent parents and students.  Since August 2015 I have spent approximately 20% of my time on such work.

8.   Since August 2015, I have turned away countless parents with viable IDEA cases because I could not afford to represent them only upon the hope of a fee award sometime in the distant future.

2

9.    The reasons I have found it impossible to sustain a practice for indigent parents and

students by relying on the "fee-shifting" provision of the IDEA include, but are not

limited to: the District's refusal to negotiate fees in good faith and at a reasonable rate;

the necessity of litigation for fees (as opposed to reasonable offers of settlement for fees);

the very long wait for fees through litigation (despite opening in January 2013, The

Ostrem Firm did not receive its first fee award through litigation until December 2016—

almost four years later); the inability to recover fees for unsuccessful claims and theories,

despite substantially prevailing in the case; the inability to recover fees for many hours of

necessary work as a solo practitioner, including work in attending necessary meetings in

an attempt to avoid litigation; some judges regularly awarding hourly rates at 75% of the

rates in the USAO fees matrix; some judges *sua sponte* cutting time entries, even when

such time was not challenged by the District; the inability to recover expert witness costs;

the unpleasant nature of fee litigation work; and the general inconsistency and insecurity

of income earned through fee litigation.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Executed on: _January 8, 2018_                    _____

                                                 Nicholas Ostrem, Esq.

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHANG CHOI, *et al.*,                    )
                                         )
        PLAINTIFFS,                      )
                                         )
        vs.                              )       Civil Action No. 17-00003 (JEB/RMM)
                                         )
DISTRICT OF COLUMBIA,                    )
                                         )
        DEFENDANT.                       )
                                         )
_____)

## VERIFIED STATEMENT OF DOUGLAS TYRKA

1.      I am over 18 years of age and competent to testify regarding the matters described herein.

2.      I am the sole owner of Tyrka & Associates, LLC, counsel for the Plaintiff Ms. McNeil in

this action.

3.      From its inception in 2005 Tyrka & Associates has always exclusively charged at hourly

rates matching those in what is commonly known as "the LSI *Laffey* Matrix," the *Laffey* Matrix

adjusted for changes in the legal services component of the Consumer Price Index as described

in *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 61 (D.C. Cir. 2015) and other cases. The LSI

*Laffey* Matrix is available from multiple sources.

4.      Though Tyrka & Associates historically primarily represented clients who could not

afford representation, the firm has had several clients pay the firm at the LSI *Laffey* Matrix rates

directly, regardless of whether reimbursement is ever obtained. The firm is currently retained by

clients at LSI *Laffey* Matrix rates.

5.      I received my juris doctorate from the University of Texas School of Law at Austin in

June of 1998. Since my graduation from law school, I have worked exclusively in litigation.



PLAINTIFF'S
EXHIBIT
**3**
ALL-STATE LEGAL®

1

Mot. for Fees Ex. 3, p. 31

Since the middle of 2003, at least 90% of my practice has been in the field of special education law, representing parents in the District of Columbia. In my conservative and educated estimate, I have litigated over 1000 IDEA administrative cases and over 50 IDEA federal cases. I have won private school placement – the most substantial relief obtainable in IDEA cases – for more than 100 children, in my conservative estimate.

6.      Tyrka & Associates and I in particular are known as experts in special education law in the District of Columbia. I am active in the community of "parent attorneys" in the District of Columbia. Aside from my contributions to semi-public discussions among members of the bar, I often advise other parent attorneys, including very experienced ones. Approximately once per week I answer a telephone call or email from a parent attorney seeking advice on a case. Other IDEA attorneys regularly ask me to take IDEA cases from them to the federal courts.

7.      In the past, for several years my firm litigated hundreds of IDEA cases each year for non-paying clients, that is, with no expectation of payment other than from court awards pursuant to the IDEA's fee-shifting provision. In the last several years, it has become very difficult to earn a reasonable income from that work, and in my experienced opinion, impossible to maintain a law firm that relies upon that work for the majority of its work.

8.      Below I review the history of my efforts to obtain fees for my IDEA work and explain why IDEA work for non-paying clients has become very financially difficult.

9.      Before 2005, I did IDEA work as a subcontractor of another parent attorney. That lawyer paid me for my work when she was paid by DCPS. As I understood the process from many conversations with her, she periodically sent her bills, which included my work, to DCPS, and periodically settled the fees for those bills with them at figures very close to 100% of what she had billed. Through that process, I was paid for my IDEA work in at least 95% of cases at 100%

2

of what I had billed, and was paid from a few months to one year after performing the work. The

small number of cases for which I was not fully paid were cases in which the bills had exceeded

the attorneys' "fee cap" then in effect in the District of Columbia. The other lawyer billed for my

time, and DCPS paid for my time, at an hourly rate between what is commonly known as the

"USAO *Laffey* Matrix" rate and LSI *Laffey* Matrix rate.

