THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**<u>VERIFIED STATEMENT OF DIANA M. SAVIT</u>**

1. I am over 18 years of age and competent to testify regarding the matters described herein.

2. I am the managing partner of Savit & Szymkowicz, LLP, a law firm located in Bethesda, Maryland. I am admitted to practice in the District of Columbia and Maryland, and in numerous federal courts, including the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit.

3. I have represented parents in hundreds of IDEA cases in the District of Columbia and Maryland over the past 30 years. Before entering private practice, I served for six years as an assistant corporation counsel (precursor to an assistant attorney general for the District of Columbia), and represented the District of Columbia in special education cases, including serving for a period of time as lead counsel in defending post-judgment motions in *Mills v. Board of Education of the District of Columbia*, the 1971 special education class action lawsuit. I typically carry a caseload of 10-20 pending or active IDEA matters at a time, in the District of Columbia and in various Maryland counties.

4. In addition to my work as a special education lawyer, I handle matters in various areas of employment law, including employment discrimination. I typically carry a total caseload of 20-30 pending or active matters in all of my practice areas. Many of the non-IDEA cases involve allegations of employment discrimination. I also handle business disputes. For example, I am currently litigating a case in which I represent two defrauded former clients of a real estate broker who misappropriated money they had given the broker to be held in escrow, pending a real estate purchase.

5. I do not charge different rates for my IDEA work than for my other work.

6.       I have found legal work under the IDEA to be at least as complex as employment discrimination and commercial dispute work. This complexity results from several factors.

7.       Every IDEA case requires specialized non-legal knowledge regarding special education, including knowledge of other professional disciplines whose services the individual student might require. Every case requires knowledge of education policies, procedures, techniques, best practices, records, and administration. Almost every case requires knowledge of specialized disciplines, including psychology, speech and language pathology, occupational therapy, physical therapy, and medicine, and others. A competent IDEA litigator must know enough about those disciplines to understand and critique evaluations, cross-examine experts, and work with one's own experts. Moreover, because school districts use their regular staff as experts but parents' expert witness fees are not reimbursable even if they win and are otherwise entitled to recover fees and costs as "prevailing parties," IDEA litigators must often rely on their own knowledge in challenging a school district's staff, instead of that of experts.

8.       There is very limited discovery and pretrial exchange between the parties in IDEA cases. That usually makes the preparation and litigation of IDEA cases more complicated, especially because hearing officers typically allow respondents to spontaneously adjust their defenses. Before the start of an IDEA hearing, and often well into a hearing, I often have little idea what positions the respondent will take beyond "Respondent did not deny FAPE." Similarly, I often do not know, until after I have rested my clients' case (as parents usually go first in IDEA hearings and bear the burden of proof), on what documents the respondent will rely and for what purpose.  Even though exhibits that may be used in the hearing must be disclosed in advance, there is no advance knowledge of what portions of what documents the respondent will emphasize, from a file possibly hundreds or thousands of pages thick. Despite my practice of

requesting access to my clients' education records well before initiating litigation, I am usually surprised by at least some of the documents that are disclosed to me five days before the hearing, as the school districts usually do not allow access to correspondence, including emails, as part of "education records," and selectively produce them for use as evidence shortly before hearings. Correspondence often has important information that was previously unknown to me or to my client. Similarly, though the respondent may identify five to twenty potential witnesses in advance, I usually do not know which witnesses will actually testify, and about what. That is because hearing officers almost never require the parties to state the substance of anticipated witnesses' testimony when they are disclosed before the hearing. Without any idea of what witnesses may say, I have no idea until the close of the parent's case what testimony will be offered, including from designated experts. Even if I have encountered the witnesses before, it usually does not matter, as school district witnesses are frequently called to testify on unexpected matters, including matters about which they do not have personal knowledge. For these reasons, in a typical case and usually even in a simple case, I must prepare for many different potential defenses that could be presented by the respondent, without knowing how the information and defenses could be presented.

9. I have litigated both administrative and federal court IDEA cases. In my experience, the administrative work is generally at least as complex as the federal work. The work in both venues involves the same legal questions. The federal work requires much more writing, and often more research as a result. But because at the administrative level the legal issues are rarely well defined until closing argument, at the administrative level one usually needs much more legal preparation and a much better general IDEA familiarity than is required at the federal level. There is much less time to think about the issues and to research key points of law. At the

administrative level, the lawyer must be able to think on his/her feet much more than in court litigation, which centers much more around written documents one can take time to prepare. Similarly, because there is no discovery at the administrative level, one often does not know what the key evidence, including testimony, is until well into the hearing, so one must be very familiar with every existing document and must prepare for a broad range of "surprise" testimony, including possible testimony from a diverse range of experts.

