## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.T., | |
| Plaintiff, | |
| v. | Civil Action Nos. 19-cv-989 (BAH), 22-cv-91 (BAH) |
| DISTRICT OF COLUMBIA, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff J.T. seeks attorneys' fees and costs, totaling $415,042.55,[1] pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3)(B)(i)(1), from the District of Columbia ("the District") for her counsel's services in connection with two administrative due process proceedings she has pursued over the previous six years on behalf of her minor son. Pl.'s Mot. for Att'ys' Fees ("Pl.'s Mot. 2017 HOD"), 22-cv-91, ECF. No. 9; Pl.'s Mot. for Att'ys' Fees ("Pl.'s Mot. 2019 HOD"), 19-cv-989, ECF. No. 48. While the parties generally agree on plaintiff's entitlement to reasonable attorneys' fees as a prevailing party—though defendant disputes the timeliness of one of her requests—the question of what constitutes "reasonable" fees remains hotly debated. In this case, as in so many other IDEA fee disputes before this Court, the core disagreement concerns how best to model the prevailing market rate in the relevant community so that the judicially-mandated awards of IDEA attorneys' fees most closely approximate a fictional universe in which IDEA litigation rates are shaped by a free market.

---

[1] *See* Pl.'s Reply Supp. Mot. Att'y's Fees ("Pl.'s Rep. 2017 HOD") at 2, 19-cv-989, ECF. No. 61 (providing the total amount of fees requested as to one proceeding as of the filing of the Reply $192,324.05); Pl.'s Reply Supp. Mot. Att'y's Fees ("Pl.'s Rep. 2019 HOD") at 2, 19-cv-989, ECF. No. 55 (providing the total as to the other proceeding as $222,718.50).

The creation of that fictional universe has proven elusive.  Several decades since the enactment of the IDEA, this Circuit does not seem any closer to settling on a method for calculating reasonable rates for litigation under this important statute, let alone a method that can be easily applied in all IDEA proceedings without major follow-on fee litigation.  In recent years, the use of the same decades-old matrix advanced by the plaintiff here to calculate her requested rates has been upheld by one panel, *see Salazar ex rel. Salazar v. Dist. of Columbia*, 809 F.3d 58, 63–65 (D.C. Cir. 2015), only to be questioned by another, *see Eley v. Dist. of Columbia*, 793 F.3d 97, 104–05 (D.C. Cir. 2015), or rejected, *see id*. at 105 (Kavanaugh, J., concurring) ("I would simply add that, in my view, the United States Attorney's Office *Laffey* matrix is appropriate for IDEA cases.").  Those decisions were mere months apart, creating substantial confusion for IDEA litigants and their counsel, as well as the district court. A potential solution presented itself when the United States Attorney's Office for the District of Columbia ("DC-USAO") generated a new fee matrix in 2015, in an effort to respond to many of the identified deficiencies with the then available matrices, which solution was cautiously adopted as a path out of the morass of dueling Circuit authority.  *See, e.g.*, *Jones v. Dist. of Columbia*, No. 15-cv-1505 (BAH), 2019 WL 652349, at *6 – 14, 16 (D.D.C. Feb. 15, 2019); *DL v. Dist. of Columbia*, 267 F. Supp. 3d 55, 66–72 (D.D.C. 2017).  Yet that approach, too, was rejected by the D.C. Circuit.  *DL v. Dist. of Columbia*, 924 F.3d 585, 591–93 (D.C. Cir. 2019).

As a result, to date, almost fifty years after enactment of the predecessor to the IDEA in 1975, *see* 20 U.S.C. § 1400(c)(2), the law in this Circuit remains unsettled whether a fee matrix exists that can reliably be applied in IDEA proceedings to determine reasonable attorneys' fees. These difficulties are to everyone's detriment.  The goal of the IDEA is to ensure the provision of a "free appropriate public education" to all disabled children, *see id.* § 1400(d)(1)(A), but

legal and judicial resources that may be better spent on the consideration of the merits of IDEA challenges are instead diverted to the resolution of long, hard-fought fee litigation; the District of Columbia diverts more of its resources towards "fees-for-fees;" and the unpredictability of the judicial fee awards likely makes attracting competent counsel to help parents and children navigate and enforce their rights under the IDEA more difficult.  Fee calculations should not turn into "a second major litigation," *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983), but in IDEA disputes, that is exactly what they reliably and too frequently become.

In yet another attempt to tackle these issues, plaintiff's motions will be granted in part. She is entitled to attorneys' fees and costs as to both the underlying IDEA challenges, but not at her requested rates.  Defendant successfully establishes that its proffered rate matrix—the newly developed "Fitzpatrick Matrix," first generated in 2021 by the DC-USAO—represents a clear improvement over plaintiff's requested matrix, the so-called LSI *Laffey* matrix, in its modelling of the prevailing market rates for complex federal litigation in the District of Columbia.  Plaintiff will therefore be awarded fees at Fitzpatrick Matrix rates.

## I.    BACKGROUND

Plaintiff, J.T., is the mother of a child with special needs, V.T., who has initiated multiple proceedings under the IDEA against District of Columbia Public Schools ("DCPS") since 2015. *See J.T. v. Dist. of Columbia*, 496 F. Supp. 3d 190, 195–99 (D.D.C. 2020) (summarizing history of J.T.'s IDEA proceedings).  Plaintiff's various Due Process Complaints have challenged several of her son's Individualized Education Programs (IEPs) (or lack thereof) and school placements, and in some instances sought judicial review of the administrative determinations in this Court, pursuant to 20 U.S.C. § 1415(i)(2).  The facts underlying these multitudinous proceedings have been fully detailed in this Court's previous opinions in *J.T. v. Dist. of*

*Columbia*, No. 17-cv-1319 (BAH), 2019 WL 3501667, at *2–3 (D.D.C. Aug. 1, 2019), and *J.T.*,
496 F. Supp. 3d at 195–99, and as such will only be related briefly in relevant part below.

Here, plaintiff seeks to recover some portion of the attorneys' fees she incurred in these
IDEA proceedings, which a court may "in its discretion . . . award . . . to a prevailing party who
is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i)(I).  These requests stem
from two particular administrative determinations and ensuing challenges, in which she contends
she was the prevailing party.  *See* Pl.'s Mem. Supp. Mot. for Att'ys' Fees ("Pl.'s Mem. 2017
HOD") at 2, 22-cv-91, ECF. No. 9; Pl.'s Mem. Supp. Mot. for Att'ys' Fees ("Pl.'s Mem. 2019
HOD") at 2, 19-cv-989, ECF. No. 48.

Her first request centers on a November 27, 2017 Hearing Officer Determination, which
afforded her partial relief on a due process complaint she had filed earlier that year.  Pl.'s Mot.
2017 HOD, Ex. 2., November 2017 Hearing Officer Determination ("2017 HOD") at 2, 13–14,
22-cv-91, ECF No. 9-3.  That complaint alleged that DCPS had denied V.T. a free appropriate
public education (FAPE) because the IEP developed for him in 2017 was inappropriate to meet
his needs.  *Id.* at 3–4.  While the complaint originally "alleged 12 ways in which [V.T.'s] 2017
IEP was inadequate," by the time of the hearing the challenges "had been winnowed down to
seven reasons that the 2017 IEP failed to provide V.T. with an appropriate education."  *J.T.*,
2019 WL 3501667, at *3.  In particular, the complaint alleged that:

> the IEP (1) permitted too large a class size; (2) permitted too high a student-to-adult
> classroom ratio; (3) did not require a quiet classroom or limit noise and distractions
> outside the classroom; (4) did not appropriately limit groups permitted outside the
> classroom; (5) did not appropriately limit hallway activity; (6) did not mandate that V.T.
> would remain with the same small group of students for the entire school day; and (7) did
> not prescribe a location where V.T. would receive educational services.

*Id.*  Ultimately, the hearing officer found that the 2017 IEP was appropriate and that DCPS had
met its "responsibility for ensuring that [V.T.'s] IEP adequately m[et his] needs and [was] not

overly restrictive."  2017 HOD at 10–13.  Nonetheless, plaintiff was granted partial relief in that

DCPS was ordered to conduct an observation of V.T., schedule a meeting with J.T. and DCPS

personnel, and update V.T.'s IEP and school placement based on the observation and a

discussion of J.T.'s concerns.  *Id.* at 13–14.

Plaintiff then sought judicial review of the 2017 HOD insofar as her claim that the 2017

IEP was inappropriate had been denied, *see J.T.*, 2019 WL 3501667 at *3, but the case was

dismissed as moot because the parties had since agreed to a new IEP in 2018, and plaintiff "ha[d]

not sought retrospective relief for the year that V.T. was educated pursuant to the 2017 IEP," *id.*

at *4–6.  The D.C. Circuit affirmed.  *J.T. v. Dist. of Columbia*, 983 F.3d 516, 528 (D.C. Cir.

2020).

Plaintiff's second fee request concerns a November 20, 2019 Hearing Officer

Determination (2019 HOD), which concluded that DCPS had denied V.T. a FAPE for the 2019-

2020 school year to date and awarded much of the relief requested.  *See* Admin. Record at 3–13,

19-cv-989, ECF No. 28-1.  The underlying complaint had followed a series of other due process

hearings and determinations regarding V.T.'s school placement, after which DCPS had failed to

assign V.T. to any school at all for the 2019–2020 school year, despite its attempts to locate an

appropriate school.  *See id.* at 6–8.  The complaint alleged that this failure amounted to the denial

of a FAPE and requested, among other things, funding for V.T.'s home schooling until DCPS

provided an appropriate school placement.  *Id.* at 20–23.  The hearing officer agreed, finding

that, although "diligent and fairly consistent" efforts had been made to assign V.T. to an

appropriate school, because DCPS did not manage to finalize V.T.'s new IEP prior to the 2019–

2020 school year and did not offer him an appropriate educational placement, it denied him a

FAPE.  *Id.* at 11.  Nevertheless, because, in the interim, DCPS had developed a new IEP for V.T.

and was at that time making referrals to possible schools, the officer declined to award prospective relief, but did award compensatory education for V.T.'s missed school up to the time of the hearing decision.  *Id.* at 12.