10.     After its formation, Tyrka & Associates billed DCPS for IDEA attorneys' fees for several

hundred cases from 2006 through 2008. Those bills all included hourly rates perfectly matching

the LSI *Laffey* Matrix rates.

11.     On multiple occasions, Quinne Harris-Lindsey, the DCPS attorney responsible for

reviewing IDEA attorney fee bills, told me that Tyrka & Associates bills were "clean" and

reliable.

12.     On two occasions, DCPS settled large groups of Tyrka & Associates' bills. In one of

those settlements, DCPS paid the firm 99.9% of what was billed, after applying the "fee cap" of

$4,000 per case, and in the other settlement DCPS paid 91% of what was billed after applying

the "fee cap."[1] That is, DCPS settled all of the bills at those rates, including those bills which did

not exceed the fee cap, so the fee cap did not limit the ultimate payment and thus did not impact

settlement.

13.     From July 2007 through December 2008, Tyrka & Associates submitted bills regarding

232 IDEA administrative cases to DCPS.

14.     In February 2008, my firm and DCPS settled the bills for 34 of those cases. DCPS later

made payment pursuant to that settlement.

---

[1] Prior to 2009, federal law prohibited the District of Columbia from paying attorneys' fees for IDEA cases in excess
of $4,000 per case. *See, e.g., Calloway v. Dist. of Columbia*, 216 F.3d 1, 4 (D.C. Cir. 2000).

3

15.     In September of 2008, DCPS sent to me a document identified titled "Settlement Agreement" regarding 63 of the remaining 198 cases. I immediately signed and returned the document to DCPS, but DCPS never made payment pursuant to that document, despite numerous inquiries.

16.     After DCPS' payment pursuant to the February 2008 settlement, DCPS did not issue any other payment regarding any of the 198 bills until April 15, 2009.

17.     From April 15, 2009 through July 8, 2009, DCPS made partial payment toward 38 of the 198 bills.[2]

18.     On July 14, 2009, most of my firm's clients involved in the 198 unsettled bills filed suit for the costs and fees itemized in most of those bills. As of that time, the District had made no payment at all toward 160 of the unsettled bills, each of which had been submitted to DCPS from seven to seventeen months before that time.

19.     From July 14, 2009 through November 4, 2009, DCPS made partial payment toward 53 of the 198 unsettled bills.

20.     DCPS made no other payment toward the 198 bills until June 2011. As of that time, DCPS had made no payment at all toward 107 of the 198 unsettled bills.

21.     In June 2011, DCPS made partial payment toward 34 of the bills in litigation.

22.     Following the June 2011 payment, DCPS had fully paid none of the 198 unsettled bills, had made partial payment toward 125 bills, and had made no payment at all toward the remaining 73 bills, all of which had been submitted to DCPS from 2.5 to 4 years before that time, 65 of which had been in litigation for almost two years.

---

[2] I use the word "partial" because DCPS did not pay the bills in full. DCPS later stated that it considered the payments to be full and final in each case.

4

23.     An accurate chart of the facts of the several preceding paragraphs is as follows:

| Date | Event | settled | partially paid | no payment |
|---|---|---|---|---|
| July 07-Dec 08 | 232 bills submitted | 0 | 0 | 232 |
| Feb 08 | 34 bills settled | 34 | 0 | 198 |
| Sep 08 | offer and acceptance re 63 bills, no payment | 34 | 0 | 198 |
| April 09-July 09 | partial payment of 38 bills | 34 | 38 | 160 |
| July 09 | fee litigation begun | 34 | 38 | 160 |
| July 09-Nov 09 | partial payment of 53 bills | 34 | 91 | 107 |
| June 11 | partial payment of 34 bills | 34 | 125 | 73 |

24.     Because none of the bills was ever paid in full, my firm's clients did not withdraw any of their fee claims. Approximately 142 of the fees cases begun by me in 2009 remain in litigation, without final resolution of the amounts due, despite my prosecution of those claims, including a motion for contempt.

25.     In January 2009, Quinne Harris-Lindsey, the DCPS attorney responsible for reviewing and approving IDEA attorney invoices, informed me that DCPS would no longer negotiate settlements of IDEA attorneys' fees. In September 2009, in a deposition under oath, Ms. Harris-Lindsey stated that DCPS had stopped negotiating IDEA attorney fee settlements on October 1, 2008 at the latest.

26.     In the fall of 2009, a District of Columbia attorney opposing me in a suit related to IDEA attorney fees told me that DCPS intended not to pay any bill from my firm while the firm was involved in any litigation with DCPS over any attorneys' fees.

5

27.     With only a few exceptions, DCPS had made no payments to my firm since June 2011 except as ordered by a court. The few exceptions were payments made pursuant to the settlement of fees after the substantive litigation of IDEA cases.

28.     In 13 cases, I have had to file for contempt or threaten to do so after months of failure by the District to comply with fee orders won in litigation.