10. IDEA cases thus differ significantly from the other matters I routinely handle. Employment discrimination cases may take much longer to resolve, but with the advantage of discovery, substantive motions practice and meaningful pretrials, I usually know both my own client's case, and the other side's, quite well by the time I get to trial. In addition, there is little possibility of "surprise" evidence, as if my adversary tries to use evidence at trial that should have been produced in discovery, the court will grant relief. This may take the form of a continuance or one of a range of sanctions, such as excluding the evidence or making factual findings adverse to the party who withheld the information. A "surprise" at an IDEA hearing, on the other hand, usually carries no penalties for the school district. Most District of Columbia hearing officers take the position that they lack jurisdiction to enforce parents' right of access to their children's educational records, and will not hold school districts to facts or issues identified in their responses to due process complaints, because IDEA contains no express remedy for a school district's failure to properly respond.

11. My currently most complex case—the business dispute involving the defrauded real estate clients—offers a useful comparison. The case began in 2012 as a civil action in the Superior Court of the District of Columbia. We were able to take some discovery and amassed much useful information to support my clients' claims of fraud and breach of contract. The

defendant then filed a bankruptcy petition in the United States Bankruptcy Court, which stayed the Superior Court case. We had to file a separate adversary proceeding, alleging that the debt was not dischargeable in bankruptcy on account of the defendant's fraud and defalcation in his fiduciary duty as a broker. The bankruptcy case, in turn, was stayed for six months because the broker was indicted by the United States Attorney's office. The USAO relied, in part, on information I had obtained in discovery in the Superior Court case in deciding to indict the defendant. The defendant recently pled guilty to theft, and I am preparing a summary judgment motion for the bankruptcy court on the nondischargeability issue. Although this case has been in three courts, under multiple statutory and common law schemes (civil, bankruptcy and criminal), and has been pending for more than three years, I have always felt that I had full command of the facts and issues, due to the availability of discovery and other procedures that allowed me to gather the information I needed and allowed me sufficient time to react to new developments as they occurred. I also believe that the availability of these procedures, particularly discovery, was a significant factor in bringing the broker to justice via his guilty plea.

12. I have entered into hourly rate retainers with many clients, in various areas of law. I have always set my hourly rate at the outset of the relationship. I have varied my hourly rates with different clients over time and for other reasons, including personal relationships, but I have never changed my hourly rate based on the expected complexity of a case. I have not done that because the total cost of more complex litigation is already captured by the greater number of hours spent on those cases, and because it is often difficult to judge the complexity of a case at the outset.

13. I do not take IDEA cases for clients who cannot pay, only in the hope of later recovering fees from the respondent under the IDEA's fee-shifting provision. I do not do so for District of

Columbia clients because, based on my long experience with and careful watch of IDEA fee litigation in the District of Columbia, I do not consider the expected fee and expense recoveries sufficient to sustain my practice. The factors that discourage me from accepting IDEA cases on a contingent fee basis include the following: the District's refusal to negotiate fees in good faith and at a reasonable rate; the necessity of litigation for fees; the prospect that even if I win a due process case for a client and become entitled to sue for my legal fees, the case may be assigned to a judge who will only award fees at an hourly rate equal to 75% of the rates in the United States Attorney's Office version of the "*Laffey* matrix;" the irony that if I do a good job, the District is likely to turn around and argue, in the fee litigation, that the case was "obvious" and "simple" and that I should therefore accept only a modest fee award; the risk of losing the cases (even cases that are meritorious, because many of the presiding hearing officers have a marked proclivity to rule for the school districts, often to the point of helping the school districts with their cases in the hearings) and thereby obtaining no fee;  the inability to recover fees for many hours of necessary work, including attending certain meetings, because the IDEA specifically precludes payment for certain types of necessary legal work;  the inability to recover expert witness costs; the very long wait for fees through litigation; and the general inconsistency and insecurity of income earned in that way. I am fortunate in that I have built my practice to the point where I can restrict it to paying clients, who pay me for almost all of my labor and expenses, quickly, consistently, and regardless of the outcome.  I would not still be practicing special education law if I were relying largely on low-income clients who need contingent fee lawyers, although often those clients need lawyers the most and have highly meritorious cases, because the system has been able to get away with treating them particularly poorly due to their limited resources.

14.     From my long experience with IDEA litigation and IDEA fee litigation and my close watch of IDEA fee litigation, I do not believe that I could support my practice if a significant portion of it consisted of contingent work for non-paying clients. For the reasons listed above, I would not be tempted to take such a case unless it was extremely strong on the merits and I could reasonably expect to be awarded an hourly rate of at least $500, far above the "75% of USAO *Laffey*" rate many judges would award me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on *August 13, 2015*                              *Diana M. Savit*
                                                           Diana M. Savit