Plaintiff sought judicial review of this 2019 HOD as well, challenging the denial of prospective relief, in addition to the determinations from two other administrative hearings.  *See J.T.*, 496 F. Supp. 3d at 196–99, 211–13.  Plaintiff succeeded as far as the 2019 HOD was concerned: because DCPS in fact never managed to find V.T. an appropriate placement for the 2019–2020 school year, the 2019 HOD "erroneously permitted DCPS to deny V.T. a FAPE indefinitely, and V.T. [was] therefore entitled to compensatory education for the entire 2019–2020 school year," as well as certain other requested relief.  *Id.* at 212–13.  The D.C. Circuit affirmed.  *J.T. v. Dist. of Columbia*, No. 20-cv-7105, 2022 WL 126707, at *1 (D.C. Cir. Jan. 11, 2022).

Plaintiff now requests attorneys' fees associated with these two underlying victories, the resolution of which has been consolidated pursuant to Federal Rule Civil Procedure 42(a) as they present common issues regarding the reasonableness of plaintiff's requested fees.  *See* Minute Order (Oct. 27, 2022), 19-cv-989.  Regarding the 2017 HOD, she instituted a new action in January 2022 by filing a "Complaint for Attorneys' Fees and Costs," *see* 22-cv-91, Compl. at 1, ECF No. 3, followed by a motion for attorneys' fees months later, *see* Pl.'s Mot. 2017 HOD.  As to the 2019 HOD, plaintiff filed a motion for attorneys' fees within the same federal action in which she had challenged the underlying administrative decision.  *See* Pl.'s Mot. 2019 HOD.  Together, the two pending motions seek (1) fees and costs incurred for months of work on the administrative actions underlying the respective HODs, including time spent on their subsequent implementation; (2) for the 2019 HOD, the time spent on the successful judicial challenge; and

(3) in both cases, the recent work involved in bringing these fee requests.  *See* Pl.'s Mot. 2017 HOD, Ex. 1, Itemization of Hours and Expenses ("2017 HOD Itemization"), 22-cv-91, ECF No. 9-2; Pl.'s Mot. 2019 HOD, Ex. 1, Itemization of Hours and Expenses ("2019 HOD Itemization"), ECF No. 48-1.

After consolidation of the two actions, the DC-USAO filed a statement of interest, pursuant to 28 U.S.C. § 517, expressing the government's view that "the Fitzpatrick Matrix should properly be regarded as the benchmark for hourly billing rates for complex federal litigation in this jurisdiction."  *See* Statement of Interest of the United States ("DC-USAO Statement") at 29, 19-cv-989, ECF No. 58.  Concluding that the resolution of the parties' present disputes "may affect the interest of the United States government in future federal attorneys' fees litigation," the Court denied the plaintiff's motion to strike the DC-USAO Statement and, accordingly, will consider the views of the United States in resolving these disputes. *See* Minute Order (Dec. 19, 2022), 19-cv-989.  The motions became ripe for resolution on December 9, 2022, with the filing of plaintiff's sur-reply regarding the 2017 HOD.  *See* Pl.'s Sur-Reply Supp. Mot. Att'ys' Fees ("Pl.'s Sur-Rep. 2017 HOD"), 19-cv-989, ECF No. 63-2; 19-cv-989, Minute Order (Dec. 9, 2022), 19-cv-989 (authorizing the proposed sur-reply).

## II.   LEGAL STANDARD

The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees . . . to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i)(I).  Attorneys' fees under the IDEA are not limited to time spent in, and preparing for, adversarial proceedings alone.  "Rather, an attorney can recover for work when there is 'a clear showing that the time was expended in pursuit of a successful resolution of the case in which fees are being claimed.'"  *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 735 F.

App'x 733, 736 (D.C. Cir. 2018) (per curiam) (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1335 (D.C. Cir. 1982) (per curiam)).

Although the "IDEA provides relatively little guidance to either the courts or litigants regarding how, precisely, these 'reasonable attorneys' fees' are to be calculated," *Reed v. District of Columbia*, 843 F.3d 517, 520 (D.C. Cir. 2016) (quoting *Eley*, 793 F.3d at 100), the statute does require that such fees be "based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished," and disallows any "bonus or multiplier," 20 U.S.C. § 1415(i)(3)(C).  In addition, the statute authorizes "courts to reduce awards of attorneys' fees if they 'unreasonably exceed[] the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience.'" *Reed*, 843 F.3d at 520 (alteration in original) (quoting 20 U.S.C. § 1415(i)(3)(F)(ii)).

In applying a statutory fee-shifting provision allowing recovery of reasonable attorneys' fees, the "guiding light" is "the lodestar method[, which] produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550–51 (2010) (emphasis in original).  The lodestar approach applies in IDEA cases using a "two-part framework that takes into account: (1) the 'number of hours reasonably expended in litigation'; and (2) the 'reasonable hourly rate' for the services provided." *Reed*, 843 F.3d at 520 (quoting *Eley*, 793 F.3d at 100).

To meet the first part of this framework, "fee applicants must document the hours spent litigating in IDEA proceedings in which they prevailed." *Id.*  For the second part of the framework, the D.C. Circuit instructs that the appropriate "reasonable hourly rate" may be

determined upon consideration of "three sub-elements: (1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skills, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Id.* at 521 (quoting *Eley*, 793 F.3d at 100) (alterations in original).

Fee applicants in IDEA cases often attempt to demonstrate the third sub-element, the prevailing market rate, by relying "on two separate, but inter-related, approaches": (1) "attempting to demonstrate that IDEA cases fall within the bounds of th[e] type of litigation" that uses the "*Laffey* Matrix," a fee matrix originally compiled to reflect the prevailing rate for "'complex federal litigation,'"; and (2) "providing evidence of the fees charged, and received, by IDEA litigators." *Id.* A matrix—such as the aforementioned *Laffey* Matrix—showing the average hourly price tag of comparable lawyers may "provide a useful starting point" in calculating market rates. *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). Yet, because such "matrices are somewhat crude," the matrix's proponent usually cannot stop there. *Id.* Instead, the proponent may point to additional evidence, which can include "surveys to update the matrix; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Id.* No particular type of evidence is considered gospel, for "evidence of the prevailing market rate can take many forms." *Eley*, 793 F.3d at 104 n.5.

Initially, the "fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates." *Id.* at 100 (quoting *Covington*, 57 F.3d at 1107). Once an applicant meets this burden, a presumption applies that the product of the number of hours billed and the hourly rates, is "the reasonable fee." *Covington*, 57 F.3d at 1109 (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). At that

point, the burden shifts to the opposing party to "provide specific contrary evidence tending to show that a lower rate would be appropriate." *Id.* at 1110 (quoting *Concerned Veterans*, 675 F.2d at 1326).

## III.   DISCUSSION

As a preliminary matter, the timeliness of plaintiff's two motion seeking fees will be addressed, followed by an assessment of those fee requests pursuant to the lodestar method discussed *supra*.  The parties disagree only as to what the "'reasonable hourly rate' for the services provided" should be in this case.  *Reed*, 843 F.3d at 520 (quoting *Eley*, 793 F.3d at 100). Given the sense of *déjà vu* this dispute is likely to provoke—for the history of determining "reasonable" rates for IDEA attorneys' fees in this Circuit is long, tortured, and ongoing—a brief overview of the key attempts to settle the question will be provided.

With that context in mind, the three sub-elements used to establish a "reasonable" rate will then be assessed.  The first two sub-elements, regarding plaintiff's attorneys' billing practices and skills, experience, and reputation, are not disputed and easily satisfied by plaintiff. The crux of this fee litigation, as in so many others, comes down to the third sub-element: the prevailing market rate in the relevant community.  Defendant mounts two arguments against the notion that plaintiff has successfully carried her burden of establishing the applicability of her requested LSI *Laffey* rates, which will be assessed—and rejected—in turn.  Its third argument will fare better, for defendant carries its rebuttal burden that its proffered Fitzpatrick Matrix rates better represent the prevailing market rates in the relevant community.  The reasoning for these conclusions is set out below.

A.       Timeliness

Before attorneys' fees may be awarded pursuant to 20 U.S.C. § 1415(i)(3)(B)(i), any request for such fees must be timely made.  As narrated *supra* in Part I, plaintiff seeks attorneys' fees in connection with two instances in which she was the prevailing party in her ongoing IDEA disputes with the District.

While prescribing a statute of limitations for plaintiffs seeking substantive review in federal court of administrative determinations, *see* 20 U.S.C. § 1415(i)(2)(B) (imposing a 90-day limitations period from the date of the administrative decision), the IDEA is silent regarding any applicable limitations period governing the actions prevailing parties are authorized to bring in federal court for the recovery of attorneys' fees, *see id.* § 1415(i)(3).  "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 266–67 (1985).  In identifying a local time limitation to adopt, the court is to "characterize the essence of the claim," determine the limitations period for the most "analogous cause of action under state law," and ensure that the chosen limitations period "is not inconsistent with federal law or policy."  *Id.* at 266–68, 271; *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 355 (1991) (explaining that the "court 'borrows' or 'absorbs' the local time limitation most analogous to the case at hand"); *Spiegler v. Dist. of Columbia*, 866 F.2d 461, 463–64 (D.C. Cir. 1989) (same).

As explained below, a three-year applications period applies to plaintiff's fee claims and she has met this timeliness requirement.