29.     Before 2011, on those occasions when DCPS made partial payment on a bill before being ordered to do so, on average it paid approximately one-third of the amount originally billed.

30.     In fewer than 15 instances in the last nine years, DCPS has sent me an offer to settle all issues in an administrative IDEA case, including attorneys' fees. In those offers DCPS has never offered more than $5,000 in fees, and has repeatedly offered $0 in fees. From many conversations with many parent attorneys, I understand that DCPS much more frequently sends other parent attorneys settlement offers in IDEA administrative cases, but that those offers similarly never contain fees exceeding $5,000.

31.     From my long experience reviewed above and my regular communication with many other parent attorneys, I have concluded that 1) it is a waste of time to seek fee reimbursement from the District before filing suit; and 2) parents and lawyers should expect to wait for reimbursement a minimum of 18 months and often several years from the date substantive work begins.

32.     In 2005, the DCPS attorney then responsible for reviewing and approving IDEA attorney fee invoices told me that my partner and I represented the students in approximately 10% of all administrative IDEA cases in the District.

33.     Through 2005-2008, my firm maintained a client list of approximately 300, and filed more than 200 administrative complaints on behalf of indigent clients each year.

6

34.     During the years 2005-2009, I was very familiar with the identities of lawyers specializing in parent-side IDEA work in the District of Columbia. During those years, Brown & Associates was the largest such firm by a wide margin, and my firm was the second or third largest.

35.     Through 2005-2008, because negotiated fees with DCPS were fairly reliable and because my firm had a substantial staff as a result, my firm operated much like a public interest organization. The firm assisted our clients in all ways related to special education, without regard for eventual compensability of individual activities.

36.     In 2009, having received no payments from DCPS in more than a year, I laid off my firm's entire staff and closed the firm's offices. Since that time, I have functioned primarily as a solo practitioner, with no full-time associates and no full-time paralegal or clerical help.

37.     In the years since March 2009, I have necessarily prioritized all my work according to expected income. This has meant that I give potential IDEA administrative cases from non-paying clients the lowest priority, though I often would prefer to do more of that work because the students of indigent parents tend to have much greater need of help. When working for a richer client, the difference between winning and losing is usually the difference between the parents paying for services or getting them for free; when working for a poorer client, the difference between winning and losing is always the difference between the student getting necessary services or not getting them.

38.     In the years since March 2009, my firm has filed fewer than 70 IDEA administrative complaints total for clients without the means to pay the firm, after filing hundreds per year total in the preceding several years. In that time, I have turned away many potential clients, all of them non-paying clients with IDEA cases; I have not turned away any paying clients in that time.

7

39.     In estimating the likely return for possible work, I put the lowest estimate on work for non-playing clients with IDEA cases for many reasons, including the following: the District's refusal to negotiate fees in good faith and at a reasonable rate; the necessity of litigation for fees; some judges regularly awarding hourly rates of 75% of the rates in the USAO fees matrix; the chance of losing the cases and obtaining no fee; the inability to recover fees for unsuccessful claims and theories; the inability to recover fees for many hours of necessary work, including work in attending necessary meetings; the possibility of judges cutting time entries for various reasons; the inability to recover expert witness costs; the very long wait for fees through litigation; the unpleasant nature of fee litigation work; and the general inconsistency and insecurity of income earned in that way.

40.     On several occasions I have been asked to give advice to lawyers beginning a practice focusing on IDEA work for non-paying clients. I consistently tell them that to account for likelihood of success, cuts to work performed, the inefficiencies of working for oneself, and the range of hourly rates awarded, they should expect their effective hourly rate for every hour worked to be approximately 25% of their USAO fees matrix rate, such that a hard-working lawyer in her third year out of school working (not billing) 2000 hours in a year should expect to earn approximately $130,000 at current rates. I also tell them that recovery of any money will require litigation, that at a minimum there will be no recovery until 18 months from the start of the work, and that recovery may take several years. In sum, I tell them that if they work hard they should expect to earn nothing for 2 years, then an inconsistent and insecure income according to the calculations above, with likely periods of several months or more with no income, with no health insurance, no paid leave, and double payroll taxes.

8

41.     I have known many IDEA parent lawyers for many years, including some who work primarily for non-paying clients. I closely watch IDEA fee litigation in this jurisdiction. From my experience running a small firm, from my conversations with other lawyers, and from my close watch of fee litigation I believe that with the sometime application of "75% USAO rates," it is impossible to maintain a practice in which a large portion of the work is IDEA work for non-paying clients. By "maintain," I mean "consistently cover expenses and earn a profit to support a reasonable professional income in this area."

42.     I do not know any lawyer in this jurisdiction supporting a family on IDEA work for non-paying clients. I myself would never attempt to support my family on that work. In the current climate, I can only afford to do any IDEA work for non-paying clients because my wife has a good income and health insurance. Were that not the case, I would likely forgo all work for non-paying clients, and change fields of law if necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _1/8/18_                          Douglas Tyrka

10