### 1.     *A Three-Year Statute of Limitations Applies*

While the D.C. Circuit has not addressed this question, other circuits have reached divergent conclusions on the appropriate limitations period to be imported into IDEA attorneys' fees litigation.  The underlying disagreement is whether actions for attorneys' fees represent just another phase of the ongoing administrative proceeding, or whether such actions amount to a wholly separate cause of action, different in kind than the substantive IDEA proceedings.[2]  For the courts concluding that IDEA fee actions are the former, the limitations periods deemed most analogous are short, on the order of weeks or months, because those are the deadlines applicable to comparable events like seeking judicial review of an administrative decision.  *See, e.g.*, *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 875 (8th Cir. 2020); *King ex rel. King v. Floyd Cnty. Bd. Of Educ.*, 228 F.3d 622, 625–26 (6th Cir. 2000); *Powers v. Ind. Dep't of Educ., Div. of Special Educ.*, 61 F.3d 552, 556–58 (7th Cir. 1995).  For the courts conceiving of IDEA fee actions as independent from the IDEA administrative process, the analogous limitations periods are years-long, because local law applies such periods to independent causes of action.  *See, e.g.*, *Meridian Joint Sch. Dist. No. 2 v. D.A.*, 792 F.3d 1054, 1064 (9th Cir. 2015); *Zipperer ex rel. Zipperer v. Sch. Bd. Of Seminole Cnty.*, 111 F.3d 847, 851–52 (11th Cir. 1997).

Multiple judges on this Court have followed the approach of the Ninth and Eleventh Circuits, with most agreeing that the three-year statute of limitations set out in D.C. Code § 12-310(8), which applies to causes of action "not otherwise specifically prescribed," should be imported for IDEA attorneys' fee actions.  *See Davidson v. Dist. of Columbia*, 736 F. Supp. 2d 115, 124 (D.D.C. 2010) (Urbina, J.); *Wilson v. Gov't of Dist. of Columbia*, 269 F.R.D. 8, 20 (D.D.C. 2010) (Walton, J.); *Brown ex rel. P.L. v. Barbara Jordan Pub. Charter Sch.*, 495 F.

---

[2]      The Supreme Court recently declined an invitation to definitively settle the question.  *See Richardson v. Omaha Sch. Dist.*, 141 S. Ct. 2851 (2021) (denying writ of certiorari).

Supp. 2d 1, 2 (D.D.C. 2007) (Leon, J.); *Armstrong v. Vance*, 328 F. Supp. 2d 50, 54–55 (D.D.C.

2004) (Friedman, J.); *Kaseman v. Dist. of Columbia*, 329 F. Supp. 2d 20, 24–25 (D.D.C. 2004)

(Huvelle, J.); *Akinseye v. Dist. of Columbia*, 193 F. Supp. 2d 134, 144–45 (D.D.C. 2002), *rev'd*

*on other grounds*, 339 F.3d 970, 971–72 (D.C. Cir. 2003) (Walton, J.); *but see Abraham v. Dist.*

*of Columbia*, 338 F. Supp. 2d 113, 122 (D.D.C. 2004) (Collyer, J.) (concluding that "a short

period" of 30 days "for fee applications is consistent with the law and good policy").

 This case presents no reason to depart from the persuasive reasoning underlying the

general consensus reached on this Court.  The subsection of the IDEA allowing for appeals of

administrative hearing determinations to federal courts is separate from the subsection allowing

for prevailing parties to sue for attorneys' fees, and only the former is given an explicit statute of

limitations.  *See* 20 U.S.C. § 1415(i)(2)(A)–(B), (i)(3)(A)–(B).  Moreover, the legal issues

presented in an action for attorneys' fees—regarding whether the plaintiff qualifies as a

prevailing party, the hours the attorney worked, the reasonableness of the proposed rates, among

others—are entirely distinct from those presented by the merits of the underlying IDEA action.

These considerations confirm that, for the purposes of applying a statute of limitations, an action

for attorneys' fees is best conceived of as an independent action and not merely a new stage of

the ongoing IDEA proceedings.

 Looking to local law, then, the three-year statute of limitations from D.C. Code § 12-

310(8) that applies to actions otherwise lacking a prescribed limitations period appropriately

applies to IDEA fees actions, provided that such a period is consistent with the federal policies

underlying the IDEA.  *See Wilson*, 471 U.S. at 266–67.  The purpose of the IDEA is well-

recognized as, "among other things, 'to ensure that all children with disabilities have available to

them a free appropriate public education . . . designed to meet their unique needs and prepare

them for further education, employment, and independent living' and 'to ensure that the rights of children with disabilities and parents of such children are protected.'" *Wilson*, 269 F.R.D. at 19 (quoting 20 U.S.C. § 1400(d)(1)(A)–(B)).  Facilitating attorney representation in IDEA proceedings by allowing a longer statute of limitations for fee recovery is entirely consistent with these purposes.  Thus, consistent with the general consensus practice on this Court, a three-year statute of limitations for prevailing plaintiffs to file an IDEA attorneys fee action will be applied here.

## 2. *Plaintiff's Requests for Attorneys' Fees Are Timely*

The timeliness of plaintiff's two separate requests for attorneys' fees can now be assessed with these principles in mind.

Her second request, made in Civil Action No. 19-989 regarding her successful challenge to the September 2019 administrative determination, sidestepped the timeliness issue because that request was made by motion within the same federal district court action initiated to challenge the underlying administrative proceedings, rather than in a separate action brought under the IDEA.  As such, that request was governed by the deadline set out under the Federal Rules of Civil Procedure specifying that a motion for attorneys' fees must, "[u]nless a statute or a court order provides otherwise, . . . be filed no later than 14 days after the entry of judgment." FED. R. CIV. P. 54(d)(2)(B)(i).  In this case, "a court order provide[d] otherwise," *id*., directing plaintiff "to file any motion for fees and costs within 30 days of the resolution of her appeal of [the] case to the D.C. Circuit."  Minute Order (Oct. 18, 2020), 19-cv-989.  Plaintiff obeyed, filing her motion for attorneys' fees on March 15, 2022, three weeks after the D.C. Circuit's mandate was entered reflecting the resolution of her appeal.  *See* Pl.'s Mot. 2019 HOD; Mandate of U.S. Court of Appeals, 19-cv-989, ECF No. 47.  For obvious reasons, then, defendant does not

dispute that this request was timely made.  *See generally* Def.'s Opp'n Pl.'s Mot. Att'y's Fees

("Def.'s Opp'n 2019 HOD"), 19-cv-989, ECF 51.

Plaintiff's first request, however, is another matter.  That request concerned the 2017

HOD, which she had then litigated in federal court in Civil Action No. 17-1319, culminating in

the D.C. Circuit's issuance of its mandate in the subsequent appeal on February 5, 2021.

Mandate of U.S. Court of Appeals, 17-cv-1319, ECF No. 48.  At that point, plaintiff had two

options for requesting the attorneys' fees associated with the underlying administrative decision

in which she had prevailed: file a motion, pursuant to Federal Rule of Civil Procedure 54(d)(2),

in Civil Action No. 17-1319 by February 19, 2021 (unless a court order changed the deadline) or

initiate a separate action for attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(A).  Defendant

argues that, for the latter course, plaintiff would have had to file within three years of the date on

which plaintiff "prevailed" in the underlying IDEA proceedings, November 27, 2017, requiring

the filing of a separate fees action by November 27, 2020.  *See* Def.'s Opp'n Pl.'s Mot. Att'y's

Fees ("Def.'s Opp'n 2017 HOD") at 1–2, 3–5, 22-cv-91, ECF 11.  Plaintiff did choose to initiate

a separate action for attorneys' fees, Civil Action No. 22-91, but did not file that complaint until

January 19, 2022.  *See* Compl., 22-cv-91, ECF No. 3.  Defendant therefore contends that the

corresponding request for attorneys' fees must be denied as untimely.  Def.'s Opp'n 2017 HOD

at 3–5.  Plaintiff counters that she could not have filed a Rule 54(d)(2) motion at the conclusion

of her federal court proceedings in Civil Action No. 17-1319, because she ultimately did not

receive any relief in those proceedings, but likewise could not have initiated a new action

pursuant to 20 U.S.C. § 1415(i)(3)(A) until those federal proceedings had concluded since, until

then, her prevailing party status remained unclear.  Pl.'s Reply Supp. Mot. Att'y's Fees ("Pl.'s

Rep. 2017 HOD"), 19-cv-989, ECF. No. 61.

Plaintiff is correct.  While true that courts applying the three-year statute of limitations generally use the issuance of the underlying HOD as the trigger for running the limitations period, the plaintiffs in those cases had not subsequently challenged the HOD in federal court; they had simply prevailed outright in the administrative proceedings and turned to federal court only to recover attorneys' fees.  *See, e.g.*, *Davidson*, 736 F. Supp. 2d at 118; *Wilson*, 269 F.R.D. at 11.  Here, plaintiff obtained only partial relief in the 2017 HOD, prompting her to challenge the unfavorable aspects of the determination in federal court, as was her right under the IDEA.  Prevailing on that federal court challenge remained a live possibility—thus entitling her to additional attorneys' fees under the IDEA—until the conclusion of those proceedings, which did not arrive until over three years from the issuance of the 2017 HOD.  Forcing plaintiff to file her action for attorneys' fees within three years of the HOD's issuance, before the resolution of all the issues associated with that HOD, could have created multiple fees actions (and even more "fees for fees" associated with the litigation of those multiple actions), and as such would be entirely cross-wise with principles of judicial economy and the IDEA's policy of facilitating access to representation.  Where, as here, plaintiff qualifies as the prevailing party in the underlying HOD only by virtue of a partial success and continues to litigate the unfavorable aspects of that determination in federal court, the borrowed three-year statute of limitations must run from the final disposition of those proceedings, even if she obtains no further relief in the federal proceedings.  In short, because plaintiff initiated Civil Action No. 22-91 within three years of the conclusion of her federal court challenges to the 2017 HOD, her request for attorneys' fees associated with the underlying determination was timely made.

### B.        Prevailing Market Rate

With the timeliness of both of plaintiff's requests for attorneys' fees settled, the remaining issue is to determine what those fees should be.  Defendant does not dispute that plaintiff is "a prevailing party who is the parent of a child with a disability," 20 U.S.C. § 1415(i)(3)(B)(i)(I), and, as such, is generally entitled to reimbursement of reasonable attorneys' fees and costs under the IDEA.  *See id.*; Def.'s Opp'n 2019 HOD at 2; Def.'s Opp'n 2017 HOD at 2.  Nor does defendant dispute any of the charges submitted by plaintiff's counsel or his billing practices.  *See* Def.'s Opp'n 2019 HOD at 1; Def.'s Opp'n 2017 HOD at 1.  Only the reasonableness of plaintiff's proposed hourly rate for reimbursement is disputed.  *See* Def.'s Opp'n 2019 HOD at 1; Def.'s Opp'n 2017 HOD at 1.

As to the sole disputed issue on the reasonableness of the hourly rate, defendant argues that this case should not be considered complex federal litigation and that plaintiff's evidence is insufficient to show that the prevailing market rate in the community for IDEA cases is in line with the Legal Services Index (LSI) *Laffey* Matrix, which is what plaintiff urges should determine the applicable rate here.  Def.'s Opp'n 2019 HOD at 2–3; Def.'s Opp'n 2017 HOD at 5.  Additionally, defendant argues that even if plaintiff's case were considered complex federal litigation, the newly developed Fitzpatrick Matrix should be employed instead of plaintiff's proposed LSI *Laffey* Matrix.  *See* Def.'s Opp'n 2019 HOD at 2–3; Def.'s Opp'n 2017 HOD at 5.

As noted, *supra* in Part II, when considering the reasonableness of an attorney's proposed hourly rate for reimbursement for work invoiced in an IDEA case, the D.C. Circuit has instructed examination of "(1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Eley*, 793 F.3d at 100 (alterations in original) (quoting *Covington*, 57 F.3d at 1107); *Reed*, 843 F.3d at 521 (citing

three sub-elements).  Defendant's arguments concern only the last of these three elements, which is hardly surprising.  They are but the latest in a long-running debate over how courts should best determine the "prevailing market rates in the relevant community."  *Reed*, 843 F.3d at 520 (quoting *Eley*, 793 F.3d at 100).  The irony is that, as a result of the IDEA's fee shifting provisions, the courts themselves are largely setting the prevailing market rates for the community of IDEA practitioners by awarding fees and costs deemed "reasonable." 20 U.S.C. § 1415(i)(3)(B)(i).  A brief overview of the current state of the law on these court-driven determinations is therefore in order, before trudging once more into this legal thicket and turning to the core disagreement on the reasonableness of the proposed rates in this case.

### 1. Overview of Available Matrices

To provide courts with a workable standard in these cases, IDEA attorneys' fee litigation often centers on the appropriate fee matrix to apply as a starting point.  For many years, the near-only game in town was the *Laffey* Matrix, so called for its debut in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), a civil class action gender discrimination case.  The D.C. Circuit endorsed the use of the *Laffey* Matrix shortly after its development, *see Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988), and it quickly became "[t]he most commonly used fee matrix" in the D.C. Circuit "for lawyers who practice complex federal litigation," *Eley*, 793 F.3d at 100 (internal quotation omitted).  "In the following decades, hourly rate disputes in this [C]ircuit often revolved around whether a case was sufficiently complex to warrant *Laffey* rates, and, if so, how best to update the *Laffey* matrix for inflation."  *DL*, 924 F.3d at 589 (citing *Reed*, 843 F.3d at 525–26; *Eley*, 793 F.3d at 101).  The latter efforts led to two subsequent versions of the *Laffey* matrix commonly invoked by IDEA plaintiffs: the version maintained by the DC-USAO, with periodic updates on the original's 1983

data using the Bureau of Labor Statistics inflation index tracking regional price increases across

all goods, and a version advanced by plaintiffs' attorneys, based on a 1989 version of the *Laffey*

Matrix and updated with a different Bureau of Labor Statistics index called the Legal Services

Index, which tracks price increases for the legal market specifically on a nationwide basis.  *See*

*id.* 589–90.  Plaintiff puts forward the latter version—the LSI *Laffey* Matrix—as the basis for her

requested fees.  *See* Pl.'s Mem. 2019 HOD at 9; Pl.'s Mem. 2017 HOD at 9.

The *Laffey* Matrix has had a long run, and the LSI *Laffey* Matrix in particular has

obtained substantial traction.  *See DL*, 924 F.3d at 590 (noting that "courts frequently found the

LSI *Laffey* matrix more persuasive" when it was "pitted against" the USAO version).[3]  This

matrix is not without several major deficiencies, however. *See id.* at 594 (observing that "as time

passes, the *Laffey* matrix may well—like shoulder pads, eight-tracks, and other '80s fads before

it—be losing its shine").

For one, the data underlying the *Laffey* Matrix is now going on four-decades old.  The

*Laffey* Matrix's original incarnation was based on twenty-five affidavits submitted to show the

hourly rates charged in 1981 and 1982 by attorneys working in complex federal employment

litigation.  *See Laffey*, 572 F. Supp. at 371–72.  A version of these rates was then updated in 1989

by a local attorney "speaking with attorneys from seven major law firms" in Washington, D.C. to

obtain their rates from that year and "comparing" those rates to those "set forth in two broad-

ranging surveys of hourly rates published in the *National Law Journal*," thus creating the 1989

dataset underlying the LSI *Laffey* Matrix.  *DL*, 924 F.3d at 589 (internal quotation omitted).

While both the *Laffey* Matrix and the LSI *Laffey* Matrix attempt to remedy the outdated age of

---

[3]     Indeed, this Court has previously found the LSI *Laffey* Matrix rates to be reasonable in IDEA proceedings.  *See, e.g.*, *U.F. v. Dist. of Columbia*, No. 19-cv-2156 (BAH), 2020 WL 4673418, at *7, 9 (D.D.C. Aug. 12, 2020); *Eley v. Dist. of Columbia*, 999 F. Supp. 2d 137, 156, 166 (D.D.C. 2013).

the underlying data by applying Bureau of Labor Statistics inflation indices, neither index purports to model how the hourly rates for lawyers in this particular market in the District of Columbia working in complex federal litigation have increased over time.  For another, the Matrix was developed based on a relatively small sample set of attorneys' rates.  The aforementioned affidavits and seven-firm survey may well have been the best possible option to develop a reasonable sample "[i]n those fledgling days [of fee litigation]—before big data, Google, or a prolific cottage industry dedicated to studying the legal profession," *DL*, 924 F.3d at 589—but it does not induce confidence as a starting place in 2023.  Finally, as exemplified by parties' arguments in this very case, determining exactly what type of legal work falls within the bounds of "complex federal litigation" is no straightforward task.  Indeed, as the D.C. Circuit has noted, "*Laffey* is not very helpful in explicating 'complex federal litigation,'" and in this particular context, "[u]nfortunately, the case law provides little guidance to litigants attempting to demonstrate that IDEA cases constitute 'complex federal litigation.'"  *Reed*, 843 F.3d at 525–26.

No surprise, then, that recent years have seen several efforts to develop more robust and up-to-date fee matrices, with the aim of supplanting the *Laffey* Matrix.   Beginning in 2015, the DC-USAO "undert[ook] a major effort to replace the *Laffey* datasets by using a more current rate survey as the base for a brand new matrix," commonly referred to as the 2015 USAO Matrix. *DL*, 924 F.3d at 590; DC-USAO Statement at 4–5.  The 2015 USAO Matrix used as a starting point a 2011 survey of the hourly rates of lawyers working in the Washington, D.C. metro area (as defined by the Census Bureau), a custom-ordered subset of data from the ALM Legal Intelligence's annual Survey of Law Firm Economics, and updated the rates for inflation using

yet another Bureau of Labor Statistics index, this time the Producer Price Index—Office of Lawyers national index. *DL*, 924 F.3d at 590; DC-USAO Statement at 4–5.

In *DL*, the D.C. Circuit confronted the question of whether the rates set out in the 2015 USAO Matrix or the LSI *Laffey* Matrix amounted to "reasonable attorneys' fees" for a prevailing party in an IDEA action. 924 F.3d at 591–94. While crediting the concerns the district court had raised about the ongoing application of the LSI *Laffey* Matrix, *id*. at 594, and acknowledging defendant's arguments that the data underlying the 2015 USAO Matrix was much more recent and boasted a statistically significant sample size as compared to that underlying the LSI *Laffey* Matrix, *id.* at 591, the Circuit panel concluded that the then-new-2015 USAO Matrix "depart[ed] from the statutory requirement that reasonable fees be tethered to 'rates prevailing in the community' for the 'kind and quality of services furnished,'" *id.* at 587–88 (quoting 20 U.S.C. § 1415(i)(3)(C)). Specifically, the Circuit panel found several features of the 2015 USAO Matrix wanting, thereby falling short of meeting defendant's rebuttal burden, citing, first, that this Matrix "incorporate[d] rates for the wrong type of practitioner," by including hourly rates from non-litigators and lawyers not practicing complex federal litigation, and, second, that this Matrix drew from the entire "metro area" spanning thousands of square miles around the District rather than being limited geographically to the District of Columbia. *Id.* at 592. In light of those shortcomings, the Circuit panel rejected the district court's "decision to embrace [the] newer but irrelevant figures" of the 2015 USAO Matrix, and remanded for a new determination of the "reasonable rate." *Id.* at 593.

The USAO tried once again to address these concerns, promulgating yet another fee matrix in November 2021: the Fitzpatrick Matrix. *See* "Attorney's Fees," U.S. Attorney's Office for the District of Columbia, *available at* https://www.justice.gov/usao-dc/civil-division

(accessed Jan. 10, 2023).  The USAO retained law professor Brian Fitzpatrick to create that

matrix, which is based on the hourly rates charged by lawyers litigating in the United States

District Court for the District of Columbia, as recorded in motions for attorneys' fees brought

between May 31, 2013 and May 31, 2020.  *See* Def.'s Opp'n 2017 HOD, Ex. 1, Brian T.

Fitzpatrick Declaration ("Fitzpatrick Declaration") ¶¶ 5–12, 22-cv-91, ECF 11-1.  The

underlying dataset consists of "675 lawyer-year data points (one data point for each year in

which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases," with

years of experience ranging from less than one year to fifty-eight, and rates ranging from $100 to

$1250.  *Id.* ¶ 11.  The Fitzpatrick Matrix updates these 2013–2020 rates for inflation using the

same index as employed in the LSI *Laffey* Matrix.  *Id.* ¶ 18.  Defendant urges adoption of this

new matrix as the basis for plaintiff's requested fees in this case, in lieu of the LSI *Laffey* Matrix.

*See* Def.'s Opp'n 2017 HOD at 12–14; Def.'s Opp'n 2019 HOD at 9–11.  Given this fee matrix's

novelty, no court has yet had occasion to consider the reasonableness of the Fitzpatrick Matrix's

rates in an IDEA case.

## 2. Reasonable Hourly Rates In This Case

With this context in mind, the reasonableness of plaintiff's requested LSI *Laffey* Matrix

fees in this case can now be assessed.  As the fee applicant, plaintiff has the "preliminary

burden" to "'justify[] the reasonableness of the rates,'" and if she meets that burden, "those rates

are 'presumed to be . . . reasonable' unless and until the defendant offers 'equally specific

countervailing evidence' supporting another rate."  *DL*, 924 F.3d at 591 (quoting *Covington*, 57

F.3d at 1107, 1109).

22

**(a) First and Second Sub-Elements: Attorney's Billing Practices and Experience**

The first sub-element for establishing a reasonable hourly rate requires the applicant to show the rates that her attorney "customarily charges clients." *Covington*, 57 F.3d at 1103. *See also Lee v. Dist. of Columbia*, 298 F. Supp. 3d 4, 11 (D.D.C. 2018) (noting this "factor requires the applicant to show her attorney's 'custom' with respect to billing in IDEA cases"). Plaintiff's counsel, Douglas Tyrka, states in his affidavit that his firm has "always exclusively charged at hourly rates matching those in . . . 'the LSI *Laffey* Matrix.'" Pl.'s Mot. 2019 HOD, Ex. 2, Verified Statement of Douglas Tyrka (Mar. 15, 2020) ("Tyrka V. Stm.") ¶ 8, ECF No. 48-2.[4] The D.C. Circuit has opined that "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan ex rel. Thomas v. Dist. of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum*, 465 U.S. at 895 n.11); *see also Baylor*, 735 F. App'x at 735 (noting that "the District Court appropriately relied on this Court's holding that an attorney's usual billing rate is presumptively the reasonable rate" (internal quotation omitted)). Thus, this first sub-element favors using the LSI *Laffey* Matrix as the prevailing market rate.

The second sub-element requires consideration of Mr. Tyrka's relevant "skill, experience, and reputation." *Covington*, 57 F.3d at 1103. Mr. Tyrka supports this sub-element in his affidavit by explaining the significant skill and experience he has developed in litigating to protect children's rights under the IDEA. *See generally* Tyrka V. Stm. He explains that at least

---

[4] Plaintiff submitted identical declarations and exhibits in support of her motions in both Civil Action No. 19-989 and Civil Action No. 22-91. For simplicity's sake, only the citations to those submitted in Civil Action No. 19-989 are used here and in the following sections.

ninety percent of his practice since 2003 has been representing parents in the District of

Columbia in special education law cases. *Id.* ¶ 15. In this time, he has "litigated over 1000

IDEA administrative cases and over 50 IDEA federal cases," winning "private school placement

. . . for more than 100 children." *Id.* The affidavit also provides that Mr. Tyrka and his

associates are considered experts in special education law in the District of Columbia. *See id.*

¶ 16. Further, Mr. Tyrka "often advise[s] other parent attorneys," and is "regularly ask[ed]" by

"[o]ther IDEA attorneys" "to take IDEA cases from them to the federal courts." *Id.* In sum,

plaintiff has demonstrated her attorney's skill, experience, and reputation developed over his

long career in this field of law.

Therefore, as to the first two sub-elements, plaintiff has shown her entitlement to fees

reimbursed at the requested rates provided in the LSI *Laffey* Matrix. Notably, defendant raises

no challenge as to Mr. Tyrka's representations regarding, or satisfaction of, either of the first two

sub-elements in establishing a reasonable hourly rate. *See generally* Def.'s Opp'n 2017 HOD;

Def.'s Opp'n 2019 HOD.

### (b) Third Sub-Element: Prevailing Market Rates in the Relevant Community

Defendant's challenge to plaintiff's requested fee award focuses on the third sub-element

in establishing a reasonable hourly rate, namely: consideration of the prevailing market rate for

similar services in the District of Columbia. Defendant's arguments are threefold: first, that

plaintiff fails to carry her burden that the relevant market is that of "complex federal litigation"

such that the LSI *Laffey* Matrix conceivably applies, *see* Def.'s Opp'n 2019 HOD at 3–4; Def.'s

Opp'n 2017 HOD at 5–6; second, that plaintiff fails to provide the required evidence to carry her

burden that the LSI *Laffey* Matrix adequately captures the prevailing market rates, *see* Def.'s

Opp'n 2019 HOD at 4–9; Def.'s Opp'n 2017 HOD at 6–11; and third, even assuming plaintiff

carried her initial burden, that defendant has in turn carried its rebuttal burden that the Fitzpatrick

Matrix rates are more in line with the prevailing market rate and thus more reasonable than the

LSI *Laffey* Matrix, *see* Def.'s Opp'n 2019 HOD at 9–11; Def.'s Opp'n 2017 HOD at 12–14.

These arguments are addressed in turn.

> ### (i) Defendant Has Effectively Conceded That This IDEA Case Qualifies As Complex Federal Litigation.

Fee applicants "are entitled to [a] *Laffey* rate," as plaintiff requests here, "only if they can

establish that the 'relevant legal market . . . is subject to the same hourly rates that prevail in . . .

complex federal litigation.'"  *Price v. Dist. of Columbia*, 792 F.3d 112, 117 (D.C. Cir. 2015)

(Brown, J., concurring) (second omission in original) (quoting *Laffey*, 572 F. Supp. at 374).  As a

result, much ink has spilled in IDEA attorneys' fee litigation to date about "whether a case was

sufficiently complex" to warrant those rates.  *DL*, 924 F.3d at 589; *see also, e.g.*, *Reed*, 843 F.3d

at 521 ("Because the *Laffey* Matrix and subsequent revisions to this matrix apply only to

'complex federal litigation,' fee applicants have focused their efforts on attempting to

demonstrate that IDEA cases fall within the bounds of this type of litigation.").  The D.C. Circuit

has repeatedly declined to go so far as to hold that IDEA litigation is presumptively complex

federal litigation, but has been equally clear that fee applicants may still attempt to establish its

complexity.  *See DL*, 924 F.3d at 594 (noting that "we have held that IDEA cases *sometimes* fall

within a submarket characterized by below-*Laffey* rates" but also that "we have always left open

'the possibility that . . . fee applicants may be able to demonstrate that IDEA cases are "complex

federal litigation" to which the *Laffey* Matrix presumptively applies'" (quoting *Reed*, 843 F.3d at

525) (emphasis in original)); *see also Eley*, 793 F.3d at 105 (declining to "decide today whether

IDEA litigation is in fact sufficiently 'complex' to use . . . the *Laffey* Matrix" but noting that it

was the fee applicant's "obligation" to demonstrate that IDEA proceedings were "as complex as the type of litigation" underlying the *Laffey* Matrix).

Here, plaintiff attempts to answer the call of this precedent with a series of declarations from experienced federal litigators comparing IDEA litigation to other practice areas in which federal courts have applied *Laffey* rates, each of which declarations concludes that "IDEA litigation, whether at the administrative or federal court level, is at least as complex as the work in those other areas."  Pl.'s Mem. 2019 HOD at 11–13; Pl.'s Mem. 2017 HOD at 11–13. Specifically, the declarations explain that these practitioners have found the work involved in IDEA proceedings comparable to, amongst others, "Title VII employment discrimination work, Section 1983 civil rights litigation, and Interstate Commerce Commission ('ICC') litigation," all of which regularly earn *Laffey* rates.  Pl.'s Mem. 2019 HOD at 11; Pl.'s Mem. 2017 HOD at 11; Tyrka V. Stm. ¶¶ 18–22; Pl.'s Mot. 2019 HOD, Ex. 8, Verified Statement of Diana M. Savit ("Savit V. Stm.") ¶¶ 6–11, ECF No. 48-8; Pl.'s Mot. 2019 HOD, Ex. 9, Verified Statement of Alana Hecht ("Hecht V. Stm.") ¶¶ 4–7, ECF No. 48-9; Pl.'s Mot. 2019 HOD, Ex. 10, Verified Statement of Charles Moran ("Moran V. Stm.") ¶¶ 5–8, ECF No. 48-10; Pl.'s Mot. 2019 HOD, Ex. 11, Verified Statement of Maria G. Mendoza ("Mendoza V. Stm.") ¶¶ 4–6, ECF No. 48-11; Pl.'s Mot. 2019 HOD, Ex. 12, Verified Statement of Domiento C.R. Hill ("Hill V. Stm.") ¶¶ 4–7, ECF No. 48-12.  Plaintiff then supplements these declarations by pointing to two case studies in which "well-regarded, competent lawyers without an expertise in IDEA litigation" handled IDEA administrative proceedings, in which they billed five-to-ten times the number of hours Plaintiff's counsel spent on the two proceedings in this case and required far more preparation, although the underlying issues were comparable.  Pl.'s Mem. 2019 HOD at 13–16; Pl,'s Mem. 2017 HOD at 14–16.  In plaintiff's view, this compels the conclusion that "IDEA litigation is so

complex that even very competent lawyers find it very challenging if they have not acquired an expertise."  Pl.'s Mem. 2019 HOD at 15; Pl.'s Mem. 2017 HOD at 16.

Defendant does not address these declarations or arguments, instead countering that "the D.C. Circuit has not held that IDEA litigation is presumptively complex litigation" and that plaintiff's case in particular "is not complex because it involved [an] individual IDEA plaintiff[] litigating [a] non-complex case primarily before an administrative body."  Def.'s Opp'n 2019 HOD at 3–4 (quoting *DL*, 924 F.3d at 594); Def.'s Opp'n 2017 HOD at 6 (quoting *DL*, 924 F.3d at 594).  Contrary to this framing, however, plaintiff does not attempt to rely on a presumption of complexity; presumably, the lack of such a presumption is precisely the reason plaintiff furnishes the declarations and arguments just discussed.  Normally, then, these arguments would invite an assessment of whether plaintiff has carried her burden of establishing that the relevant market is that of complex federal litigation, and then whether defendant has rebutted that conclusion.

In this case, however, that assessment is obviated by defendant's ultimate request as to the appropriate fees due in both underlying IDEA proceedings: for the Court to "award Plaintiff reasonable fees at the hourly rates set forth in the Fitzpatrick Matrix at no more than" $102,443.45 and $143,961.24 "in total attorney's fees and costs" for the 2017 HOD proceedings and the 2019 HOD proceedings, respectively.  Def.'s Opp'n 2017 HOD at 14–15; Def.'s Opp'n 2019 HOD at 12.[5]  The Fitzpatrick Matrix itself, just like the LSI *Laffey* Matrix before it, is meant to capture the market rates for complex federal litigation in the District.  *See* Def.'s Opp'n 2017 HOD at 12–13; Def.'s Opp'n 2019 HOD at 9–10; Fitzpatrick Decl. ¶ 2.  In its choice of alternative fee matrix, then, defendant apparently concedes that the relevant market is that of

---

[5]     Defendant specifies that these fees should only be awarded as to the 2017 HOD if that motion is not dismissed in its entirety as untimely, and, as discussed *supra* in Part III.A, it is not.

complex federal litigation, despite its earlier protestation that plaintiff's particular proceedings were non-complex.

In *Salazar*, the D.C. Circuit confronted a similar position on the part of the District: while contesting the plaintiff's request for LSI *Laffey* Matrix fees, the District did not argue that the appropriate fees were that of a "submarket" of non-complex IDEA disputes, but rather countered that the USAO *Laffey* Matrix set the appropriate rates. *Salazar*, 809 F.3d at 64. Noting that the latter matrix also applied to "complex federal litigation," the Circuit concluded that the District "acquies[ced] in the notion that the litigation at issue qualifies as complex federal litigation." *Id.* Here, too, defendant argues for the application of a matrix that applies to complex federal litigation rather than for rates set in some submarket of non-complex disputes, and thus compels the conclusion that "the District concedes that the relevant market is that of complex federal litigation." *Id. See also U.F. v. Dist. of Columbia*, No. 19-cv-2164 (BAH), 2020 WL 4673418, at *4 n.3 (D.D.C. Aug. 12, 2020) (concluding that "no dispute over complexity exists" where both parties advocated for a matrix that applied to complex federal litigation).

As a result, this case, like so many before, does not settle the question of whether the relevant market for IDEA attorneys' fees is necessarily that of complex federal litigation. Given defendant's concession, the only remaining issue is to determine which of the fee matrices applicable to complex federal litigation in the District should apply in this case.

### (ii) Plaintiff Carries Her Initial Burden That LSI *Laffey* Rates Represent The Prevailing Market Rates For Similar Services In The Relevant Community.

Defendant's second argument that plaintiff fails to provide the required evidence to carry her burden that the LSI *Laffey* Matrix adequately captures the prevailing market rates is similarly

quickly dispatched.  Precedent all but compels the conclusion that plaintiff has met her initial burden of establishing that LSI *Laffey* rates represent the prevailing market rate.

In support of the proposed LSI *Laffey* rates, plaintiff relies on three categories of evidence.  First, she submits several declarations from IDEA attorneys who practice in this jurisdiction attesting to their customary billing practices and hourly rates, including one from her own attorney.  *See* Tyrka V. Stm. ¶¶ 8–9; Pl.'s Mot. 2019 HOD, Ex. 3, Decl. of Charles Moran ("Moran Decl.") ¶¶ 12–14, ECF No. 48-3; Pl.'s Mot. 2019 HOD, Ex. 4, Decl. of Charles A. Sibert ("Sibert Decl.") ¶¶ 14–16, ECF No. 48-4.  Next, she bolsters that evidence with a declaration from Michael Kavanaugh, the developer of the LSI *Laffey* Matrix, explaining his relevant expertise, the methodology used to develop the matrix, and his professional belief that the matrix represents the prevailing market rates in this area.  *See* Pl.'s Mot. 2019 HOD, Ex. 7, Decl. of Dr. Michael Kavanaugh ("Kavanaugh Decl."), ECF No. 48-7.  Finally, she furnishes several examples in which fees were awarded or settlements stipulated to at LSI *Laffey* rates in recent years.  *See* Pl.'s Mem. 2019 HOD at 8, 10; Pl.'s Mem. 2017 HOD at 8, 10–11; Tyrka V. Stm. ¶ 10.  The D.C. Circuit has consistently held that this type of evidence, going into similar levels of detail, is sufficient to meet plaintiff's initial burden.  *See, e.g.*, *DL*, 924 F.3d at 591; *Salazar*, 809 F.3d at 64–65; *Covington*, 57 F.3d at 1110.  Defendant generally criticizes plaintiff's declarations as improperly focused on fees charged rather than payments received and the proffered cases and settlements as factually distinguishable, but nonetheless, this "evidence, [the D.C. Circuit has] concluded, [is] more than enough to pass the burden onto the District." *DL*, 924 924 F.3d at 591 (citing *Salazar*, 809 F.3d at 65).  There is therefore no need to belabor the issue in this case.

**(iii) Defendant Meets Its Rebuttal Burden By Demonstrating That The Fitzpatrick Matrix Better Represents The Relevant Prevailing Market Rates With Equally Specific Countervailing Evidence.**

The real question in this case, then, is whether defendant has satisfied its rebuttal burden that the Fitzpatrick Matrix is the more appropriate measure of the prevailing market rate.[6]  The "proper inquiry, under the applicable legal principles, [is] whether the District support[s] its matrix with 'equally specific countervailing evidence'" to that offered by plaintiff in support of the LSI *Laffey* Matrix.  *DL*, 924 F.3d at 591 (quoting *Covington*, 57 F.3d at 1109).

The novelty of the Fitzpatrick Matrix places defendant at somewhat of a disadvantage here.  Unlike plaintiff's proffer regarding the LSI *Laffey* Matrix, defendant cannot yet point to cases in which courts have opted to award fees at the Fitzpatrick Matrix rates where the applicable matrix was contested, let alone in IDEA litigation.[7]  Still, following promulgation, the Fitzpatrick Matrix has gained traction in the plaintiffs' bar to provide benchmark rates with

---

[6]     The stakes here are substantial, amounting to a difference of hundreds of dollars in the applicable hourly rate.  In applying either matrix, standard practice is to input the experience levels of the attorney at the time the work was performed.  *See, e.g.*, *U.F.*, 2020 WL 46734418, at *8 (collecting cases).  Both parties request that the current version of their respective matrices be applied, and, absent any objections, that too is consistent with general practice.  *See id.* at *8 n.7; Pl.'s Mem. 2019 HOD at 18; Pl.'s Mem. 2017 HOD at 18; Def.'s Opp'n 2019 HOD at 3; Def.'s Opp'n 2017 HOD at 5.  Here, attorney Tyrka graduated from law school in 1998 and has been practicing continuously since then, Tyrka V. Stm. ¶ 15, meaning he has been in the LSI *Laffey* Matrix's top experience band since all work underlying the two motions began in 2017, *see* 2017 HOD Itemization.  Under the Fitzpatrick Matrix, he would have earned rates corresponding to 19 years of experience for the work performed in 2017, 20 years of experience for the work performed in 2018, and so on, up to 25 years of experience for any work done in relation to this fee litigation in 2023.  As a result, the applicable hourly rates for Tyrka's work in these proceedings would be $919/hour under the LSI *Laffey* Matrix, *see* Pl.'s Mot. 2019 HOD, Ex. 6, LSI *Laffey* Matrix, 19-cv-989, ECF No. 48-6, but only $684–726/hour under the Fitzpatrick Matrix, *see* Def.'s Opp'n 2019 HOD, Ex. 3., Fitzpatrick Matrix, 19-cv-989, ECF No. 51-3.

[7]     The Fitzpatrick Matrix was recently employed to award fees in *Vollmann v. Dep't of Justice*, but in that case the parties agreed on the use of the matrix as a starting point and disagreed only on the applicable year with which the calculate the rates.  *See* No. 12-cv-939 (FYP), 2022 WL 1124814, at *7 (D.D.C. Apr. 14, 2022).  That the *Vollmann* Court ultimately did award attorneys' fees in line with Fitzpatrick Matrix rates, *see id.*, is therefore of limited utility here.

which to resolve fee disputes, *see* DC-USAO Statement at 6, as indicated by the following recent examples:

> **[1]** Decl. of M. Topic dated Aug. 22, 2022, ¶¶ 3, 5 (ECF No. 27-2) in *Leopold v. Dep't of Just.*, Civ. A. No. 21-0942 (TNM) (plaintiff's counsel in FOIA action declared that, although the firm's "standard billing rates for federal FOIA litigation in this District exceed the Fitzpatrick Matrix," counsel was seeking rates calculated pursuant to the Fitzpatrick Matrix); **[2]** Decl. of M. Topic dated Aug. 30, 2022, ¶ 5 (ECF No. 25-2) in *Harrington v. Dep't of Health & Human Servs.*, Civ. A. No. 20-2671 (RC) (D.D.C.) (same); **[3]** Decl. of M. Topic dated Sept. 1, 2022, ¶ 5 (ECF No. 47-2) in *Phillips v. Dep't of Homeland Sec.*, Civ. A. No. 18-0381 (EGS) (D.D.C.) (same); **[4]** Decl. of C. Tobin dated Aug. 15, 2022, ¶¶ 12, 13 (ECF No. 39-1) in *WP Co. v. Dep't of Homeland Sec.*, Civ. A. No. 20-1487 (TNM) (D.D.C.) ("Where the hourly rates that Ballard Spahr actually charged in this matter are higher, Plaintiff voluntarily limits their reimbursement of fees in this case to the reduced levels of hourly rates set forth in the Fitzpatrick Matrix."; noting also that some Ballard Spahr billing attorneys' rates were lower than Fitzpatrick Matrix rates).

*Id.* at 6–7.  Thus, while the novelty of the Fitzpatrick Matrix means that defendant cannot yet specifically counter plaintiff's examples of IDEA court-ordered fee awards and settlements at LSI *Laffey* rates, these examples suggest that as the Fitzpatrick Matrix is available for longer, its use in IDEA litigation may become more prevalent.

In the absence of applicable caselaw, to meet its rebuttal burden, defendant turns to the assumptions and methodologies underlying the Fitzpatrick Matrix, pointing out where these aspects of the Fitzpatrick Matrix are superior to those underlying the LSI *Laffey* Matrix and more accurately reflect the market for complex litigation in the District.  Def.'s Opp'n 2019 HOD at 9–11; Def.'s Opp'n 2017 HOD at 11–13.  The core dispute in this case therefore comes down to dueling expert declarations.  Defendant puts forward the declaration of Brian Fitzpatrick, the developer of the Fitzpatrick Matrix, explaining his goals in developing the matrix, how he went about collecting the underlying fee data, and the methods he used to transform that data into a fee matrix providing yearly hourly rates as determined by an attorney's years of experience.  *See* Fitzpatrick Decl.  This is the same explanatory declaration as the DC-USAO has made publicly

available on its website, along with its exhibits, as supporting documentation for the Fitzpatrick

Matrix.  *See* "Attorney's Fees," U.S. Attorney's Office for the District of Columbia, *available at*

https://www.justice.gov/usao-dc/civil-division (accessed Jan. 10, 2023).  Plaintiff counters with a

declaration from Daniel Sherman, an economist, offering his critique of the Fitzpatrick

Declaration and the associated matrix.  Pl.'s Rep. 2019 HOD, Ex. B., Declaration of Daniel R.

Sherman ("Sherman Decl."), ECF No. 55-2.  As originally filed, the Sherman Declaration

performed this critique without having reviewed the data underlying the Fitzpatrick Matrix.  *See*

*id.* ¶ 6.  After defendant pointed out, in its sur-reply, that the underlying dataset is publicly

available on the aforementioned USAO website, *see* Def.'s Sur-Reply Opp'n Pl.'s Mot. Att'ys'

Fees ("Def.'s Sur-Rep.") at 1, 19-cv-989, ECF No. 57, plaintiff retracted certain arguments

regarding the Fitzpatrick Matrix and submitted a revised Sherman Declaration, *see* Pl.'s Sur-Rep.

at 1; Pl.'s Sur-Rep., Ex. 1, Declaration of Daniel R. Sherman ("Second Sherman Decl."), ECF

63-2.

   Even taking into account Sherman's criticisms, as revised, defendant and Fitzpatrick

convincingly establish that the Fitzpatrick Matrix offers a superior measure of the prevailing

market rate for complex federal litigation in the District as compared to the LSI *Laffey* Matrix.

For a start, while both matrices base their calculations on rates obtained from federal proceedings

in this Court, the Fitzpatrick Matrix's underlying dataset has the clear benefit of being much

more recent.  The most recent fee data underlying the LSI *Laffey* Matrix is from 1989, almost 34

years ago.  *See DL*, 924 F.3d at 589.  The Fitzpatrick Matrix, by contrast, rests on fee data from

2013 through 2020.   Fitzpatrick Decl. ¶ 11.  Any fee matrix, by its nature, can only imperfectly

model how attorneys' fees increase year over year, as any inflation index can at best only

approximate the actual fluctuations of fees in this particular market over time.  Both the LSI

*Laffey* and the Fitzpatrick Matrices use the same Legal Services Index from the Bureau of Labor Statistics to update their data for inflation, putting them on equal footing as far as the accuracy of their inflation indices goes.  *See DL*, 924 F.3d at 189–90; Fitzpatrick Decl. ¶ 18.  The Fitzpatrick Matrix's more recent dataset, then, presents a clear advantage.  Whatever inaccuracies are introduced by relying on an inflation index to update the data each year, the LSI *Laffey* Matrix incorporates far more of them, as the original data must be projected over several decades.  *See* Kavanaugh Decl. ¶ 9 ("I update the *Laffey* matrix from 1988-1989 to 2010-2011 by calculating the change in the Legal Services component of the Consumer Price Index and apply the change to arrive at an estimate for the next year.  The process is repeated.  A chain of estimates results with each year's estimate linked to the proceeding year's figure by the change in the price index."); DC-USAO Statement at 15 (calculating that of plaintiff's requested LSI *Laffey* hourly rate of $919, 71% consists entirely of inflation adjustments).  By relying on data that is only several years, rather than several decades, old, the Fitzpatrick Matrix is much more likely to produce a reliable approximation of the relevant market rate each year.

Second, the Fitzpatrick Matrix derives its rates from a large sample size, incorporating "675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases," which points "spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years."  Fitzpatrick Decl. ¶ 11.  Those data points are listed in full in a spreadsheet posted on the DC-USAO website, alongside information on the individual lawyers, cases from which they derive, and subject matter of the underlying litigation.  *See id.* ¶ 13; "Attorney's Fees: Supporting Materials," U.S. Attorney's Office for the District of Columbia, *available at* https://www.justice.gov/usao-dc/civil-division (accessed Jan. 10, 2023).   The precise contours of the data underlying the LSI

*Laffey* Matrix, by way of comparison, remain murky.  The DC-USAO Statement attaches as an exhibit the 1989 declaration of the attorney who created the LSI *Laffey* Matrix base rates to support his own fee request in *Save Our Cumberland Mountains*, allowing for some insight into the original creation of the Matrix.  *See* DC-USAO Statement, Ex. A., Decl. of Joseph Yablonski, dated June 2, 1989 (ECF No. 537-33 in *DL v. Dist. of Columbia*, No. 05-1437 (D.D.C.)) ("Yablonski Decl."), 19-cv-989, ECF No. 58-1.  The six-page declaration generally describes Yablonski's data collection methods, which consisted of reviewing affidavits submitted in support of attorneys' fee requests in several cases before this Court and the D.C. Circuit, "sp[eaking] with attorneys" from seven listed law firms, and "compar[ing] the rates [he] had found with the rates set forth in two broad-ranging surveys of hourly rates published in the *National Law Journal* in November 1987 and November 1988."  ¶¶ 5–6.  The exact data points from which Yablonski derived his rates seem lost to history, if they were ever made available at all.  *See, e.g.*, *DL*, 924 F.3d at 594 (noting as a valid concern about the LSI *Laffey* Matrix the uncertainty "whether it captures a truly representative sample of complex federal litigators").  Thus, though impossible to say for certain that the Fitzpatrick Matrix rests on a more robust dataset than the Fitzpatrick Matrix, this would appear to be a safe bet.  By basing its calculated rates on hundreds of data points, all of which are fully disclosed and cover many levels of experience and areas of complex federal litigation actually pending before this Court, the Fitzpatrick Matrix promises a more reliable estimation of the going market rates for complex litigation in the District.

Third, the Fitzpatrick Matrix takes that dataset and uses it to calculate rates in 36 individual experience categories.  *See* Def.'s Opp'n 2019 HOD, Ex. 3., Fitzpatrick Matrix, ECF No. 51-3.  The LSI *Laffey* Matrix, by contrast, breaks lawyers' rates into only five bands of

experience.  *See* Kavanaugh Decl. at 4.  In view of the standard practice among many lawyers and law firms involved in complex federal litigation to differentiate fees based on years of experience, the increased granularity offered by the Fitzpatrick Matrix over the LSI *Laffey* Matrix offers a better approximation of hourly rates in the relevant market.

In short, the data underlying the Fitzpatrick Matrix present several clear advantages over that underlying the LSI *Laffey* Matrix.  As the Circuit has admonished, however, virtues like "more recent raw data and [a] statistically significant sample size," like those on display here, are "traits [that] matter only if the data surveys the relevant population."  *DL*, 924 F.3d at 591–92.  The DC-USAO's previous attempts to provide an alternative to the *Laffey* Matrix have stumbled on the latter requirement.  *See id.* at 592.  Here, Fitzpatrick's methodology for capturing the underlying fee data effectively responds to many of those concerns, and appropriately limits itself to the relevant market for complex federal litigation in the District of Columbia.  The Circuit rejected the 2015 USAO Matrix, in part, for "incorporate[ing] rates for the wrong types of practitioner," in that the survey relied upon did not purport to sample only those practicing "complex federal litigation," but rather included "real estate lawyers, family lawyers, and insurance lawyers," and did not specify what percentage of respondents were litigators.  *Id.*  The Circuit also took issue with the 2015 USAO Matrix's reliance on data that "c[a]me[] from outside the District of Columbia," in that it surveyed the entire "metro area," which "stretches well beyond the District to cover thousands of square miles over three states."  *Id.*  The Fitzpatrick Matrix avoids these pitfalls entirely, gathering its data from "publicly filed motions for fees and supporting documentation, as well as associated court orders" filed in the United States District Court for the District of Columbia, and excluding those cases that "involved rates that did not appear to be free market transactions."  Fitzpatrick Decl. ¶¶ 5, 8–10.  As such, the

data is derived purely from attorneys litigating in federal court within the District, guaranteeing that "the data surveys the relevant population."  *DL*, 924 F.3d at 591–92.  Notably, while plaintiff and her expert take issue with some of the calculations employed in the Fitzpatrick Matrix, nowhere do they attempt to argue that its survey methodology does not effectively survey the correct population and the correct market.  *See* Pl.'s Reply Supp. Mot. Att'y's Fees ("Pl.'s Rep. 2019 HOD") at 6–7, 19-cv-989, ECF No. 55; Pl.'s Rep. 2017 HOD at 9–12.

Plaintiff and Sherman raise some valid concerns regarding the Fitzpatrick Matrix, but none allow for the conclusion that the LSI *Laffey* Matrix remains superior.  For example, Sherman points out that while the underlying data in the Fitzpatrick Matrix covers 2013 through 2020, the years 2019 and 2020 include data for only thirty-one and two attorneys, respectively— during the two-year period when much litigation slowed due to the COVID pandemic—meaning that the "estimates of rates presented in the matrix primarily represent cases from 2013-2018, with relatively little input from later years."  Second Sherman Decl. ¶ 5.  True as this may be, even if the Fitzpatrick Matrix had entirely stopped its data collection in 2018, it would still be based on information nearly thirty years more recent than that used in the LSI *Laffey* Matrix.

Additionally, the Fitzpatrick Matrix excluded IDEA litigation from its underlying dataset, noting that these cases are "subject to lower rates prescribed by case law."  Fitzpatrick Decl. ¶ 9 (citing *Eley*, 793 F.3d at 105).  Plaintiff takes issue with that reason for exclusion and characterization of *Eley*, which, as she notes, declined to decide whether IDEA litigation was presumptively "complex" federal litigation.  Pl.'s Rep. 2019 HOD at 5 & n.2.  Be that as it may, IDEA cases would have necessarily been excluded from the matrix for an independent reason, namely that "the cases involve[] rates that d[o] not appear to be free market transactions," in that they are "based on an existing fee matrix."  Fitzpatrick Decl. ¶ 9.  Plaintiff presents it as a serious

"concern" that IDEA cases have been excluded from a matrix that is to be used for IDEA fee calculations, but does not address the dearth of free market transactions in this area. *See* Pl.'s Rep. 2017 HOD at 10. While the irony is apparent—recourse to a fee matrix is required to establish the prevailing market rates for IDEA litigation, but that matrix excludes IDEA litigation from its assessment of the relevant market because the rates for that litigation are judicially set— the Fitzpatrick Matrix can hardly be criticized for taking that reality into account. In any case, the LSI *Laffey* Matrix fares no better in this regard, as there is no indication that any of the affidavits or lawyers surveyed to create its underlying dataset included rates used in IDEA litigation, either.

Plaintiff further views as a "plain flaw" in the Fitzpatrick Matrix that "each year, the matrix increases the rates of less experienced lawyers far more quickly than it does those of more experienced lawyers." Pl.'s Rep. 2019 HOD at 6–7; Pl.'s Rep. 2017 HOD at 10. Fitzpatrick explains that this choice, as a feature of his regression formula, was deliberate and consistent with common practice: "The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (*e.g.*, faster growth earlier in one's career than at the end of one's career)." Fitzpatrick Decl. ¶ 14 (citing Jacob Mincer, Schooling, Experience, and Earnings (1974)). It is unclear why plaintiff views as a "plain flaw" the concept of faster early-career wage growth, which as Fitzpatrick explains is consistent common economic practice. *Id.* Further, it is consistent with common sense. Early in an attorney's career, each passing year is likely to bring with it its share of developmental experiences, training, and increased exposure to key areas of practice, each adding plausible value to that attorney's rate. The likelihood of a lawyer having had relevant experiences like taking a deposition, drafting dispositive motions,

examining a witness, or arguing in court will change substantially from the first year out of law school to the tenth year, and so it follows logically that her hourly rate will see greater relative gains in those early years.  An attorney several decades into her career, by contrast, is by comparison unlikely to encounter anything in a given year that drastically changes her value to a client—she is already an experienced attorney, and to the extent her rates will continue to increase, this is more likely due to inflation and the demands of the market than to the fact that she has another year under her belt of performing work at the same level.  Differentiating the hourly rate increase by experience level thus seems to be a feature, not a bug, of the Fitzpatrick Matrix.

Finally, plaintiff criticizes the Fitzpatrick Matrix for "do[ing] nothing but add $28 each year to the hourly rate of every attorney at every level" until 2020 (after which each year's values are instead increased using the inflation index), when in her expert's opinion "the estimated rates should be adjusted annually by a percentage factor."  Pl.'s Rep. 2019 HOD at 7; Pl.'s Rep. 2017 HOD at 11.  Fitzpatrick's arrival at the $28 increases for the years of data collection was not random, however, but a natural consequence of the application of his regression formula, which models the impact of a lawyer's years of experience upon the hourly rate.  *See* Fitzpatrick Decl. ¶ 14 (providing the regression formula for the lawyer data as: rate = 227.319 + 16.54492 * experience – 0.2216217 * experience ^ 2 + 27.97634 * (year – 2013)); *see, also e.g.*, *Segar v. Smith*, 738 F.2d 1249, 1261 (D.C. Cir. 1984) ("In essence, the regression measures the impact of each potential explanatory variable upon the dependent variable by holding all other explanatory variables constant.").  While Fitzpatrick had the option of using other types of regressions, his reasons for settling on the one he did to calculate the Matrix's rates is explained thusly:

Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected in the matrix ultimately adopted; *in order to minimize fee disputes, these other models were rejected in favor of the more generous untransformed, fixed-effect model.*

Fitzpatrick Decl. ¶ 14 (emphasis added).  Once again, it is not clear why plaintiff believes the current regression formula fails adequately to model the relevant market, beyond a general distaste for the resultant "flat number," Pl.'s Rep. 2019 HOD at 7; Pl.'s Rep. 2017 HOD at 11, when this regression formula is apparently most consistent with the goal of modeling "reasonable" rates for an award of attorneys' fees that are "adequate to attract competent counsel," *Blum*, 465 U.S. at 897.

For the foregoing reasons, defendant meets its rebuttal burden of establishing that the fees set out in the Fitzpatrick Matrix offer the more appropriate measure of the prevailing market rates for complex federal litigation in the District of Columbia.  Plaintiff will therefore be awarded attorneys' fees in accordance with Fitzpatrick Matrix rates.[8]

### C.  Post-Judgment Interest

Finally, plaintiff asks for an "order that the District pay an additional" $2,000.00 and $1,500.00 "for each delay of a month or part thereof in payment," for the fees related to the 2019 HOD proceedings and 2017 HOD proceedings, respectively.  Pl.'s Mem. 2019 HOD at 19; Pl.'s Mem. 2017 HOD at 19.  In support of her request, she points out that the District has a "long history of ignoring the timelines in orders for payment of IDEA attorneys' fees."  *Id.* (citing *Thomas v. District of Columbia*, 908 F. Supp. 2d 233, 245–46 (D.D.C.

---

[8]     Defendant mounts a final argument that, should the Court find plaintiff's proposed fees to be reasonable, those fees should be reduced insofar as they relate to the 2017 HOD, to account for plaintiff's limited success on the merits in those proceedings.  *See* Def.'s Opp'n 2017 HOD at 14.  Fees will be awarded in line with defendant's requested rates and, consequently, this argument need not be reached.

2012)); *see also* Tyrka V. Stm. ¶ 30 ("In 14 cases, I have had to file for contempt or threaten to do so after months of failure by the District to comply with fee orders won in litigation.").

Plaintiff is correct that the District's poor payment track record calls for imposition of post-judgment interest.  Indeed, this Court has characterized the District's history of refusing full and timely payments of attorneys' fees as "disgraceful."  *Thomas*, 908 F. Supp. 2d at 246.  At the same time, however, plaintiff asks for too much by requesting a flat fee of thousands of dollars for each month of delayed payment, for she "does not cite any example of a court in this Circuit ordering such a severe penalty at this stage of litigation."  *Brown v. Dist. of Columbia*, 80 F. Supp. 3d 90, 102 (D.D.C. 2015) (refusing to impose penalty of $2,000 per month).  "Instead, the Court will award post-judgment interest pursuant to 28 U.S.C. § 1961(a)," *id.*, which sets a statutory rate for interest on "any money judgment in a civil case recovered in a district court," 28 U.S.C. § 1961(a) (providing that "interest shall be calculated from the date of the entry of the judgment"); *see also Allen v. Dist. of Columbia*, 969 F.3d 397, 402 (D.C. Cir. 2020) (explaining that "'any money judgment' includes an award of attorneys' fees" (quoting *Akinseye v. District of Columbia*, 339 F.3d 970, 972 (D.C. Cir. 2003))).

## IV.    CONCLUSION

For the foregoing reasons, plaintiff's motions are granted in part.  Having prevailed in her efforts to obtain relief under the IDEA, plaintiff is entitled to reimbursement of reasonable attorneys' fees and litigation costs incurred in pursuing her successful claims.[9]  While plaintiff

---

[9]    As recounted, *supra*, in Part I, those successes encompass plaintiff's administrative proceedings regarding the 2017 and 2019 HODs, the federal district and appellate court challenges to the 2019 HOD, and the ensuing fee litigation to recover for the 2017 and 2019 HOD proceedings.  Plaintiff does not attempt to claim fee reimbursement from the appeal of the 2017 HOD challenge to the D.C. Circuit—as is appropriate, because she obtained no relief there—but seemingly does request fees relating to the district court litigation.  *See* 2017 HOD Itemization at 4–5 (including as entries "Prepare and file federal complaint, motion to proceed anonymously, and all related documents" on February 23, 2018, and subsequent entries corresponding with the ensuing district court litigation).  Since plaintiff obtained no

met her initial burden of demonstrating that the rates provided by the LSI *Laffey* Matrix are in line with the prevailing rates in the relevant market of complex federal litigation and thus presumptively reasonable, defendant succeeds in rebutting those rates, having offered "equally specific countervailing evidence" that the rates provided by the Fitzpatrick Matrix more accurately represent the prevailing rates in the same market. *Covington*, 57 F.3d at 1107, 1109. To that end, plaintiff is directed to submit new fee and cost award calculations based on the Fitzpatrick Matrix rates, taking into account her attorneys' levels of experience during the relevant periods of the proceedings, and including the work done since her initial motions for fees, with a brief opportunity for defendant to review those new calculations.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  January 23, 2023

_____
BERYL A. HOWELL
Chief Judge

---

relief in that federal court action—as she concedes, *see* Pl.'s Rep. 2017 HOD at 2—she cannot be said to have prevailed and thus is not entitled to attorneys' fees under the IDEA for that litigation.  When plaintiff resubmits her attorneys' fee and cost award calculations as directed in the accompanying Order, she is to take this into account.